Megan A. Maitia (Bar No. 285271)
megan@summallp.com
Hayley E. Huntley (Bar No. 351438)
hayley@summallp.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117 South
Pasadena, CA 91030
Tel.: (213) 260-9455
*Attorneys for Defendants*
*Christian Combs and Sean Combs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| GRACE O'MARCAIGH, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIAN COMBS, an individual, SEAN COMBS, an individual, and JOHN and JANE DOES 1–10 and ABC CORPORATIONS 1–10,<br><br>Defendants. | Case No.: 25-cv-03650-DMG (MAAx)<br><br>**DECLARATION OF SEAN COMBS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date: August 29, 2025<br>Time: 9:30 a.m.<br>Judge: Dolly M. Gee<br>Courtroom: 8C |

## DECLARATION OF SEAN COMBS

I, SEAN COMBS, declare as follows:

1.    I have personal knowledge of, and would be able to testify competently regarding, all of the facts in this declaration, unless stated upon information and belief, and as to those matters, I believe them to be true.

2.    I submit this declaration in support of Defendants' motion to dismiss the Complaint, dated April 4, 2024, in the above-captioned action for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted against any of the Defendants. A copy of the Complaint is attached hereto as Exhibit A.

3.    Since 2020, I have been a citizen, permanent resident, and domiciliary of the State of Florida.

4.    I am currently incarcerated in the Federal Detention Center in Brooklyn, New York. I have been housed in that facility since on or about September 17, 2024.

5.    Prior to my arrest, I conducted my day-to-day business affairs from the State of Florida.

6.    Since 2020, I have operated under a State of Florida driver license.

7.    Since 2020, I have been registered to vote in the State of Florida.

8.    Since 2020, I have filed my individual federal and state tax returns in the State of Florida. I also file a non-resident California tax return for certain passive income that I earn.

9.    I was a citizen, permanent resident, and domiciliary of the State of Florida at all times relevant to the allegations in the Complaint.

10.    I was a citizen, primary resident, and domiciliary of the State of Florida when Plaintiff filed the Complaint in the Superior Court of the State of California, County of Los Angeles, and when this action was removed to the United States District Court for the Central District of California, Western Division.

11.    Paragraphs 23 through 26 of the Complaint specifically reference a yacht charter agreement for the vessel known as the "Victorious" (the "MYBA Charter

Agreement"). Plaintiff claims the torts allegedly committed against her by Defendants in or about December 2022 occurred on that yacht while it was in international waters near the U.S. Virgin Islands.

12. A minimally redacted copy of the MYBA Charter Agreement, dated November 17, 2022, between September Yachting Limited, on the one hand, and JCMUS Inc., on the other hand, in addition to the "Addendum 1" thereto, are attached hereto as Exhibit B.

13. The MYBA Charter Agreement refutes two matters incorrectly alleged in the Complaint. First, Paragraph 19 of the Complaint incorrectly alleges that the "owne[r]" of the Victorious is "Fraser." Victorious is owned by September Yachting Limited, located in the Cayman Islands.

14. Second, Paragraph 25 of the Complaint incorrectly alleges that I chartered the yacht Victorious. It was chartered by JCMUS Inc.

15. I am neither a signatory nor a party to the MYBA Charter Agreement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on Wednesday, July 23, 2025

SEAN COMBS

2

# EXHIBIT A

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/04/2024 9:37 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

**RODNEY S. DIGGS (SBN 274459)**
rdiggs@imwlaw.com
**TYRINE S. AMAN (PL 504978)**
taman@imlwaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
**A Professional Law Corporation**
444 South Flower Street, Suite 3200
Los Angeles, California 90071
Telephone:    (213) 489-0028
Facsimile:    (213) 489-0552

**TYRONE A. BLACKBURN, ESQ.** (*pro hac vice pending*)
tblackburn@tablackburnlaw.com
**T. A. Blackburn Law, PLLC**
1242 E. 80th St 3rd Floor
Brooklyn, NY 11236
Telephone: (347) 427-5999

Attorneys for Plaintiff, **GRACE O'MARCAIGH**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| GRACE O'MARCAIGH,  an individual,<br><br>   *Plaintiff,*<br><br>  vs.<br><br>CHRISTIAN COMBS, an individual, SEAN COMBS, an individual, and JOHN and JANE DOES 1-10 and ABC CORPORATIONS.  1-10.<br><br>   *Defendants.* | CASE NO.:   24STCV08571<br><br>**COMPLAINT FOR DAMAGES**<br><br> **1. Assault**<br> **2. Battery**<br> **3. Sexual Assault**<br> **4. Premises Liability**<br> **5. Aiding and Abetting**<br> **6. Intentional Infliction of Emotional Distress**<br> **7. Negligent Infliction of Emotional Distress**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff GRACE O'MARCAIGH ("PLAINTIFF"), by and through her attorney of record, allege as follows:

## PARTIES

1. Plaintiff GRACE O'MARCAIGH (hereinafter "PLAINTIFF") is a European Caucasian female who worked as a Stewardess in the Yachting Industry since 2018.

2.       PLAINTIFF's love of yachting started at an early age and was the foundation on which she had built her career.

3.       Through yachting, PLAINTIFF has traveled the world, met many new friends and colleagues, and enjoyed a very successful career.

4.       Throughout her career, PLAINTIFF has always worked well in teams and received high praises and great feedback from her managers and colleagues.

5.       PLAINTIFF also consistently received exemplary reviews from her clients for her excellent customer service as well as glowing references over the past few years.

6.       PLAINTIFF has consistently received promotions and has never been rejected for any position she has applied for.

7.       Prior to being sexually assaulted by Defendant Christian Combs (hereinafter "DEFENDANT C. COMBS"), PLAINTIFF planned to work the entirety of her career in hospitality and the yachting industry. Unfortunately, those plans have been derailed due to the trauma PLAINTIFF continues to have as a result of the assault.



Christian "King" Combs

COMPLAINT FOR DAMAGES

8.    DEFENDANT C. COMBS is a twenty-five-year-old autotuned and heavily edited rapper.

9.    Unfortunately, as the saying has it, the apple does not fall far from the tree.

10.    Defendant Sean Combs ("DEFENDANT S. COMBS"), who has also been accused of several acts of sexual assault, rape, sexual violence, and drugging, among other deplorable conduct, is the father of DEFENDANT C. COMBS, who has seemingly taken after his father and the family business of reckless partying, drugging others, sexual violence, and other illegal conduct.

11.    Specifically, DEFENDANT C. COMBS is the second child of billionaire DEFENDANT S. COMBS and his late ex-partner, Kim Porter.

12.    Upon information and belief, DEFENDANT C. COMBS resides in the city of Beverly Hills, California in Los Angeles County, California.



Sean Combs

13.    Defendant Sean Combs (hereinafter "DEFENDANT S. COMBS") is a rapper and record executive popularly known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, Brother Love, or Love.

COMPLAINT FOR DAMAGES

14.    DEFENDANT S. COMBS became famous in the early 1990s with his record label Bad Boy Records. He rose to prominence in the music and entertainment industry over the decades and is regularly revered as a hip-hop mogul and top rap/hip-hop producer in the industry.

15.    Upon information and belief, DEFENDANT S. COMBS resides in the city of Beverly Hills, California in Los Angeles County, California.

16.    During the relevant period, Defendants John and Jane Does 1-10 are currently unknown individuals and/or employees who aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment, Defendants ratified, embraced, and added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

17.    During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities who employed Plaintiff or aided and/or abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## JURISDICTION

18.    This Court has personal jurisdiction over the Defendants under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

   a.    The transaction of any business within the state;

   b.    The making of any contract within the state;

   c.    The commission of a tortious act within this District; and

   d.    The ownership, use, or possession of any real estate in this state.

## FACTS COMMON TO ALL CAUSES OF ACTION

19.    In or around July 2022, GRACE O'MARCAIGH ("PLAINTIFF") was working on Victorious, a superyacht built by "Akyacht" and owned and operated by Fraser.

20.    PLAINTIFF worked as a temporary Second Stewardess for the company Equiom FW049 IC.

21.    PLAINTIFF worked in her temporary position for a month on Victorious then was subsequently offered a permanent position due to her professionalism, passion for the job, and

great customer service skills.

22.     In or about September 2022, PLAINTIFF had been part of a dedicated team at the Monaco Boat Show tasked with selling charters for Victorious to high-net-worth clients such as C. COMBS and S. COMBS.

23.     In December 2022, PLAINTIFF and her team were advised that the yacht had been successfully chartered for the 2022 holiday period.

24.     PLAINTIFF changed her personal holiday family plans to accommodate the charter service and flew to St. Martin to prepare the yacht for service.

25.     PLAINTIFF soon learned the client who chartered the yacht was DEFENDANT S. COMBS and his family.

26.     DEFENDANT S. COMBS leased the yacht, and had full control of the staff and premises of the yacht.

27.     Although PLAINTIFF was used to working in discreet and VIP environments, this was one of her first times working with an "A-list celebrity." Because of this, PLAINTIFF and the rest of the team assigned to the yacht were determined to make the holidays special for DEFENDANT S. COMBS and his family.

28.     For the duration of the trip, PLAINTIFF was assigned the 6:00 p.m. to 6:00 a.m. shift along with one other crew member. This shift, commonly known as the "late shift," was very busy.

29.     Late shift duties included dinner and drink service for the clients for the entire 12-hour period. Dinner and drink service had to be carried out with minimum staff support or backup during the night shift since only two individuals were assigned.

30.     Although DEFENDANT S. COMBS was always typically on the yacht, his sons, DEFENDANT C. COMBS and Justin Combs, were staying in a luxury villa nearby but joined their father aboard the yacht most evenings.

31.     During the second week of the charter service, there was a significant amount of partying and drug use, which caused the guests to stay up throughout the night.

32.     The make-up of the yacht quickly evolved from just DEFENDANT S. COMBS and his family to include a constant rotation of suspected sex workers and other A-List celebrities such

as French Montana and actor Cuba Gooding, Jr.

33.    DEFENDANT S. COMBS turned what was sold as a wholesome family excursion into a hedonistic environment.

34.    According to PLAINTIFF, it resulted in an unexpected increase in workload for her and her colleagues as well as unwanted exposure to unlawful drug use, sex work, and general chaos.

35.    It also created an extremely hazardous environment; for example, guests often demanded drink service until 6:00 a.m., staff was often treated with disrespect, suspected sex workers were sprawled out unconscious about the yacht, and it was difficult to distinguish which bottles of alcohol were laced with drugs and which bottles were not.

36.    It is important to note that as a bartender, PLAINTIFF understands the impact of alcohol and the likelihood that a person would not generally become intoxicated following one mixed drink. Because of this, PLAINTIFF found it very suspicious that after one shot of DeLeon tequila or one mixed drink, various women on the yacht would be falling over themselves, panicking, or passing out. This led PLAINTIFF to reasonably believe that the alcohol given to these women was likely laced with drugs.

37.    PLAINTIFF was aware that Rodney Jones ("Mr. Jones"), a producer who was employed to work on the Love Album: Off the Grid, was required to be on standby for musical recordings often late into the night.

38.    The Love Album: Off the Grid is the fifth studio album by American rapper and record producer Sean "Diddy" Combs, released on September 15, 2023.

39.    Mr. Jones was accepted as an extended member of the service staff and spent time with PLAINTIFF at the service bar and piano room, where he played the piano.

40.    On or about the early morning of December 28, 2022, the evening shift started as normal. At about 5:00 a.m., PLAINTIFF was messaged on the on-duty phone that DEFENDANT C. COMBS would be joining the yacht by tender, a smaller craft that runs back and forth from a larger yacht and used for servicing and providing support and entertainment to a private or charter yacht. DEFENDANT C. COMBS wanted to be brought over to Victorious to record in the yacht's makeshift recording studio with Mr. Jones.

41.     Although it was not unheard of for DEFENDANT C. COMBS to come aboard at such a late hour, he usually stayed at his dwelling offshore overnight, particularly when there was no party on board on any given night.

42.     DEFENDANT C. COMBS arrived in the tender and was heavily intoxicated. PLAINTIFF suspects DEFENDANT C. COMBS was intoxicated from a mixture of narcotics and alcohol.

43.     Upon entering the recording studio, DEFENDANT C. COMBS immediately started ordering that tequila shots be poured from a bottle of alcohol he may have brought onto the yacht.

44.     Ironically, DEFENDANT C. COMBS was playing Cassie's "Me and U" was playing in the background. Cassie was an artist under S. COMBS and was his former love interest who also accused S. COMBS of serious sexual and mental abuse.

45.     In the studio, DEFENDANT C. COMBS asked that PLAINTIFF bring the shots to the recording studio/sundeck, and PLAINTIFF obliged as she was the only serving steward at the time.

46.     PLAINTIFF noticed immediately that he was particularly attentive with her, which she considered very inappropriate.

47.     However, PLAINTIFF began to become concerned when he insisted that she take shots of the tequila he may have brought on board the yacht.

48.     Under pressure and wanting to be polite, PLAINTIFF obliged. Prior to this, the Plaintiff witnessed DEFENDANT S. COMBS create a "Black Santa Video," which showed him demanding the Captain, various head of departments, and crew take a shot of Tequila with him.

49.     As this was a pattern established by the Captain of the yacht and DEFENDANT S. COMBS, Plaintiff felt comfortable knowing that Mr. Jones was present and didn't think anything more of it. She felt that she would take one shot, and he would let her return to the pantry.

50.     According to PLAINTIFF, at this point, the mood changed, and things became sinister. DEFENDANT C. COMBS insisted that PLAINTIFF stay chatting and that she sit beside him.

51.     PLAINTIFF resisted and remained polite, asking to leave. DEFENDANT C.

COMPLAINT FOR DAMAGES

COMBS became aggressive and insisted that PLAINTIFF take a further shot and sit beside him.

52.    At this point, DEFENDANT C. COMBS violently grabbed PLAINTIFF's arm and began hurting her. He pulled PLAINTIFF to the seat beside him and prevented her from getting up.

53.    PLAINTIFF insisted that she had to return to the pantry, but her pleas fell on deaf ears. Angered, DEFENDANT C. COMBS forced PLAINTIFF to take another shot.

54.    PLAINTIFF was quite scared and realized she was in a very dangerous situation. PLAINTIFF was also feeling the effect of the tequila shots and quickly suspected that the Tequila was spiked.

55.    At this point, the situation escalated, and PLAINTIFF started to be physically assaulted by DEFENDANT S. COMBS. He touched PLAINTIFF's legs, breasts, anus, and vagina. He also tried to kiss her and proceeded to kiss her neck, face, and hands.

56.    The timeline at this point is very blurry and vague to PLAINTIFF, as she does not recall exactly what happened to her due to the effects of the spiked Tequila shots.

57.    Luckily for PLAINTIFF, due to DEFENDANT S. COMBS' insistence on Mr. Jones recording everything, Mr. Jones has an audio recording of DEFENDANT C. COMBS drugging and sexually assaulting PLAINTIFF.

58.    Below is the transcript of DEFENDANT C. COMBS forcing PLAINTIFF to consume the suspected laced shots of DeLeon tequila:

Audio 1

**DEFENDANT C. COMBS:** Yo, it's shot o'clock.

**PLAINTIFF:** No, I'm not doing shots. Christian?

**DEFENDANT C. COMBS:** Everybody, we got to take a shot.


Audio 2

**PLAINTIFF:** I'll just put the ledge.

**DEFENDANT C. COMBS:** No, no, no. Take the whole thing.

**PLAINTIFF:** No, you will take it as well.

**DEFENDANT C. COMBS:** Take the whole shot.

**PLAINTIFF:** I'm only doing it as long as you take it as well.

**DEFENDANT C. COMBS:** I ain't going to lie, I'm not taking nothing. Please, please, take the shot.

**PLAINTIFF:** You are drugging me?

**DEFENDANT C. COMBS:** Take the shot. Hey, yo, play another beat one time because now--

59.     Below is the transcript of DEFENDANT C. COMBS' sexual assault of PLAINTIFF:

[Cassie *Me & U* featuring P. Diddy and Young Joc song playing in the background]

**PLAINTIFF:** This is not an offer.

**DEFENDANT C. COMBS:** You said what?

**PLAINTIFF:** I can't. I'm swapping out. I can't do it. I'm sorry, darling.

**DEFENDANT C. COMBS:** Nah, we need you.

**PLAINTIFF:** I'm going to stop. Stop. I have to go. I have to go. Honestly, I'm like already losing sleep. I have to go now.

**DEFENDANT C. COMBS:** You're the best one on this ship, though.

**PLAINTIFF:** What do you mean?

**DEFENDANT C. COMBS:** Who's going to replace you?

**PLAINTIFF:** Who's going to replace me?

**DEFENDANT C. COMBS:** Fuck that. That's going to be trash, though. You feel me?

**PLAINTIFF:** Excuse me, you don't touch my legs like that. I'll move my legs where I want to.

**PLAINTIFF:** If I want to do this, then I will. You don't touch my legs like that.

**DEFENDANT C. COMBS:** Listen, you and everybody in the crew, it's great.

**PLAINTIFF:** I can't. I have to go down. I have to go down.

**DEFENDANT C. COMBS:** No. Yo, tell me, listen.

**PLAINTIFF:** What?

**DEFENDANT C. COMBS:** Like say you're just vibing with me the whole time.

**PLAINTIFF:** I can't. I promise you, I wish I could, but I can't. Unless I say that you guys

requested me.

**DEFENDANT C. COMBS:** Yes, who can I talk to right now? Who can I talk to? I'm going to say I requested you right now.

**PLAINTIFF:** Well, you can take your hand off my ass for the first thing.

60.     According to the PLAINTIFF, she said she would have to be requested because she knew anyone of authority who would approve the request was asleep. Defendant C. Combs would not have been able to contact them, and PLAINTIFF could then leave.

61.     After being assaulted in the recording studio, PLAINTIFF attempted to resume her duties that night.

62.     She made her way to the pantry, where she met another steward who was assigned to take over the shift. Her colleague recognized that PLAINTIFF was visibly intoxicated, in shock, and trying to finish the shift.

63.     Shortly after returning to the pantry, DEFENDANT C. COMBS called for PLAINTIFF. He went looking for her and demanded that she find him a place to sleep on the yacht.

64.     At such a late hour of the night, there were no spare cabins for DEFENDANT C. COMBS to stay in. Despite this, he refused to go back to shore. The most acceptable place for him to sleep that night was in the cinema.

65.     PLAINTIFF directed him to the cinema, which was commonly used as an extra sleeping area. The cinema has one door to exit and enter. PLAINTIFF entered the room, and DEFENDANT C. COMBS blocked her from exiting.

66.     PLAINTIFF retreated to a corner of the room, and DEFENDANT C. COMBS became physical and extremely aggressive. He cornered PLAINTIFF and started to grope her. PLAINTIFF pushed him back constantly.

67.     DEFENDANT C. COMBS then took off all of his clothes.  His penis was erect, and he grabbed her arms and was trying to force PLAINTIFF to perform oral copulation on him.

68.     The PLAINTIFF began fighting DEFENDANT C. COMBS, and not long after, her partner on board entered the cinema. This startled DEFENDANT C. COMBS, and the PLAINTIFF was finally able to leave.

COMPLAINT FOR DAMAGES

69.     The PLAINTIFF'S partner became concerned and went looking for the PLAINTIFF after she had not returned to her room after her shift had ended.

70.     The morning after, PLAINTIFF complained to the yacht's captain, Captain Petar Milkov.

71.     Captain Milkov berated the PLAINTIFF.  He lacked compassion or concern, failed to investigate, and insisted that the PLAINTIFF was probably voluntarily partying with the guests. She was not.

72.     Captain Milkov added insult to injury by assigning PLAINTIFF to work in front of the house, which required personally serving DEFENDANT C. COMBS while they were on the yacht. PLAINTIFF was not provided an option to be isolated or not have to serve DEFENDANT C. COMBS.

73.     PLAINTIFF was twenty-five years old at the time of the attack.

74.     Based on information and belief, DEFENDANT S. COMBS' employees, including his drug mule Brendan Paul, his Chief of Staff Kristina Khorram, and his second in line Frankie Santella, learned of what occurred and informed DEFENDANT S. COMBS.

75.     Shortly after, Captain Milkov received a generous tip from DEFENDANT S. COMBS in order to keep Captain Milkov quiet and keep him from protecting PLAINTIFF or taking action on her behalf.

76.     Only a few members of the ship's staff were required to write statements. PLAINTIFF and her partner were the only two staff members not interviewed and not asked to write a statement.

**AS A RESULT OF DEFENDANT C. COMBS' SEXUAL ASSAULT PLAINTIFF HAS SUFFERED**

77.     Below are images of PLAINTIFF's bruises because of DEFENDANT C. COMBS violently grabbing her and attempting to force her to perform oral copulation:

COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT FOR DAMAGES





COMPLAINT FOR DAMAGES

78.     According to PLAINTIFF, the past year (2023) has been the most deeply traumatizing time of her life.

79.     After DEFENDANT C. COMBS' sexual assault and the subsequent coverup orchestrated by DEFENDANT S. COMBS and his staff, PLAINTIFF was isolated and retaliated against on the Yacht.

80.     This isolation and retaliation finally resulted in PLAINTIFF's termination by Captain Petar Milkov on or around May 10, 2023.

81.     In addition to losing her employment, PLAINTIFF also lost her longtime partner, with whom she had planned a future. PLAINTIFF'S partner was never the same after seeing PLAINTIFF's bruises on her body because of DEFENDANT C. COMBS' sexual assault and having to deal with the mental and emotional ramifications, so they separated.

82.     PLAINTIFF's mental health deteriorated to the point that she was medicated and required intensive therapy. Additionally, she fell into a deep depression and was unable to fully carry out her maid of honor duties at the wedding of her only sister in June 2023, which she had been looking forward to doing for over eighteen months.

83.     PLAINTIFF's anxiety and panic attacks prevented her from securing another permanent position in the Yachting industry in 2023.

84.     PLAINTIFF also developed a severe eating disorder as a result of the attack due to the shame and mental warfare she was experiencing that affected her body image and appetite.

85.     On several occasions, the effects of DEFENDANT C. COMBS' sexual assault led PLAINTIFF to have severe suicidal ideations.

86.     In addition to PLAINTIFF's psychological trauma, her physical health began to deteriorate.  PLAINTIFF had several epileptic seizures. These seizures resulted in PLAINTIFF losing her ability to privately do things she was accustomed to doing alone. PLAINTIFF now requires supervision to do basic activities like swimming and bathing and is not required to inform people in public places that she is epileptic and requires supervision.

## PREMISES LIABILITY AND
## AIDING AND ABETTING FOR DEFENDANT S. COMBS

87.     According to the PLAINTIFF, DEFENDANT S. COMBS chartered the Yacht and

assumed responsibility for the actions of himself, his guests, and his family.  Upon information and belief, DEFENDANT S. COMBS fostered and encouraged an environment of debauchery.  There was always a party atmosphere filled with suspected sex workers, suspected laced alcohol, violence, and sheer disrespect of women and the Yachts crew.

88.    Upon information and belief, DEFENDANT S. COMBS did not have any safeguards in place to ensure there was no excessive drug use, no excessive drinking, and no importation of purported sex workers.

89.    DEFENDANT S. COMBS' apparent failure to ensure there was a safe environment on the Yacht was intentional.  On one occasion, Kristina Khorram, DEFENDANT S. COMBS' chief of staff, instructed Plaintiff to ensure that the entire bar area was stocked with DeLeon Tequila and Ciroq Vodka.  It was important for DEFENDANT S. COMBS to be surrounded by these bottles.  On this occasion, DEFENDANT S. COMBS was visibly intoxicated.

90.    PLAINTIFF is unsure if he was high from drugs, alcohol, or both.  Out of nowhere, Kristina Khorram quickly approached PLAINTIFF and ordered her to remove all the Ciroq and DeLeon bottles.  She was informed that (REDACTED 1)[1] and (REDACTED 2)[2] were boarding the Yacht.  At that point, DEFENDANT S. COMBS exited the room, (REDACTED 1) and (REDACTED 2) entered the room, and DEFENDANT S. COMBS returned, sober, holding his newborn daughter.  This all occurred within less than an hour.

91.    This incident led PLAINTIFF to believe that DEFENDANT S. COMBS knew right from wrong and had the ability and wherewithal to determine that the environment on the Yacht was safe.  He intentionally created an unsafe environment that gave license to DEFENDANT C. COMBS to believe that he was free to sexually assault PLAINTIFF.

92.    DEFENDANT S. COMBS allowed DEFENDANT C. COMBS and his friends to behave carelessly, as they observed and mimicked his actions.

93.    According to PLAINTIFF, on many occasions, she witnessed young girls visiting the boat, stay for less than 30 minutes in a cabin with a guest and leave. This led PLAINTIFF to believe these girls were sex workers.

---

[1] A famous female Comedian.
[2] Wife of a famous comedian and founder of a New York-based charity.

COMPLAINT FOR DAMAGES

94.     According to PLAINTIFF, DEFENDANT S. COMBS routinely engaged in and encouraged open illegal drug use while on the yacht.

95.     On several occasions, PLAINTIFF witnessed DEFENDANT S. COMBS smoking marijuana while receiving services from the Yachts crewmembers.  He would not allow them to leave as he smoked, and as a result, several crew members had a contact high.

96.     According to PLAINTIFF, in another incident, DEFENDANT S. COMBS had several women whom Plaintiff suspected of being sex workers on the yacht.  In one incident, a girl was extremely upset and ran to the lower deck, locked herself in the massage room, and was hysterically crying.  She said she did not feel safe and wanted to leave.  The crew was alerted of this. At this time, Sarah Chapman, one of S. COMBS' children's mother, was due to have a massage, so PLAINTIFF had to attempt to remove this young woman from the massage room, but she was very reluctant as she felt unsafe.  Eventually, she left.

97.     According to PLAINTIFF, on another occasion, DEFENDANT C. COMBS lost a large bag of marijuana and required the crew to search the yacht for it.

98.     According to PLAINTIFF, on another occasion, while Hulu was filming, DEFENDANT S. COMBS and his friends, including Yung Miami, were playing a game called "Careesha Please." DEFENDANT S. COMBS was dared to expose himself.  At that point, DEFENDANT S. COMBS stood up, pulled down his pants, and exposed his penis.  PLAINTIFF was standing beside the table and heard the commotion.  DEFENDANT S. COMBS' mother was sitting beside him.  Plaintiff then returned to the pantry and refused to stand by outside of the pantry for the duration of that service period.

99.     According to PLAINTIFF, on another occasion during New Year's Eve, DEFENDANT S. COMBS had guests who stayed until late afternoon the next day.  A fight broke out between Justin Combs' friends.  They physically assaulted each other and walked around the boat topless, screaming.  PLAINTIFF and the crew felt very uneasy in this environment. At one point, one of DEFENDANT S. COMBS' guests shoved Plaintiff's chief steward on the stairs and threw an object across the bar.

100.     According to PLAINTIFF, on another occasion, she witnessed an argument between a woman and a man. The man was upset and proceeded to physically assault her.

COMPLAINT FOR DAMAGES

101.    According to PLAINTIFF, DEFENDANT S. COMBS' assistant and noted drug mule, Brendan Paul, once came down to the pantry and was laughing uncontrollably. He told PLAINTIFF that he had to sit and watch DEFENDANT S. COMBS have sex with multiple women. He said DEFENDANT S. COMBS wanted him present just in case he needed him to get him something while he was in the middle of the act. PLAINTIFF questioned why Brendan would want to work for DEFENDANT S. COMBS if he was required to do such things, and Brendan replied that DEFENDANT S. COMBS was a good link to have in the industry.

102.    According to PLAINTIFF, when DEFENDANTS S. COMBS chartered the Yacht, she witnessed and served several "A-list" guests on board, including rappers (REDACTED 3)[3], (REDACTED 4)[4], (REDACTED 5)[5], and (REDACTED 6)[6], as well as (REDACTED 7)[7] and Cuba Gooding Jr.

103.    According to PLAINTIFF, Cuba Gooding Jr. was extremely unpleasant to serve. He sat at the bar and made derogatory comments to PLAINTIFF. He was visibly intoxicated, and she was in the room and witnessed him inappropriately touching Producer Rodney Jones, who at the time was working on The Love Album.

104.    As a result of the conduct of S. COMBS and C. COMBS, PLAINTIFF continues to suffer serious harm.

**FIRST CAUSE OF ACTION**
**ASSAULT**
**(Against Defendant C. Combs)**

105.    The PLAINTIFF realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

106.    On or around December 28, 2022, DEFENDANT C. COMBS assaulted PLAINTIFF by violently grabbing her, groping her legs, breasts, anus, and vagina.

107.    He also tried to kiss her and proceeded to kiss her neck, face, and hands.

108.    Prior to the assault, DEFENDANT C. COMBS also forced PLAINTIFF to drink

---

[3] Philadelphia Rapper
[4] 30-year-old Atlanta rapper who rose to prominence following the release of his 2017 mixtapes
[5] 25-year-old British Rapper
[6] Moroccan Rapper signed to Bad Boy Records, and Maybach Music Group
[7] Former Model and CEO of Female Urban Clothing Brand

COMPLAINT FOR DAMAGES

alcohol which she now believes was laced with drugs.

109.    DEFENDANT C. COMBS also exposed himself to PLAINTIFF, baring his naked, erect penis, trying to physically force PLAINTIFF to perform oral copulation.

110.    PLAINTIFF was seriously bruised as a result of the attack.

111.    Plaintiff did not consent to any of the sexual assault or misconduct and was drugged/intoxicated by DEFENDANT C. COMBS.

112.    Through the aforementioned acts, DEFENDANT C. COMBS caused harmful or offensive contact with an intimate part of PLAINTIFF's body as defined by California Civil Code § 1708.5.

113.    Through the aforementioned acts, DEFENDANT C. COMBS caused harmful or offensive contact between an intimate part of Defendant's body and PLAINTIFF's body as defined by California *Civil Code* § 1708.5.

114.    Through the aforementioned acts, DEFENDANT C. COMBS caused PLAINTIFF an imminent apprehension of harmful or offensive contact with an intimate part of Plaintiff's body, and sexually offensive contact with Plaintiff resulted.

115.    As a result of DEFENDANT C. COMBS' conduct, PLAINTIFF has suffered economic injury, all to PLAINTIFF's general, special, and consequential damage in an amount to be proven at trial, but in no event is less than the minimum jurisdictional amount of this Court.

116.    As a result of DEFENDANT C. COMBS' above-described conduct, PLAINTIFF has suffered and continues to suffer great emotional distress and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

117.    As described in this Complaint, DEFENDANT C. COMBS' conduct was done with oppression, fraud, and/or malice, warranting significant damages, including punitive damages.

## SECOND CAUSE OF ACTION
### BATTERY
### (Against Defendant C. Combs)

118.    The plaintiff realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

119.    On or around December 28, 2022, DEFENDANT C. COMBS sexually battered

COMPLAINT FOR DAMAGES

PLAINTIFF by violently grabbing her, groping her legs, breasts, anus, and vagina.

120.    He also tried to kiss her and proceeded to kiss her neck, face, and hands.

121.    Prior to the assault, DEFENDANT C. COMBS also forced PLAINTIFF to drink alcohol, which she now believes was laced with drugs.

122.    DEFENDANT C. COMBS also exposed himself to PLAINTIFF, baring his naked, erect penis, trying to physically force PLAINTIFF to perform oral copulation.

123.    PLAINTIFF was seriously bruised as a result of the attack.

124.    Plaintiff did not consent to any of the sexual assault or misconduct and was drugged/intoxicated by DEFENDANT C. COMBS.

125.    Through the aforementioned acts, DEFENDANT C. COMBS caused harmful or offensive contact with an intimate part of PLAINTIFF's body as defined by California Civil Code § 1708.5.

126.    Through the aforementioned acts, DEFENDANT C. COMBS caused harmful or offensive contact between an intimate part of Defendant's body and PLAINTIFF's body as defined by California *Civil Code* § 1708.5.

127.    Through the aforementioned acts, DEFENDANT C. COMBS caused PLAINTIFF an imminent apprehension of harmful or offensive contact with an intimate part of Plaintiff's body, and sexually offensive contact with Plaintiff resulted.

128.    As a result of DEFENDANT C. COMBS' conduct, PLAINTIFF has suffered economic injury, all to PLAINTIFF's general, special, and consequential damage in an amount to be proven at trial, but in no event is less than the minimum jurisdictional amount of this Court.

129.    As a result of DEFENDANT C. COMBS' above-described conduct, PLAINTIFF has suffered and continues to suffer great emotional distress and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

130.    As described in this Complaint, DEFENDANT C. COMBS' conduct was done with oppression, fraud, and/or malice warranting significant damages, including punitive damages.

///

///

COMPLAINT FOR DAMAGES

### THIRD CAUSE OF ACTION
#### SEXUAL ASSAULT
#### (Against Defendant C. Combs)

131. The PLAINTIFF realleges and incorporates by reference as though set forth fully at this point, each and every allegation contained herein.

132. The plaintiff realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

133. On or around December 28, 2022, DEFENDANT C. COMBS sexually battered PLAINTIFF by violently grabbing her, groping her legs, breasts, anus, and vagina.

134. He also tried to kiss her and proceeded to kiss her neck, face, and hands.

135. Prior to the assault, DEFENDANT C. COMBS also forced PLAINTIFF to drink alcohol which she now believes was laced with drugs.

136. DEFENDANT C. COMBS also exposed himself to PLAINTIFF, baring his naked, erect penis, trying to physically force PLAINTIFF to perform oral copulation.

137. PLAINTIFF was seriously bruised as a result of the attack.

138. Plaintiff did not consent to any of the sexual assault or misconduct and was drugged/intoxicated by DEFENDANT C. COMBS.

139. Through the aforementioned acts, DEFENDANT C. COMBS caused harmful or offensive contact with an intimate part of PLAINTIFF's body as defined by California Civil Code § 1708.5.

140. Through the aforementioned acts, DEFENDANT C. COMBS caused harmful or offensive contact between an intimate part of Defendant's body and PLAINTIFF's body as defined by California *Civil Code* § 1708.5.

141. Through the aforementioned acts, DEFENDANT C. COMBS caused PLAINTIFF an imminent apprehension of harmful or offensive contact with an intimate part of Plaintiff's body, and sexually offensive contact with Plaintiff resulted.

142. As a result of DEFENDANT C. COMBS' conduct, PLAINTIFF has suffered economic injury, all to PLAINTIFF's general, special, and consequential damage in an amount to be proven at trial, but in no event is less than the minimum jurisdictional amount of this Court.

143. As a result of DEFENDANT C. COMBS' above-described conduct, PLAINTIFF

has suffered and continues to suffer great emotional distress and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

144.    As described in this Complaint, DEFENDANT C. COMBS' conduct was done with oppression, fraud, and/or malice warranting significant damages, including punitive damages.

### FOURTH CAUSE OF ACTION
### PREMISES LIABILITY
### (Against Defendant S. Combs)

145.    The PLAINTIFF realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

146.    DEFENDANT S. COMBS leased, occupied and/or controlled the yacht on which PLAINTIFF was sexually assaulted and battered on the date and time PLAINTIFF was sexually assaulted and battered.

147.    DEFENDANT S. COMBS had control over the staff and the happenings aboard the yacht.

148.    DEFENDANT S. COMBS completely controlled the premises of the yacht, allowing who he wanted on, throwing parties, having sex workers come to service his guests, allowing fights to occur, and nonstop illegal drug use and alcohol use.

149.    DEFENDANT S. COMBS had a valid lease giving him control of the yacht for the entire holiday season and occupied the yacht in order to throw lawless parties and allow illegal activities to occur.

150.    Over the 2022 holiday season, DEFENDANT S. COMBS used the yacht that he leased and had control over as a location for mayhem, including illegal prostitution, drug use, and reckless partying.

151.    DEFENDANT S. COMBS was negligent in the use or maintenance of the yacht.

152.    DEFENDANT S. COMBS allowed and encouraged the people aboard his yacht, including his son C. COMBS to engage in the drugs and reckless behavior while aboard the yacht.

153.    PLAINTIFF was sexually assaulted and battered by DEFENDANT S. COMBS' son, C. COMBS when he forced her to drink a likely laced drink, violently grabbed her, groped her, exposed his erect penis to her, and tried to force her to perform oral copulation on him all

while on the premises of the yacht in question.

154.    DEFENDANT C. COMBS also tried to kiss her and proceeded to kiss her neck, face, and hands.

155.    PLAINTIFF was severely mentally, emotionally, and physically harmed while on the yacht.

156.    DEFENDANT S. COMBS' negligence was a substantial factor in causing PLAINTIFF's harm because of failing to properly use and secure the yacht and for fostering an environment for drug use and assault to occur without ramifications.

157.    Through the aforementioned acts, DEFENDANT S. COMBS caused Plaintiff an imminent apprehension of harmful or offensive contact with an intimate part of PLAINTIFF's body, and sexually offensive contact with PLAINTIFF resulted.

158.    As a result of DEFENDANT S. COMBS' conduct, PLAINTIFF has suffered economic injury, all to PLAINTIFF's general, special, and consequential damage in an amount to be proven at trial, but in no event is less than the minimum jurisdictional amount of this Court.

159.    As a result of DEFENDANT S. COMBS' above-described conduct, PLAINTIFF has suffered and continues to suffer great emotional distress and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

160.    As described in this Complaint, the DEFENDANT S. COMBS' conduct was done with oppression, fraud, and/or malice warranting significant damages, including punitive damages.

**FIFTH CAUSE OF ACTION**
**AIDING AND ABETTING**
**(Against Defendant S. Combs)**

161.    The PLAINTIFF realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

162.    DEFENDANT S. COMBS knew that an assault/battery/sexually assault was being committed and was and going to be committed against PLAINTIFF because he encouraged and fostered an environment and culture to his son and his employees to do whatever they want with PLAINTIFF and the other yacht staff.

163.    S. COMBS provided drugs and alcohol to be used to take advantage of many

COMPLAINT FOR DAMAGES

women on the yacht, including PLAINTIFF.

164.    S. COMBS knew PLAINTIFF had been assaulted because he "paid off" the yacht Captain after hearing of PLAINTIFF's complaint relating to his son DEFENDANT C. COMBS' assault/battery/sexual assault against PLAINTIFF.

165.    DEFENDANT S. COMBS' conduct was a substantial factor in causing harm to PLAINTIFF's harm.

166.    Through the aforementioned acts, DEFENDANT S. COMBS caused PLAINTIFF an imminent apprehension of harmful or offensive contact with an intimate part of PLAINTIFF's body, and sexually offensive contact with PLAINTIFF resulted.

167.    As a result of DEFENDANT S. COMBS' conduct, PLAINTIFF has suffered economic injury, all to PLAINTIFF's general, special, and consequential damage in an amount to be proven at trial, but in no event is less than the minimum jurisdictional amount of this Court.

168.    As a result of DEFENDANT S. COMBS' above-described conduct, PLAINTIFF has suffered and continues to suffer great emotional distress and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

169.    As described in this Complaint, the DEFENDANT S. COMBS' conduct was done with oppression, fraud, and/or malice warranting significant damages, including punitive damages.

### SIXTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (Against Defendant C. Combs)

170.    The PLAINTIFF realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

171.    On or around December 28, 2022, DEFENDANT C. COMBS assaulted PLAINTIFF by violently grabbing her, groping her legs, breasts, anus, and vagina.

172.    Prior to the assault, DEFENDANT C. COMBS also forced PLAINTIFF to drink alcohol which she now believes was laced with drugs.

173.    DEFENDANT C. COMBS also exposed himself to PLAINTIFF, baring his naked, erect penis, trying to physically force PLAINTIFF to perform oral copulation.

174.    He also tried to kiss her and proceeded to kiss her neck, face, and hands.

175.    PLAINTIFF was seriously bruised as a result of the attack.

176.    Defendants' extreme and outrageous conduct alleged in this Complaint, including but not limited to assault, sexual assault, and battery upon Plaintiff, were done in wanton and reckless disregard of such consequences to Plaintiff.

177.    PLAINTIFF now experienced seizures and has to constantly be helped by others for tasks that she could previously do independently.

178.    PLAINTIFF has also been unable to secure another job in the industry she knows and loves, the yachting industry, since she was wrongfully terminated from her position with the Fraser.

179.    PLAINTIFF's relationship with her significant other prematurely ended because her significant other could not bear to deal with the physical and emotional ramifications of the assault by C. COMBS.

180.    DEFENDANT C. COMBS' actions were extreme and outrageous.

181.    As a direct and proximate result of said extreme and outrageous conduct by DEFENDANT C. COMBS, PLAINTIFF did suffer humiliation, mental anguish, and emotional and physical distress and has been hurt and injured in her health, strength, and activity, sustaining an injury to her nervous system and person, all of which have caused, continue to cause and will continue to cause Plaintiff great mental, physical and nervous pain and suffering.

182.    As a result of such severe emotional distress, PLAINTIFF has been generally, specially, and consequentially damaged in an amount to be established according to evidence.

183.    DEFENDANT C. COMBS committed the aforementioned infliction of emotional distress willfully and intentionally and by means of oppression, fraud, and malice and in conscious disregard of PLAINTIFF's rights. Therefore, PLAINTIFF is entitled to an award of exemplary or punitive damages in an amount to be established at trial to meaningfully punish DEFENDANT C. COMBS, thereby deterring similar conduct in the future.

### SEVENTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (Against Defendant C. Combs)

184.    The plaintiff realleges and incorporates by reference, as though set forth fully at

COMPLAINT FOR DAMAGES

this point, each and every allegation contained herein.

185.    The plaintiff realleges and incorporates by reference, as though set forth fully at this point, each and every allegation contained herein.

186.    On or around December 28, 2022, DEFENDANT C. COMBS assaulted PLAINTIFF by violently grabbing her, groping her legs, breasts, anus, and vagina.

187.    Prior to the assault, DEFENDANT C. COMBS also forced PLAINTIFF to drink alcohol which she now believes was laced with drugs.

188.    DEFENDANT C. COMBS also exposed himself to PLAINTIFF, baring his naked, erect penis, trying to physically force PLAINTIFF to perform oral copulation.

189.    He also tried to kiss her and proceeded to kiss her neck, face, and hands.

190.    PLAINTIFF was seriously bruised as a result of the attack.

191.    Defendant's extreme and outrageous conduct alleged in this Complaint, including but not limited to assault, sexual assault, and battery, were negligent.

192.    PLAINTIFF now experienced seizures and has to constantly be helped by others for tasks that she could previously do independently.

193.    PLAINTIFF has also been unable to secure another job in the industry she knows and loves, the yachting industry, since she was wrongfully terminated from her position with the Fraser.

194.    PLAINTIFF was also abandoned by her significant other who could not bear to deal with the physical and emotional ramifications of the assault by DEFENDANT C. COMBS.

195.    As a direct and proximate result of said extreme and outrageous conduct by DEFENDANT C. COMBS, PLAINTIFF did suffer serious emotional distress including humiliation, mental anguish, and emotional and physical distress and has been hurt and injured in her health, strength, and activity, sustaining an injury to her nervous system and person, all of which have caused, continue to cause and will continue to cause PLAINTIFF great mental, physical and nervous pain and suffering.

196.    As a result of such severe emotional distress, PLAINTIFF has been generally, specially, and consequentially damaged in an amount to be established according to evidence.

197.    DEFENDANT C. COMBS committed the aforementioned infliction of emotional

26

distress willfully and intentionally and by means of oppression, fraud, and malice and in conscious disregard of PLAINTIFF's rights. Therefore, PLAINTIFF is entitled to an award of exemplary or punitive damages in an amount to be established at trial to meaningfully punish DEFENDANT C. COMBS, thereby deterring similar conduct in the future.

**PRAYER**

WHEREFORE, PLAINTIFF GRACE O'MARCAIGH prays for judgment against all DEFENDANTS, jointly and severally, as follows:

1.     For compensatory, special, and general damages according to proof;

2.     For punitive and exemplary damages;

3.     For costs of suit, pre-judgment, and post-judgment interest; and

4.     Such other and further relief as the Court may deem necessary or appropriate

Dated: April 4, 2024                        **IVIE McNEILL WYATT PURCELL & DIGGS**

                                    **By:** *Rodney S. Diggs*
                                    **RODNEY S. DIGGS, ESQ.**
                                    Attorneys for Plaintiff,
                                    **GRACE O'MARCAIGH**

COMPLAINT FOR DAMAGES

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff GRACE O'MARCAIGH hereby demands a jury trial.

Dated: April 4, 2024                     **IVIE McNEILL WYATT PURCELL & DIGGS**

                                     **By:** _Rodney S. Diggs_
                                         **RODNEY S. DIGGS, ESQ.**
                                         Attorneys for Plaintiff,
                                         **GRACE O'MARCAIGH**

COMPLAINT FOR DAMAGES

**<u>PRESERVATION NOTICE</u>**

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

<u>Electronically Stored Information:</u>

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

29

COMPLAINT FOR DAMAGES

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

Regarding the paper information, you are directed to preserve any emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents about the controversy, parties, or witnesses. We expect to obtain several documents and other data from you through discovery, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter.

30

COMPLAINT FOR DAMAGES

This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this Complaint's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: April 4, 2024                    **IVIE McNEILL WYATT PURCELL & DIGGS**

                              **By:** _Rodney S. Diggs_____
                                    **RODNEY S. DIGGS ESQ.**
                                    Attorneys for Plaintiff,
                                    **GRACE O'MARCAIGH**

COMPLAINT FOR DAMAGES

EXHIBIT B



NAME OF VESSEL: VICTORIOUS

Port of Registry: George Town    Flag: Cayman Islands    Type: Commercial Yacht    Length: 85.01m / 278' 11

© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

This Date: 17 November 2022    and Place: London

Between the Undersigned Parties it has been Agreed as Follows:

OWNER: September Yachting Limited
ADDRESS: Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

CHARTERER: JCMUS Inc.
ADDRESS: C/O Edmiston & Company Ltd, Commerce House,1 Bowring Road, Ramsey, Isle of Man IM8 2LQ

Broker: Edmiston & Company Ltd, Commerce House,1 Bowring Road, Ramsey, Isle of Man IM8 2LQ    MYBA ID: EDMLON
Stakeholder: Fraser Worldwide SAM, 20 Avenue de Fontvieille 98000, Monaco    MYBA ID: FYW MC1

## CHARTER PARTICULARS

CHARTER PERIOD:    From : 12 Noon Hrs on 20 December 2022
                   To :   12 Noon Hrs on 3 January 2023

PLACE OF DELIVERY: St Martin, Caribbean    PLACE OF RE-DELIVERY: St Martin, Caribbean

Cruising Area: Caribbean including high seas and international waters
Maximum Number of Guests Sleeping ( 12 ) and Cruising ( 12 ) on Board
Crew Consisting of: Captain + 23 crew

CHARTER FEE:

Plus: Advance Provisioning Allowance (A.P.A.) (see Clause 8):
    Delivery/Re-delivery Fees:    N/A
    Security Deposit (see Clauses 16 & 17):    N/A

To be paid as follows:

FIRST INSTALMENT:
Due date: 18 November 2022

To the following Broker's Clients Account and it shall be deemed paid only when cleared:
Edmiston & Company Ltd, CFM Monaco, 11 Bd Albert 1er, Monaco/
Swift Code:
IBAN:
Ref: VICTORIOUS/20th December 2022 - 3rd January 2023

## SIGNATURES

The OWNER and CHARTERER accept that Clauses 1-25 inclusive form part of this Agreement which consists of eight pages plus any Conditions on the following page or Addenda attached. Signed and legible facsimile copies of this Agreement shall be binding. This Agreement may be executed in two or more counterparts each of which together shall be deemed an original but all of which together shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by email delivery of a "pdf format data file" such signature shall create a valid and binding obligation upon the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or "pdf" signature page were an original thereof regardless of the jurisdiction in which the Agreement originates.

DocuSigned by:

OWNER: Ali Vura PAK    DATE: 18 Nov 2022    CHARTERER: Tarik Brooks    DATE: 11/17/2022
FOR AND ON BEHALF OF:    FOR AND ON BEHALF OF: JCM

FULL NAME OF SIGNATORY: SEPTEMBER YACHTING LIMITED    FULL NAME OF SIGNATORY: Tarik Brooks

STAKEHOLDER: A. Ende    DATE:    BROKER: Charlotte Hanlon    DATE: 17.11.2022
FOR AND ON BEHALF OF: FRASER    FOR AND ON BEHALF OF: Edmiston & Company

*Check this is a genuine MYBA E-Contract using the serial number validator online at www.myba-econtract.com

MYBA CHARTER AGREEMENT

E-Contract N°3592104237221116-03 *

Case 2:23-cv-03585-DMC-MAH   Document 18-2   Filed 07/25/25   Page 38 of 45 Page
ID #258

PAGE TWO
OF EIGHT

MYBA

## SPECIAL CONDITIONS

Smoking is allowed on outside decks only.

Children shall be under the supervision of an adult in the charter party at all times.

Rendezvous diving only.

Notwithstanding anything else contained in this Agreement, including clause 16 a), the CHARTERER and the OWNER expressly agree that the use of personal watercraft (wave runner) is only permitted to the operator having the appropriate license and meeting with local operating regulations. Any liability arising from non-compliance is entirely at the risk of the Operator.

Please instruct your bank to send the wire(s) with "no deduction to the beneficiary"; any deduction will be taken from the APA".

The Parties hereby agree that in case of damages to the Vessel caused by the Charterer or any of its guest, the Captain and/or the Owner are authorized to use the APA funds to cover such damages against provision to the Charterer of the receipt/invoice for the repair.

This Agreement constitutes the entire Agreement between the parties hereto and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter. Each party agrees that it shall have no remedies in respect of any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement. Each party agrees that it shall have no claim for negligent or innocent misstatement based on any statement contained in this Agreement.

The owner should not be liable for late delivery of the vessel on account of funds being sent late by the Charterer.

The Broker confirms and warrants that due diligence checks on the Charterer have been conducted, as mandated by applicable laws, and that said checks have been found compliant with AML regulations in the jurisdiction of the Broker.

The OWNER and CHARTERER accept that Clauses 1-25 inclusive form part of this Agreement which consists of eight pages plus any Conditions shown above or Addenda attached. Signed and legible facsimile copies of this Agreement shall be binding.

**PLEASE INITIAL** : OWNER :        CHARTERER : TB

*Check this is a genuine MYBA E-Contract using the serial number validator online at www.myba-econtract.com

© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

DocuSign Envelope ID: 81D30B93-B621-45B1-A826-DEF9990525C6

© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

**MYBA**

## CLAUSE 1    AGREEMENT TO LET AND HIRE

The OWNER agrees to let the Vessel to the CHARTERER and not to enter into any other Agreement for the Charter of the vessel for the same period.

The CHARTERER agrees to hire the Vessel and shall pay the Charter Fee, the Advance Provisioning Allowance, the Delivery/Re-delivery Fee, the Security Deposit and any other agreed charges, in cleared funds, no later than the dates and to the Account specified in this Agreement.

## CLAUSE 2    DELIVERY

The OWNER shall at the beginning of the Charter Period deliver the Vessel free of encumbrance to the Place of Delivery in compliance with its flag state requirements and the CHARTERER shall take delivery in full commission and working order. The Vessel shall be insured, seaworthy, clean, in good condition throughout and ready for service, with full equipment, including up-to-date safety and lifesaving equipment (including life-jackets for children if any are carried in the CHARTERER's Party), as required by the Vessel's registration authority and fitted out as appropriate for a Vessel of her size and type and enabling the CHARTERER to use the Vessel as set out in Clause 13. The OWNER does not warrant her use and comfort in bad weather conditions for all cruises or passages within the Cruising Area.

## CLAUSE 3    RE-DELIVERY

The CHARTERER shall re-deliver the Vessel to the OWNER at the Place of Re-Delivery free of any debts incurred for the CHARTERER's account during the Charter Period and in as good a condition as when delivery was taken, except for fair wear and tear arising from ordinary use. The CHARTERER may, if he wishes, re-deliver the Vessel to the Place of Re-Delivery and disembark prior to the end of the Charter Period but such early re-delivery shall not entitle the CHARTERER to any refund of the Charter Fee.

## CLAUSE 4    CRUISING AREA

a) The CHARTERER shall restrict the cruising of the Vessel to within the Cruising Area and to within regions in the Cruising Area in which the Vessel is legally permitted to cruise. The CHARTERER shall also restrict time under way to an average of six (6) hours per day, unless the Captain, at his sole discretion, agrees to exceed this time.

b) While the Captain and/or Broker will make all reasonable efforts to accommodate the CHARTERER's request for a berth; it is understood that the Captain and/or Owner and/or Broker and/or Stakeholder (if applicable) cannot be held liable for the non-allocation of the berth.

## CLAUSE 5    MAXIMUM NUMBER OF PERSONS - RESPONSIBILITY FOR CHILDREN - HEALTH OF THE CHARTERER'S PARTY

a) The CHARTERER shall not at any time during the Charter Period permit more than the Maximum Number of Guests Sleeping or Cruising on Board plus, at the sole discretion of the Captain, a reasonable number of visitors whilst the Vessel is securely moored in port or at anchor, or as permitted by the appropriate authority.

b) If children are taken on board, the CHARTERER shall be fully responsible for their conduct and entertainment and no member of the Crew shall be held responsible for their conduct or entertainment.

c) The nature of a Charter may render it uncomfortable or unsuitable for anybody with physical disability or undergoing medical treatment. By signature of this Agreement the CHARTERER warrants the medical fitness of all members of the CHARTERER's Party for the voyage contemplated by this Agreement. The CHARTERER and his party undertake to have all necessary visas and vaccinations for the countries to be visited.

## CLAUSE 6    CREW

a) The OWNER shall provide a Captain qualified in accordance with the Vessel's flag state requirements and acceptable to the insurers of the Vessel. He shall also provide a suitably qualified and properly trained Crew. No member of the Crew shall carry or use any illegal drugs on board the Vessel or keep any firearms on board (other than those declared on the manifest) and the Captain and Crew shall comply with the laws and regulations of any country into whose waters the Vessel shall enter during the course of this Agreement.

b) It is understood that the Crew are entitled to a minimum amount of rest in accordance with the Vessel's Code of Practice, which includes the Maritime Labour Convention (MLC) 2006.

c) The Captain and Crew are bound at all times to keep all information related to this Charter, the OWNER, the CHARTERER, and all Guests as confidential and no information is to be disclosed to any third party without prior permission of the CHARTERER in writing.

## CLAUSE 7    CAPTAIN'S AUTHORITY AND RESPONSIBILITIES

a) The OWNER shall ensure that the Captain shows the CHARTERER the same attention as if the CHARTERER were the OWNER. The Captain shall comply with all reasonable orders given to him by the CHARTERER regarding the management, operation and movement of the Vessel, wind, weather and other circumstances permitting. The Captain shall not, however, be bound to comply with any order which might, in the reasonable opinion of the Captain, result in the Vessel moving to any port or place that is not safe and proper, or might result in the CHARTERER failing to re-deliver the Vessel upon the expiration of the Charter Period, or would, in the reasonable opinion of the Captain, cause a breach of Clause 13 and/or any other clause of this Agreement. Further, without prejudice to any other remedy of the OWNER, if, in the reasonable opinion of the Captain, the CHARTERER or any of his Guests fail to observe any of the provisions in Clause 13 and if such failure continues after the Captain has given due and specific warning to the CHARTERER in writing in respect of the same, the Captain shall inform the OWNER, the Broker and the Stakeholder, and the OWNER may terminate the Charter forthwith or instruct the Captain to return the Vessel to the Place of Re-Delivery and upon such return the Charter Period shall be terminated. The CHARTERER and his Guests shall disembark, the CHARTERER having settled all outstanding expenses with the Captain beforehand and the CHARTERER shall not be entitled to any refund of the Charter Fee.

b) With particular regard to the use of watersports equipment, the Captain shall have the authority to exclude the CHARTERER or any or all of his Guests from use of any particular watersports equipment if they are unsafe, or behaving in an irresponsible manner, or are under the influence of alcohol, or are failing to show due concern for other persons or property when operating this equipment.

### NOTIFICATIONS BY THE CAPTAIN

The Captain shall immediately notify the Broker and Stakeholder of any breakdowns, disablements, crew changes, accidents, or other significant incidents that occur during the Charter Period.

**PLEASE INITIAL:- OWNER**                    **CHARTERER:**

DocuSign Envelope ID: 610306D3-BC21-4501-A825-BEF9990F26C5

# MYBA CHARTER AGREEMENT
PAGE FOUR
OF EIGHT



© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association.
Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

## CLAUSE 8  OPERATING COSTS

The Charter Fee includes the charter of the Vessel with all its equipment in working order; tools; stores; cleaning materials and basic consumable stores for engine room, deck, galley and cabins; laundry of ship's linen; the crew's wages, uniforms and food; the insurance of the Vessel and crew as per Clause 16. The CHARTERER will pay, at cost, for all other expenses. These include, but are not limited to, shoreside transport; fuel for the main engines and generators; fuel for tenders and water sports equipment; food and all beverages for the Charter Party; berthing dues and other harbour charges including pilots' fees, local taxes, divers' fees, customs formalities and any charges for waste disposal, charges for water and electricity taken from shore; ships' agents' fees where applicable; personal laundry; Charter Party communications and internet use; and hire or purchase costs of any special equipment placed on board at the CHARTERER's request.

Payment for extraordinary expenses such as special requirements or equipment, shoreside transport or excursions or any other expenses not customarily considered part of the Vessel's operating costs may be required to be paid, via the Broker's account in advance or to the Captain on boarding, in addition to the APA.

Having paid the Advance Provisioning Allowance (APA) via the Broker's Account, the CHARTERER shall be advised by the Captain, at intervals, as to the disbursement of the APA and shall, if the balance remaining becomes insufficient in the light of current expenditure as supported by receipts, pay to the Captain a sufficient sum to maintain an adequate credit balance. The OWNER shall ensure the Captain will exercise due diligence in the expenditure of the APA. Any charges or fees related to the transfer of the APA to the Vessel are for the CHARTERER's account. Exchange rates, if applicable, cannot be guaranteed.

Prior to disembarkation at the end of the Charter Period, the Captain shall present to the CHARTERER a detailed account of expenditure, with as many supporting receipts as possible, and the CHARTERER shall pay to the Captain the balance of the expenses or the Captain shall repay to the CHARTERER any balance overpaid, as the case may be.

Payment by cheque, credit card or other negotiable instrument is not normally acceptable due to the itinerant nature of the Vessel's seasonal schedule and the CHARTERER should therefore ensure that he has sufficient funds available to cover all foreseeable expenses or arrange to deposit additional funds with the Broker.

## CLAUSE 9  DELAY IN DELIVERY

a) If, by reason of *force majeure* (as defined in Clause 18 (a)), the OWNER fails to deliver the Vessel to the CHARTERER at the Place of Delivery at the commencement of the Charter Period and delivery is made within forty-eight (48) hours of the scheduled commencement date, or within one tenth (1/10th) of the Charter Period, whichever period is the shorter, the OWNER shall pay to the CHARTERER a refund of the Charter Fee at a pro rata daily rate or if it be mutually agreed the OWNER shall allow a pro rata extension of the Charter Period.

### FAILURE TO DELIVER

b) If by reason of *force majeure* the OWNER fails to deliver the Vessel within forty-eight (48) hours or a period equivalent to one-tenth (1/10th) of the Charter Period, to the Place of Delivery, whichever period is the shorter from the due time of delivery, the CHARTERER shall be entitled to treat this Agreement as terminated. The CHARTERER's exclusive remedy will be to receive immediate repayment without interest of the full amount of all payments made by him under the terms of this Agreement. Alternatively, if the parties mutually agree, the Charter Period shall be extended by a time equivalent to the delay or postponed to a mutually agreed time.

c) If the OWNER fails to deliver the Vessel at the Place of Delivery at the commencement of the Charter Period other than by reason of *force majeure*, the CHARTERER shall be entitled to treat this Agreement as repudiated by the OWNER. The CHARTERER will be entitled to immediate repayment without interest of the full amount of all payments made by him under the terms of this Agreement and shall in addition be paid by the OWNER liquidated damages of an amount equivalent to fifty percent (50%) of the Charter Fee.

### CANCELLATION BY OWNER

d) If prior to the commencement of the Charter Period as set out in Page One of this Agreement, the OWNER tenders notice of cancellation via the Broker and if the cancellation is by reason of *force majeure*, the remedy in (b) above shall apply.

e) If the cancellation is for any reason, other than *force majeure*, the CHARTERER shall be entitled to immediate repayment without interest of the full amount of all payments made by him under the terms of this Agreement and shall in addition be entitled to liquidated damages from the OWNER to be calculated and paid forthwith on the following scale:

i) thirty (30) days or more before commencement of the Charter Period, an amount equivalent to twenty five percent (25%) of the Charter Fee.

ii) more than fourteen (14) days but less than thirty (30) days before commencement of the Charter Period, an amount equivalent to thirty five percent (35%) of the Charter Fee.

iii) fourteen (14) days or less before commencement of the Charter Period, an amount equivalent to fifty percent (50%) of the Charter Fee.

## CLAUSE 10  DELAY IN RE-DELIVERY

a) If re-delivery of the Vessel is delayed by reason of *force majeure*, re-delivery shall be effected as soon as possible thereafter and in the meantime the conditions of this Agreement shall remain in force but without penalty or additional charge against the CHARTERER.

b) If the CHARTERER fails to re-deliver the Vessel to the OWNER at the Place of Re-Delivery due to intentional delay or change of itinerary against the Captain's advice, then the CHARTERER shall pay forthwith to the OWNER via the Broker/Stakeholder's Account demurrage at the daily rate plus fifty percent (50%) of the daily rate. The CHARTERER shall be liable for all operating costs as per Clause 8 and indemnify the OWNER for any loss or damage which the OWNER shall suffer by reason of deprivation of use of the Vessel or cancellation of, or delay in delivery under any subsequent Charter of the Vessel.

**PLEASE INITIAL:-** OWNER:     CHARTERER: 

DocuSign Envelope ID: 610306D3-BC21-4591-A825-BFF9990F26C5

MYBA CHARTER AGREEMENT
PAGE FIVE
OF EIGHT



© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

## CLAUSE 11 CANCELLATION BY CHARTERER & CONSEQUENCES OF NON-PAYMENT, DEFAULT OF PAYMENT OR FAILURE TO PAY

a) i) Should the CHARTERER give notice of cancellation of this Agreement on or at any time before the commencement of the Charter Period, some or all of the Charter Fee may be retained by the OWNER determined as follows:

- After this Agreement is signed but before the final instalment/deposit is due to be paid, the OWNER shall be entitled to retain the first instalment/deposit.

- After any subsequent instalments/deposits are due to be paid, the OWNER shall be entitled to retain the first instalment/deposit and any subsequent instalments/deposits due.

If any of the instalments/deposits are due to be paid but have not been paid at the time of notice of cancellation then the OWNER shall have a claim against the CHARTERER for the amount so due.

ii) Should the CHARTERER fail to pay, after having been given written notice by the OWNER, any amount due under this Agreement, the OWNER reserves the right to treat this Agreement as having been repudiated by the CHARTERER and to retain the full amount of all payments and to recover all sums unpaid and due up to the date of the repudiation.

b) DUTY TO MITIGATE FOLLOWING EITHER CANCELLATION OF THE CHARTER OR NON-PAYMENT OF THE CHARTER FEE

i) Notwithstanding the OWNER's right to receive or retain all payments referred to above, whether due to cancellation or non-payment, the OWNER shall be under a duty to mitigate the CHARTERER's loss and in the event that the OWNER is able to re-let the Vessel for all or part of the Charter Period under this Agreement, the OWNER will give credit for the net amount of charter hire arising from such re-letting after deduction of all commissions and other consequential expenses arising from such re-letting. The intention is that the OWNER shall receive the same in net proceeds from any re-letting as would have been received under this Agreement had it not been cancelled or repudiated, so that the OWNER shall reimburse or forgive payments received or due from the CHARTERER only to the extent that the net proceeds from any re-letting which correspond to part or all of the Charter Period exceed the amounts which would have been received under this Agreement. The OWNER shall use his best endeavours to re-let the Vessel and shall not unreasonably withhold his agreement to re-let, although charters which may reasonably be considered detrimental to the Vessel, its reputation, its Crew or its schedule may be refused.

ii) If, prior to the date of cancellation, the Vessel has taken on provisions for the Charter, or has utilised the Delivery/Re-delivery Fee as set out on Page One of this Agreement, then the CHARTERER shall pay for these expenses unless all or part can be either refunded by the supplier or transferred to the next Charter, in which case they shall be adjusted accordingly. The Captain and OWNER shall be under a duty to mitigate these expenses where possible.

c) If, after signature of this Agreement, the OWNER is adjudged bankrupt or, in the case of a company, a liquidator, receiver or administrator is appointed over all or part of the OWNER's assets, the CHARTERER shall be entitled to cancel the Charter and all monies paid to the OWNER, his agent or the Stakeholder pursuant to this Agreement shall be refunded without further deduction.

## CLAUSE 12 BREAKDOWN OR DISABLEMENT

If after delivery the Vessel shall at any time be disabled by breakdown of machinery, grounding, collision or other cause so as to prevent reasonable use of the Vessel by the CHARTERER for a period between twelve (12) and forty-eight (48) consecutive hours or one tenth (1/10th) of the Charter Period, whichever is the shorter (and the disablement has not been brought about by any act or default of the CHARTERER) the OWNER shall make a pro rata refund of the Charter Fee for the period of the disablement or, if mutually agreed, allow a pro rata extension of the Charter Period corresponding with the period of disablement. If the CHARTERER wishes to invoke this clause he shall give immediate notice to the Captain directly, (or via the Broker). The CHARTERER shall not be liable for extra costs relating to the immobilisation of the Vessel but will remain liable for normal expenses during the period of disablement.

In the event of the actual or constructive total loss of the Vessel or if the Vessel is disabled as aforesaid for a consecutive period of more than forty-eight (48) hours or one tenth (1/10th) of the Charter Period, whichever is shorter, the CHARTERER may terminate this Agreement by notice in writing to the OWNER via the Brokers or to the Captain if no means of communication is available. Within two (2) working days after such termination, the Charter Fee shall be repaid by the OWNER pro rata without interest for that proportion of the Charter Period outstanding after the date and time on which the loss or disablement occurred. In the event of such termination the CHARTERER may effect redelivery by giving up possession of the Vessel where she lies. The CHARTERER shall be entitled to recover from the OWNER the reasonable cost of returning the CHARTERER and his Guests to the Place of Re-Delivery together with reasonable accommodation expenses incurred.

Alternatively, after a consecutive period of disablement of more than forty-eight (48) hours or one tenth (1/10th) of the Charter Period, whichever the shorter, and dependent on the nature and seriousness of the disablement, by mutual agreement the CHARTERER may elect to remain on board for the duration of the Charter Period and the CHARTERER will then have no further or additional claim against the OWNER.

## CLAUSE 13 USE OF THE VESSEL

The CHARTERER shall comply, and shall ensure that the Guests comply, with the laws and regulations of any country into whose waters the Vessel shall enter during the course of this Agreement.

The CHARTERER shall ensure that no pets or other animals are brought on board the Vessel without the consent in writing of the OWNER. The CHARTERER shall ensure that the behaviour of the CHARTERER and his Guests shall not cause a nuisance to any person or bring the Vessel into disrepute. The Vessel is not to be used for commercial photo or film shoots of any nature, unless by written permission from the OWNER.

The CHARTERER and Guests shall afford the Crew due respect at all times. No Crew member shall be subjected to any type of harassment, sexual or otherwise, by the CHARTERER or Guests at any time during the Charter Period.

Unless otherwise agreed, smoking shall be restricted to the exterior areas of the Vessel designated by the Captain.

Rendezvous diving only unless otherwise noted under special conditions.

The Captain shall promptly draw the CHARTERER's attention to any infringement of these terms by himself or his Guests, and if such behaviour continues after this warning, the Captain shall inform the OWNER or Stakeholder, and the OWNER may, by notice in writing given to the CHARTERER, terminate this Agreement in accordance with Clause 7.

If the CHARTERER or any of the Guests shall commit any offence contrary to the laws and regulations of any country which results in any member of the Crew of the Vessel being detained, fined or imprisoned, or the Vessel being detained, arrested, seized or fined, the CHARTERER shall indemnify the OWNER against all loss, damage and expense incurred by the OWNER as a result, and the OWNER may, by notice to the CHARTERER, terminate this Agreement forthwith.

The Vessel operates a zero tolerance policy and the possession or use of any illegal drugs or any weapons (including firearms) is strictly prohibited on board the Vessel. Failure to comply shall be sufficient reason for the OWNER to terminate the Charter forthwith without refund or recourse against the OWNER, Stakeholder or Broker.

**PLEASE INITIAL:-** OWNER:      CHARTERER: 

© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

**CLAUSE 14 NON-ASSIGNMENT**

The CHARTERER shall not assign this Agreement, sub-let the Vessel or part with control of the Vessel without the consent in writing of the OWNER, which consent may be on such terms as the OWNER thinks fit.

**CLAUSE 15 SALE OF THE VESSEL**

a) The OWNER agrees not to sell the Vessel during the Charter Period as set out on Page One of this Agreement.

b) Should the OWNER agree to sell the Vessel after the signing of this Charter Agreement, but before delivery to the CHARTERER, the OWNER shall immediately, upon entering into an agreement for the sale of the Vessel, give notice of such sale in writing to the CHARTERER via the Broker. This information shall be kept in strict confidence by all parties to the Agreements.

c) Should the Vessel be sold one of the following provisions will apply:

i) The OWNER shall arrange for the Buyer to perform the Charter on the same terms and conditions by signature of a tri-partite Novation Agreement.

Where the Charter is taken over by the Buyer on the same terms and conditions there shall be no penalty against the OWNER and no additional commission due to the Broker.

ii) If the Buyer is unwilling or unable to fulfil the Charter Agreement then this Charter Agreement shall be considered as having been cancelled by the OWNER in accordance with Clause 9. All payments made by the CHARTERER shall be promptly repaid in full to him without deduction, and in addition liquidated damages calculated in accordance with Clause 9 (e), i, ii or iii, as appropriate, shall be paid. The Broker and Stakeholder shall be paid by the OWNER the full commission due on this original Agreement no later than seventy-two (72) hours after formal cancellation.

**CLAUSE 16 INSURANCE**

a) Throughout the period of this Agreement the OWNER shall insure the Vessel with first-class insurers against all customary risks for a Vessel of her size, value, and type on cover no less than is provided under Institute Yacht Clauses 1.11.85 or other recognised terms extended to provide Permission to Charter and to cover Third Party liability, Water Skiers liabilities together with liabilities arising from the use by the CHARTERER and other competent person(s) authorised by him of personal water craft, including jet skis, wave runners and other similar powered craft as well as windsurfers, dinghies, catamarans or other water-sports equipment carried by the Vessel. The insurance shall also cover War, Strikes, Pollution and include insurance of Crew against injuries and/or Third Party liabilities incurred during the course of their employment. The CHARTERER shall remain liable for any loss, damage or liabilities arising from any act of negligence of the CHARTERER or his Guests and not recoverable by the OWNER under his insurance.

b) All such insurances shall be on such terms and subject to such excess (deductible) as are customary for a vessel of this size, value, and type. Copies of all relevant insurance documentation shall be available on request for inspection by the CHARTERER prior to the Charter on reasonable notice to the OWNER, and shall be carried on board the Vessel.

c) The CHARTERER should carry independent insurance for Personal Effects whilst on board or ashore and for any Medical or Accident expenses (including emergency transport evacuation) incurred.

d) The CHARTERER should be aware that neither Charterer's Liability Insurance nor Cancellation and Curtailment Insurance are included in this Agreement.

**CLAUSE 17 SECURITY DEPOSIT**

Unless otherwise provided on Page One of this Agreement, the Security Deposit shall be held by the Stakeholder on the OWNER's behalf and may be used in, or towards, discharging any damage or liability that the CHARTERER may incur under any of the provisions of this Agreement. If not required, as confirmed by the Captain in writing to the Stakeholder, the Security Deposit shall be refunded without interest to the CHARTERER on the first working day after the end of the Charter Period, or after settlement of all outstanding questions, whichever is the later.

**CLAUSE 18 DEFINITIONS**

**a) FORCE MAJEURE**

In this Agreement 'force majeure' means any cause directly attributable to acts, events, non-happenings, omissions, accidents or Acts of God beyond the reasonable control of the OWNER, the Crew, or the CHARTERER (including, but not limited to, strikes, lock-outs or other labour disputes, civil commotion, riots, acts of terrorism, blockade, invasion, war, fire, explosion, sabotage, storm, collision, grounding, fog, governmental act or regulation, contaminated fuel, major mechanical or electrical breakdown beyond the Crew's control and not caused by lack of maintenance and/or OWNER's or Crew's negligence). Crew changes and shipyard delays not attributable to the aforementioned causes, do not constitute force majeure.

**b) OWNER, CHARTERER, BROKER AND STAKEHOLDER**

Throughout this Agreement, the terms OWNER, CHARTERER, Broker, and Stakeholder and corresponding pronouns shall be construed to apply whether the OWNER, CHARTERER, Broker or Stakeholder is male, female, corporate, singular or plural, as the case may be.

**c) VAT**

In this Agreement VAT means Value Added Tax levied by a member state of the European Union.

**d) WORKING DAY**

In Clause 20 Working Day is defined as a day when the banks are open for business in the country where the stakeholder is situated.

**CLAUSE 19 SALVAGE**

During the period of the Charter, the benefits, if any, from any derelicts, salvages and towages, after paying the Crew's proportion, and a proportion of the Charter Fee during the time when the Vessel is engaged in providing salvage assistance, and expenses during this time directly related to the salvage, shall be shared equally between the OWNER and the CHARTERER.

**PLEASE INITIAL:- OWNER:**     **CHARTERER:** 

DocuSign Envelope ID: 61039B5EBC2DA59C AND ABF99905866

# MYBA CHARTER AGREEMENT

PAGE SEVEN
OF EIGHT



© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

## CLAUSE 20 PAYMENT OF CHARTER FEES AND OTHER MONIES TO THE OWNERS

All funds received by the Broker against this Agreement shall be transferred immediately upon receipt to the Stakeholder (if the Broker is not the Stakeholder) and then held by the Stakeholder in a designated Account in the currency of this Agreement. Fifty percent (50%) of the Charter Fee shall be paid to the OWNER by the Stakeholder after deduction of the full commission by Bank Transfer on the date of commencement of the Charter Period or on the first working day thereafter. The Advance Provisioning Allowance (A.P.A.) shall be paid by the Stakeholder, to the Captain, or to the OWNER for onward transmission to the Captain prior to embarkation, by Bank Transfer. The Delivery and/or Re-delivery fees (if applicable) and any extraordinary expenses shall either be paid with the first payment to the OWNER or directly to the Captain. The balance of the Charter Fee shall be paid to the OWNER on the first working day following completion of the Charter Period unless the Stakeholder shall have received written notice of a complaint by or on behalf of the Charterer. Once such notice of complaint has been received by the Stakeholder, the Stakeholder shall be obliged to retain the balance of the Charter Fee for a period of [14] days. If during such [14] day period the Charterer's complaint is resolved by agreement with the Owner then the Stakeholder shall pay the balance of the Charter Fee to the Owner (or as otherwise directed in an Arbitration Award). If after [14] days neither party shall have appointed an arbitrator then the balance of the Charter Fee shall be paid by the Stakeholder to the Owner on the first working day after the 14 day period referred to above. If either party shall have appointed an arbitrator then the Stakeholder shall retain the balance of the Charter Fee in a designated account until an Arbitration Award has been published or the matter settled by mutual agreement between the parties.

## CLAUSE 21 COMPLAINTS

The CHARTERER shall give notice of any complaint in the first instance to the Captain on board and note shall be taken of the time, date and nature of the complaint. The Captain shall inform the Broker and Stakeholder as soon as practicable.

If, however, this complaint cannot be resolved on board the Vessel then the CHARTERER shall give notice to the OWNER or to the Broker within twenty-four (24) hours of the event or occurrence unless it is impracticable due to failure or non-availability of communications equipment. The complaint may be made verbally in the first instance, but shall be confirmed as soon as possible in writing specifying the precise nature of the complaint.

## CLAUSE 22 FORCE MAJEURE

When force majeure is invoked in relation to breakdown or disablement, the Owner will instruct the Captain or Owner's representative to submit a detailed technical report, a copy of the vessel's maintenance log, if applicable, and all relevant supporting documentation to the Charterer or Charterer's representative.

## CLAUSE 23 ARBITRATION & LAW

a) This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the arbitration Act 1996 or any statutory modification or re-enactment thereof.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three Arbitrators. A party wishing to refer a dispute to arbitration shall appoint its Arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own Arbitrator within 14 calendar days of that notice and stating that it will appoint its Arbitrator as sole Arbitrator unless the other party appoints its own Arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own Arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its Arbitrator as sole Arbitrator and shall advise the other party accordingly. The award of a sole Arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole Arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of EUR50 000 or currency equivalent (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of EUR400 000 or currency equivalent (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceedings are commenced.

Where the reference is to three Arbitrators the procedure for making appointments shall be in accordance with the procedure for full arbitration stated above.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Agreement.

The award rendered by the arbitration shall be final and binding upon both parties and may if necessary be enforced by the Court or any other competent authority in the same manner as a judgement in High Court.

If notice of arbitration proceedings is given by either party, the Stakeholder, after receiving notification of such proceedings, shall not deal with those monies held by them without the agreement of both parties or in accordance with the order of the Arbitrators or their final award. The monies should be held in a designated client account. This account should be interest bearing where national banking rules permit. The Stakeholder may, with the agreement of both parties, pay the monies into an Escrow Account jointly controlled by the accredited legal representatives of both parties pending the result of the arbitration.



PLEASE INITIAL:- OWNER:          CHARTERER:

# MYBA CHARTER AGREEMENT

PAGE EIGHT
OF EIGHT



© Copyright MYBA The Worldwide Yachting Association - Produced by MYBA and adopted by the American Yacht Charter Association. Charter Agreement Revised 2017 - MYBA will not be responsible for any abuse or misrepresentation of this Agreement.

## CLAUSE 24 BROKERS

a) The commission shall be deemed to be earned by the Broker and the Stakeholder upon the signature of this Agreement by the OWNER and CHARTERER and payment of deposit funds by CHARTERER and be payable by the OWNER on the full Charter Fee plus the Delivery/Re-delivery Fee, if applicable, but excluding running expenses, according to Clause 20 of this Agreement, whether or not he defaults for any reason including force majeure. In the event of cancellation by the CHARTERER, the commission shall be deducted as an expense from the deposit.

b) If the CHARTERER should extend this Charter, the OWNER shall pay commission on the gross Charter Fee for the extension, on the same basis as provided in 24a.

c) If the CHARTERER should sign an agreement for the Re-Charter of the Vessel from the OWNER, his Agent or the Stakeholder, within two (2) years from the date of completion of the Charter period, whether or not on the same terms, then the Broker shall be entitled to, and shall be paid by the OWNER, commission on the gross Charter Fee paid for that further Charter upon the same basis as provided herein.

However, if the CHARTERER should choose to sign an agreement for the re-charter of the Vessel within this two-year period via another Broker to whom the commission is being paid, the OWNER shall pay a commission once only on the first Charter within that period of one-third (1/3rd) of the full rate to the original Broker and two-thirds (2/3rds) to the new Broker.

d) i)   If any agreement should be reached directly between the CHARTERER and the OWNER for the purchase of the Vessel within two (2) years from the date of completion of the Charter period, then the Broker shall be entitled to and shall be paid by the OWNER an industry acceptable sales commission.

ii)  However, should the CHARTERER purchase the Vessel from the OWNER via a Sales Broker to whom the commission is being paid, then the OWNER shall pay, or shall ensure that the Sales Broker shall pay, to the Broker a sum equivalent to not less than fifteen (15%) percent of the gross sales commission. It is the responsibility of the OWNER to advise any future Sales Broker of this liability.

iii) Subclause 24 d) ii) above only applies following the free choice of the CHARTERER and is not relevant if the appointment of a Sales Broker different from the Broker is suggested or solicited by the OWNER, his Agent, Captain or Representative. If the appointment of a different Sales Broker is suggested or solicited by the OWNER, his Agent, Captain or Representative, then Clause 24 d) i) above shall apply, as if the CHARTERER had reached the agreement to purchase the Vessel from the OWNER directly.

e) The Broker and Stakeholder in this Agreement shall have no responsibility for any loss, damage or injury to the person or property of the OWNER or CHARTERER or any of their Guests, servants or agents, and further, the Broker and Stakeholder shall be under no liability for any errors of judgement or description or otherwise, of whatsoever nature and howsoever arising, and shall be under no further obligation, duty or responsibility to the OWNER or the CHARTERER save as set out herein. The OWNER and the CHARTERER shall jointly and severally indemnify and hold harmless the Broker and Stakeholder for any loss or damage sustained by them as a result of any liability by the Broker and Stakeholder to any Third Party (person, firm, company or authority) arising from promoting or introducing this Charter, assisting in the performance of this Agreement or performing the duty of Stakeholder.

f) For the purposes of this Clause, the terms OWNER and CHARTERER shall be understood to mean the named company or individual, or any company owned or controlled by them including companies owned indirectly or via Trustees, any Director of such a company, Beneficial Owner, Nominee, Agent or Charterer's Guest.

## CLAUSE 25 NOTICES

*Any notice given or required to be given by either Party to this Agreement shall be communicated in any form of writing and shall be deemed to have been properly given if proved to have been dispatched pre-paid and properly addressed by mail or courier service or email or by facsimile in the case of the OWNER, to him or to the Broker at their addresses as per this Agreement or, in the case of the CHARTERER, to his address as per this Agreement or, where appropriate, to him on board the Vessel.*

**PLEASE INITIAL:-** OWNER:                                    CHARTERER:

ADDENDUM 1
TO M.Y.B.A CHARTER AGREEMENT
No. 3592104237221116-03
DATED 17th November 2022
YACHT M/Y VICTORIOUS
FOR TIME PERIOD 20th December 2022 – 3rd January 2023

Between the undersigned parties:

**OWNER:** September Yachting Limited
**ADDRESS:** Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman
Islands

**CHARTERER:** JCMUS Inc.
**ADDRESS:** Edmiston & Company Ltd, Commerce House, 1 Bowring Road, Ramsey, Isle of
Man IM8 2LQ

It is agreed by all parties that:

The Charterers abbreviated company name (JCMUS Inc.) was used for the agreement and the
full legal entity name is Janice Combs Music Holdings, Inc.

All other clauses of the MYBA Agreement dated 17th November 2022 remain unchanged.

SIGNATURES

OWNER
FOR AND ON BEHALF OF:

CHARTERER
FOR AND ON BEHALF OF: JCMUS Inc.

STAKEHOLDER
FOR AND ON BEHALF OF: FRASER

BROKER
FOR AND ON BEHALF OF: Edmiston & Company