**RODNEY S. DIGGS (SBN 274459)**
rdiggs@imwlaw.com
**LAURA N. JAMES (SBN 273720)**
ljames@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
**A Professional Law Corporation**
444 South Flower Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 489-0028
Facsimile: (213) 489-0552

**TYRONE A. BLACKBURN, ESQ.** (*pro hac vice pending*)
tblackburn@tablackburnlaw.com
**T. A. Blackburn Law, PLLC**
1242 E. 80th St 3rd Floor
Brooklyn, NY 11236
Telephone: (347) 427-5999

Attorneys for Plaintiff, **GRACE O'MARCAIGH**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| GRACE O'MARCAIGH, an individual,<br><br>*Plaintiff,*<br><br>vs.<br><br>CHRISTIAN COMBS, an individual, SEAN COMBS, an individual, and JOHN DOE 1-10, JANE DOE 1-10 and ABC CORPORATIONS 1-10,<br><br>*Defendants.* | CASE NO.: 2:25-cv-03650-DMG-MAA<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT; DECLARATION OF LAURA N. JAMES IN SUPPORT THEREOF**<br><br>Hearing Date: September 4, 2026<br>Time: 9:30 a.m.<br>Judge: Hon. Dolly M. Gee<br>Courtroom: 8C |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .... 4
II. FACTUAL & PROCEDURAL BACKGROUND .... 4
a. The Complaint, Removal, and the Court's Prior Order .... 4
b. The FAC Adds the Nexus the Court Found Missing .... 6
c. The FAC's Allegations Concerning the Charter Environment and Assault .... 7
d. Trial Testimony Further Supports the FAC's Jurisdiction, Agency, Control, and Foreseeability Allegations .... 8
III. LEGAL STANDARD .... 10
IV. ARGUMENT .... 11
a. The Court Has Personal Jurisdiction Over Sean Combs .... 11
i. The FAC Alleges Purposeful Availment and Purposeful Direction .... 11
ii. Plaintiff's Claims Arise Out of and Relate to Sean Combs' California Conduct .... 13
iii. Exercising Jurisdiction Is Reasonable .... 13
iv. The FAC Does Not Waive General Jurisdiction .... 14
b. California Law Remains Available, and Maritime Claims Are Properly Pleaded in the Alternative .... 14
c. The FAC States Claims Against Sean Combs .... 16
i. Premises Liability and Alternative Maritime Negligence Are Adequately Pleaded 17
ii. Aiding and Abetting and Alternative Maritime Joint Tortfeasor Liability Are Adequately Pleaded .... 18
iii. IIED and Alternative Maritime IIED Are Adequately Pleaded .... 19
d. Jurisdictional Discovery or, Alternatively, Leave to Amend Should Be Granted if the Court Finds Any Deficiency .... 20
V. CONCLUSION .... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcaraz v. Vece*, 14 Cal.4th 1149, 1156-57 (1997) .......... 17

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .......... 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) .......... 11

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) .......... 8, 10

*Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) .......... 11

*Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1090 (9th Cir. 2023) .......... 11

*In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013) .......... 10

*Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1160 (9th Cir. 2007) .......... 10

*Rodriguez v. United States*, No. 2:14-cv-02518-ODW, 2017 WL 924458, at *2 (C.D. Cal. Mar. 6, 2017) .......... 17

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) .......... 10

**Statutes**

28 U.S.C. § 1332 .......... 15

28 U.S.C. § 1333 .......... 5, 15, 16

Fed. R. Civ. P. 12(b)(2) .......... 8

Fed. R. Civ. P. 15(a)(2) .......... 20

Fed. R. Civ. P. 8(d)(2)-(3) .......... 11, 15

Rule 12(b)(2) .......... 4, 5, 8, 10

Rule 12(b)(6) .......... 5, 11, 15, 20

**Other Authorities**

CACI No. 1000 .......... 17

# I. INTRODUCTION

Defendants' Motion to Dismiss should be denied because the FAC does exactly what the March 31 Order permitted: it alleges the nexus between Sean Combs' California business contacts, the *Victorious* charter, and Plaintiff's claims. The FAC alleges that Sean Combs used JCMUS, an entity operating from West Hollywood, and California-based personnel to authorize and execute the charter agreement that placed Plaintiff aboard the vessel and gave Sean Combs control over the guests, crew, and charter environment.

Defendants' personal-jurisdiction argument depends on rejecting those agency and control allegations, separating Sean Combs from JCMUS, and treating the charter as an unrelated entity transaction. That is not the Rule 12(b)(2) standard. At this stage, Plaintiff need only make a prima facie showing, and factual conflicts must be resolved in her favor.

Defendants' California-law and maritime arguments fare no better. The Court did not hold that California law was unavailable; it held that the parties had not adequately addressed maritime law. The FAC now preserves Plaintiff's California-law claims and jury demand while pleading maritime theories only in the alternative if the Court determines maritime law applies. Rule 8 permits that approach.

Finally, the FAC states claims against Sean Combs for premises liability, aiding and abetting, and IIED. Defendants' motion repeatedly asks the Court to resolve factual disputes, reject agency allegations, and draw inferences against Plaintiff. The pleading stage does not permit that. The Motion should be denied, or at minimum Plaintiff should receive jurisdictional discovery or leave to amend.

# II. FACTUAL & PROCEDURAL BACKGROUND

## a. The Complaint, Removal, and the Court's Prior Order

Plaintiff filed this action in Los Angeles County Superior Court on April 4, 2024, alleging claims arising from a sexual assault she suffered while working as a

stewardess aboard the *Victorious* during the December 2022 holiday charter. [Compl. ¶¶ 19-23, Dkt. 1-1.] The Complaint alleged claims against Christian Combs for assault, battery, sexual assault, intentional infliction of emotional distress, and negligent infliction of emotional distress, and asserted claims against Sean Combs for premises liability and aiding and abetting. [Compl., Dkt. 1-1.]

Defendants removed the action to this Court on April 24, 2025. [Notice of Removal, Dkt. 1.] The parties later stipulated to proceed in federal court, and the Court independently determined it had subject-matter jurisdiction under 28 U.S.C. § 1333. [Joint Stipulation ¶ 7, Dkt. 16.] Defendants then moved to dismiss the Complaint, with Sean Combs challenging personal jurisdiction under Rule 12(b)(2) and both Defendants Sean Combs and Christian Combs challenging the pleadings under Rule 12(b)(6). [Defs.' MTD Compl., Dkt. 18.]

On March 31, 2026, the Court granted the motion in part and denied it in part. [March 31 Order at 1, 12, Dkt. 37.] The March 31, 2026 Order did not dismiss Plaintiff's substantive claims with prejudice. [March 31 Order at 11-12, Dkt. 37.] The Court granted Sean Combs' Rule 12(b)(2) motion for lack of personal jurisdiction with leave to amend, denied Plaintiff's request for jurisdictional discovery, and denied Defendants' Rule 12(b)(6) motion to dismiss without prejudice. [March 31 Order at 12, Dkt. 37.] Having dismissed Sean Combs for lack of personal jurisdiction, the Court did not reach his merits arguments attacking the premises-liability and aiding-and-abetting claims. [March 31 Order at 11 n.7, Dkt. 37.]

The defect the Court identified was not that Sean Combs had no California contacts. [March 31 Order at 8-10, Dkt. 37.] Rather, the Court found that Plaintiff had not yet connected those contacts to the claims. [March 31 Order at 9-10, Dkt. 37.] The Court took judicial notice of government records identifying Sean Combs as CEO of Janice Combs Music Holdings, Inc. ("JCMUS") and listing its principal

office in West Hollywood, California, but concluded Plaintiff had not drawn a connection between Sean Combs' California business dealings and the allegations at issue. [March 31 Order at 9, Dkt. 37.] Accordingly, the Court granted leave to amend because it could not conclude that the jurisdictional defect was incurable. [March 31 Order at 12, Dkt. 37.] The Court allowed Plaintiff "an opportunity to amend her pleadings to cure the defects relating to personal jurisdiction." [March 31 Order at 12, Dkt. 37.]

**b. The FAC Adds the Nexus the Court Found Missing**

The FAC directly addresses the nexus issue. It alleges that Sean Combs is the Chief Executive Officer of JCMUS, an entity with its principal office located at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California, and that he is also the sole Manager of 450 Alton, LLC, whose annual reports list that same West Hollywood address as its principal place of business. [FAC ¶¶ 3, 10, Dkt. 38; Diggs Decl. ¶¶ 3-8, Exs. A-C.][1] The FAC alleges that JCMUS, acting as Sean Combs' agent and at his direction, chartered the *Victorious* for the December 2022 holiday period during which the events at issue occurred. [FAC ¶¶ 3, 10-12, 17-18, 35, Dkt. 38.]

Specifically, the FAC alleges that Tarik Brooks executed the MYBA Charter Agreement on behalf of JCMUS from its West Hollywood principal office, that JCMUS acted as Sean Combs' agent and at his direction, and that the agreement placed Plaintiff aboard the *Victorious* and placed Sean Combs in exclusive control of the vessel, guests, and crew.[2] [FAC ¶¶ 11-12, 17-18, 35, Dkt. 38; Diggs Decl. ¶¶ 3-5, 9-12, Exs. A-B, D.]

The November 17, 2022 MYBA Charter Agreement identified JCMUS as the

[1] References to the "Diggs Declaration" refer to the Declaration of Rodney S. Diggs previously filed with the FAC. Dkt. 38-1.

[2] Tarik Brooks was listed as Secretary and Chief Financial Officer of JCMUS; Controller of 450 Alton, LLC; and President of Combs Enterprises from August 2020 to February 2024. Those overlapping roles reinforce the inference that the *Victorious* charter was handled through Sean Combs' integrated business operations, not by a disconnected third party.

charterer for the December 20, 2022 through January 3, 2023 charter period and was signed on JCMUS's behalf by Brooks; the addendum confirmed that "JCMUS Inc." was the abbreviated name for "Janice Combs Music Holdings, Inc." [FAC ¶ 17, Dkt. 38; Diggs Decl. ¶¶ 9-10, Ex. D.] Diggs' declaration further states that Sean Combs was CEO of JCMUS, JCMUS's principal office was the West Hollywood address, and Brooks was listed as JCMUS's Secretary and CFO and as Controller of 450 Alton, LLC, whose reports also used the West Hollywood address. [Diggs Decl. ¶¶ 3-8, Exs. A-C.] Unlike the Complaint, which alleged only in general terms that Sean Combs leased or controlled the yacht, the FAC alleges how that control was obtained: JCMUS, acting as Sean Combs' agent and at his direction, entered into a charter transaction that placed Plaintiff aboard the vessel and vested Sean Combs with control over the charter environment. [Compl. ¶¶ 23, 91, 146-150, Dkt. 1-1; FAC ¶¶ 3, 10-14, 17-18, 35, 60, Dkt. 38.]

**c. The FAC's Allegations Concerning the Charter Environment and Assault**

The FAC alleges that Sean Combs was the principal charter guest and exercised full control over the staff, guests, and premises of the yacht during the charter. [FAC ¶¶ 18, 35, 60, Dkt. 38.] It alleges Plaintiff worked the 6:00 p.m. to 6:00 a.m. overnight shift, that Sean Combs typically remained aboard the yacht, and that Christian Combs and Justin Combs joined their father aboard most evenings. [FAC ¶¶ 19-20, Dkt. 38.]

The FAC also alleges that the charter environment became dangerous before the assault. [FAC ¶¶ 21, 35-38, Dkt. 38.] It alleges a rotating group of guests, open drug and alcohol use, suspected commercial sexual activity, overnight demands on crew, disrespect toward staff, difficulty distinguishing which alcohol had been tampered with, and women becoming severely incapacitated after one drink or shot. [FAC ¶¶ 21, 36, Dkt. 38.] It further alleges fights and physical violence aboard the

yacht, including a New Year's Eve fight, a guest shoving Plaintiff's chief steward, an object thrown across the bar, and a man physically assaulting a woman aboard the vessel. [FAC ¶ 38, Dkt. 38.]

The FAC then alleges that Christian Combs sexually assaulted Plaintiff while she was working. [FAC ¶¶ 23-31, 45, 50, 55, Dkt. 38.] It alleges Christian Combs touched Plaintiff without consent; that Plaintiff told him to remove his hand from her body; that she later attempted to resume her duties; and that Christian Combs then found her, blocked the only exit in the cinema, groped her, removed all of his clothes, exposed his erect penis, grabbed her arms, and attempted to force her to perform oral copulation before she escaped. [FAC ¶¶ 27-31, Dkt. 38.]

The FAC also alleges post-assault knowledge and concealment by Sean Combs. [FAC ¶¶ 33-34, 40, 63, 69-71, 77, Dkt. 38.] It alleges Plaintiff was required to continue front-of-house service and personally serve Christian Combs, that Sean Combs' employees learned of the assault and informed him, and that Captain Milkov then received a generous gratuity from Sean Combs to dissuade him from protecting Plaintiff or taking action on her behalf. [FAC ¶¶ 33-34, 40, 63, 69-71, 77, Dkt. 38.]

**d. Trial Testimony Further Supports the FAC's Jurisdiction, Agency, Control, and Foreseeability Allegations**

Plaintiff's FAC is not based on "little more than a hunch," nor does it simply "recast" previously rejected allegations. [Defs.' MTD FAC at 1 & n.2, 4-5, Dkt. 43-1.] Sworn testimony from Sean Combs' federal criminal trial corroborates the FAC's core factual premises and should be considered because Sean Combs challenges personal jurisdiction. See Fed. R. Civ. P. 12(b)(2); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). Plaintiff does not offer this testimony to prove liability by propensity; it is offered for targeted Rule 12(b)(2) purposes, including jurisdiction, agency, control, California residency and operations, and the nexus between Sean Combs' California-connected business

activity and Plaintiff's claims. [James Decl. ¶¶ 4-12, Exs. B-I.]

The record supports those points. Brendan Paul testified that he worked as Sean Combs' assistant from late 2022 to March 2024 and was based in both Los Angeles and Miami Beach because those were Sean Combs' residences. Paul further testified that assistants set up venues for "wild king nights" with liquor, candles, baby oil, Astroglide, condoms, incense, and other supplies; that Sean Combs brought drugs to those events; that Paul purchased drugs for him; and that Sean Combs called assistants when he needed things during those events. [James Decl. ¶ 4, Ex. B.]

Other witnesses confirmed the same operating structure. George Kaplan, Sean Combs' former executive assistant, testified that staff set up hotel rooms for Sean Combs with items including liquor, baby oil, and Astroglide, often using a Combs Enterprises corporate credit card. [James Decl. ¶ 5, Ex. C.] David James, Sean Combs' former personal assistant, testified that staff coordinated travel and yacht-related logistics, and that Sean Combs' business and personal travel overlapped. [James Decl. ¶ 6, Ex. D.] Derek Ferguson testified that JCMUS was one of Sean Combs' entities; that Sean Combs owned 100 percent of JCMUS during Ferguson's tenure; that JCMUS maintained its own business checking account; that both Sean Combs and Ferguson were authorized signers; and that JCMUS was used for deals involving Sean Combs's name and likeness. [James Decl. ¶ 7, Ex. E.]

The testimony also supports foreseeability and notice. "Mia" testified that she worked for Sean Combs as a personal assistant and later for Revolt Films; that the work environment depended on Sean Combs' mood; and that he sexually assaulted her more than once during her employment.[3] [James Decl. ¶ 8, Ex. F.] Jane testified to Sean Combs' Los Angeles presence and staff logistics, including that he paid expenses for a Los Angeles home, she saw him in Los Angeles, she spent time with

[3] "Mia" testified under a pseudonym to protect her privacy because her testimony concerned alleged sexual abuse by Sean Combs and related sensitive personal matters. She worked for Sean Combs from 2009 to 2017, first as a personal assistant and later in development and acquisitions for Revolt Films.

him at Mapleton, and assistants and security were used to obtain drugs, cash, and other items during hotel nights.[4] [James Decl. ¶ 9, Ex. G.] Ventura similarly testified that Sean Combs controlled private environments involving drugs, alcohol, and sexual activity, including that staff booked hotel rooms, used aliases, stocked rooms with supplies, and replenished supplies at his direction.[5] [James Decl. ¶ 10, Ex. H.] Defendants ask the Court to treat the FAC's agency, control, jurisdiction, and foreseeability allegations as speculative. They are not.

## III. LEGAL STANDARD

On a Rule 12(b)(2) motion, Plaintiff need only make a prima facie showing of personal jurisdiction. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013). In resolving a Rule 12(b)(2) motion, the Court may consider evidence outside the pleadings, including declarations and other jurisdictional evidence, and must resolve any factual conflicts in Plaintiff's favor. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1160 (9th Cir. 2007).

Specific jurisdiction requires: (1) purposeful direction toward the forum or purposeful availment of the privilege of conducting activities there; (2) claims that arise out of or relate to the defendant's forum-related activities; and (3) reasonableness. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Although courts often apply purposeful availment to contract claims and purposeful direction to tort claims, the Ninth Circuit rejects an "iron-clad doctrinal dichotomy" and requires the Court to evaluate the defendant's forum contacts and their relationship to the claims. *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th

[4] "Jane" testified under a pseudonym to protect her privacy because her testimony concerned alleged sexual abuse by Sean Combs and related sensitive personal matters. She was in a romantic relationship with Sean Combs from approximately 2021 to 2024 and testified about residences, assistants, drugs, alcohol, and controlled sexual environments during that relationship.

[5] Casandra Ventura testified under her own name. She was in a long-term romantic relationship with Sean Combs and testified about Sean Combs' use of staff, assistants, security, aliases, hotel rooms, supplies, drugs, and controlled sexual environments during that relationship.

1079, 1090 (9th Cir. 2023); *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023).

Under Rule 12(b)(6), the complaint need only plead enough factual matter to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 permits alternative and inconsistent pleading. Fed. R. Civ. P. 8(d)(2)-(3).

## IV. ARGUMENT

### a. The Court Has Personal Jurisdiction Over Sean Combs

Defendants' personal-jurisdiction argument depends on treating the FAC as if it merely repeats the Complaint. [Defs.' MTD FAC at 1, 4-5, Dkt. 43-1.] It does not. The Court previously identified a specific defect: Plaintiff had not connected Sean Combs' California business contacts to the charter and the claims arising from the charter environment. [March 31 Order at 9-10, Dkt. 37.] The FAC cures that defect by alleging that Sean Combs used JCMUS, an entity operating from West Hollywood, and California-based personnel to negotiate, authorize, and execute the charter agreement that placed Plaintiff aboard the *Victorious* and placed Sean Combs in control of the vessel, guests, and crew. [FAC ¶¶ 10-14, 17-18, 35, 60, Dkt. 38; Diggs Decl. ¶¶ 3-5, 9-12, Exs. A-B, D.]

#### i. The FAC Alleges Purposeful Availment and Purposeful Direction

The FAC satisfies the first prong of specific jurisdiction. This case sounds in tort, but the jurisdictional conduct includes a California-connected charter transaction. The Court therefore should consider both purposeful direction and purposeful availment. The FAC alleges Sean Combs did not merely have passive California contacts. It alleges he used JCMUS, an entity operating from West Hollywood, along with California-based personnel and business authority, to secure the *Victorious* charter. [FAC ¶¶ 10-14, 17-18, Dkt. 38; Diggs Decl. ¶¶ 3-5, 9-12,

Exs. A-B, D.] Defendants emphasize that Sean Combs did not personally sign the charter agreement. [Defs.' MTD FAC at 4, 8-10, 15-16, Dkt. 43-1.] That does not defeat jurisdiction at this stage. The FAC alleges JCMUS acted as Sean Combs' agent and at his direction. [FAC ¶¶ 3, 11-12, Dkt. 38.] The declaration confirms that JCMUS was the charterer, that the addendum identified JCMUS as Janice Combs Music Holdings, Inc., that Sean Combs was CEO of JCMUS, and that Brooks executed the charter on JCMUS's behalf. Trial testimony further supports the agency inference: Ferguson testified that during his tenure JCMUS was one of Sean Combs' entities, that Sean Combs owned 100 percent of it during Ferguson's tenure, and that Sean Combs was an authorized signer on its business checking account. [Diggs Decl. ¶¶ 3-5, 9-10, Exs. A-B, D; James Decl. ¶ 7**,** Ex. E.] Whether JCMUS acted for Sean Combs and whether Sean Combs controlled the charter through that entity are factual issues that must be resolved in Plaintiff's favor.

Defendants' reliance on foreign brokers, delivery location, and English-law language does not erase the pleaded California forum conduct.[6] [Defs.' MTD FAC at 8-9, Dkt. 43-1; FAC ¶¶ 10-14, Dkt. 38; Diggs Decl. ¶¶ 9-10, Ex. D.] Plaintiff's jurisdictional theory is not that St. Martin, London, or the Virgin Islands are California. It is that Sean Combs used his West Hollywood-based business structure and personnel to authorize and execute the charter that gave him control over the *Victorious* and placed Plaintiff aboard it. [FAC ¶¶ 10-14, 17-18, 35, 60, Dkt. 38; Diggs Decl. ¶¶ 3-5, 9-12, Exs. A-B, D.] Nor is Plaintiff relying on unrelated third-party contacts: the FAC alleges JCMUS acted as Sean Combs' agent and at his direction, and Brooks executed the charter from JCMUS's West Hollywood principal office. [FAC ¶¶ 3, 10-12, Dkt. 38.]

/ / /

[6] Defendants state that the charter was "executed in London," but they identify no evidence establishing that Brooks physically signed the agreement there, rather than remotely or electronically from JCMUS's West Hollywood principal office.

**ii. Plaintiff's Claims Arise Out of and Relate to Sean Combs' California Conduct**

The second prong is the issue the Court previously found missing. [March 31 Order at 9-10, Dkt. 37.] The FAC now supplies it. Plaintiff's claims against Sean Combs arise from the California-based transaction that allegedly placed Plaintiff aboard the *Victorious* and gave Sean Combs control over the charter environment. [FAC ¶¶ 10-14, 17-18, 35, 60, 69-71, 77, Dkt. 38.]

The premises-liability theory turns on control. The FAC alleges the charter agreement, executed through JCMUS at Sean Combs' direction, gave Sean Combs control over the vessel, guests, staff, and environment. [FAC ¶¶ 10-14, 18, 35, 60, Dkt. 38.] The aiding-and-abetting and IIED theories also relate to that same control: Plaintiff alleges Sean Combs fostered the dangerous environment before the assault, learned of the assault through his employees, and then used money and influence to suppress protection or accountability afterward. [FAC ¶¶ 21, 33-40, 69-71, 77-78, Dkt. 38.]

Defendants' contrary argument depends on separating Sean Combs from JCMUS and treating the charter as an unrelated entity transaction. [Defs.' MTD FAC at 8-10, 15-16, Dkt. 43-1.] But the FAC alleges the opposite. It alleges JCMUS acted as Sean Combs' agent, at his direction, and within the same interconnected business structure through which Sean Combs operated. [FAC ¶¶ 3, 10-14, Dkt. 38; Diggs Decl. ¶¶ 3-12, Exs. A-D.] At the prima facie stage, those allegations are sufficient.

**iii. Exercising Jurisdiction Is Reasonable**

Because Plaintiff satisfies the first two prongs, Sean Combs must present a compelling case that jurisdiction would be unreasonable. He cannot do so. California has an interest in adjudicating claims arising from the alleged use of a business entity operating from West Hollywood and California-based personnel to execute the charter at issue. [FAC ¶¶ 10-14, Dkt. 38; Diggs Decl. ¶¶ 3-5, 9-12, Exs. A-B, D.]

Sean Combs also cannot claim unfair surprise where the FAC alleges he used a West Hollywood-based business entity and California-based personnel to secure the charter, and the trial testimony independently confirms his Los Angeles residence, staff infrastructure, and operations. [FAC ¶¶ 10-14, Dkt. 38; James Decl. ¶¶ 4-6, 11, Exs. B-D, I.]

Nor is this an unfair forum. Defendants removed the case to federal court, stipulated to proceed in this District, and agreed not to seek transfer. [Notice of Removal, Dkt. 1; Joint Stipulation ¶ 7, Dkt. 16; Order re Stipulation, Dkt. 17.] Having secured that procedural compromise, Defendants cannot plausibly argue that litigating in this District offends fair play and substantial justice.

Defendants' foreign-location arguments raise factual disputes about agency, control, and the charter transaction; they do not establish that California is an unreasonable forum, particularly where Defendants removed the case, stipulated to remain here, and agreed not to seek transfer. [Defs.' MTD FAC at 8-10, Dkt. 43-1; Joint Stipulation ¶ 7, Dkt. 16.]

**iv. The FAC Does Not Waive General Jurisdiction**

Defendants also argue the FAC concedes the absence of general jurisdiction because it pleads Sean Combs' Florida citizenship for diversity purposes. [Defs.' MTD FAC at 6, Dkt. 43-1; FAC ¶ 6, Dkt. 38.] That overreads the pleading. Citizenship allegations for subject-matter jurisdiction are not a waiver of Plaintiff's ability to rely on evidence concerning residence, domicile, and operational presence for personal jurisdiction. [FAC ¶ 6, Dkt. 38; James Decl. ¶¶ 4-6, 11, Exs. B-D, I.] In any event, the Court need not resolve general jurisdiction because the FAC independently establishes specific jurisdiction.

**b. California Law Remains Available, and Maritime Claims Are Properly Pleaded in the Alternative**

Defendants' California-law and maritime arguments should be rejected at the

pleading stage.

The Court did not previously hold that California law was unavailable. [March 31 Order at 11, Dkt. 37.] It held that both sides had not adequately addressed maritime law and denied Defendants' Rule 12(b)(6) motion without prejudice. [March 31 Order at 11-12, Dkt. 37.] The FAC now addresses that issue directly. It asserts California-law claims as the primary basis for relief, preserves Plaintiff's jury-trial right, does not designate the action as an admiralty claim under Rule 9(h), and pleads general maritime theories only in the alternative if the Court determines maritime law applies. [FAC ¶ 8, Dkt. 38.] Plaintiff's preservation of her position that admiralty jurisdiction does not apply is not a waiver of alternative maritime pleading if the Court reaches a different conclusion.

Defendants also cannot fairly fault Plaintiff for addressing maritime law now. [Defs.' MTD FAC at 12-14, Dkt. 43-1.] The maritime issue entered the case through the parties' stipulation to remain in federal court – a stipulation Defendants drafted and filed as part of the compromise under which Plaintiff withdrew her remand motion and Defendants agreed to forgo any transfer motion. [Joint Stipulation ¶ 7, Dkt. 16; James Decl. ¶ 3, Ex. A.] That stipulation included the language that the Court had "original jurisdiction under both 28 U.S.C. § 1332 and § 1333." [Joint Stipulation ¶ 7, Dkt. 16.] The Court then independently reviewed subject-matter jurisdiction and found § 1333 satisfied. [March 31 Order at 3, 11, Dkt. 37.] Defendants cannot use their own jurisdictional drafting as a trap: first invoking § 1333 to keep the case in federal court, then arguing Plaintiff's alternative maritime pleading makes the FAC defective. [Joint Stipulation ¶ 7, Dkt. 16; Defs.' MTD FAC at 12-14, Dkt. 43-1.]

Rule 8 defeats Defendants' election argument. [Fed. R. Civ. P. 8(d)(2)-(3); Defs.' MTD FAC at 14, Dkt. 43-1.] A party may plead claims alternatively or hypothetically and may state separate claims "regardless of consistency." Fed. R.

Civ. P. 8(d)(2)-(3). Plaintiff is not required to elect now between California-law claims and maritime alternatives, especially where Defendants themselves argue both that admiralty jurisdiction does not apply and that Plaintiff must abandon either California-law or maritime theories if it does. If the Court agrees that admiralty jurisdiction does not apply, Plaintiff proceeds on her California-law claims. If the Court adheres to its prior § 1333 determination, the alternative maritime counts preserve Plaintiff's claims under the law the Court may deem applicable. Either way, alternative maritime pleading is not a basis to dismiss the FAC or Christian Combs' maritime counts.

Defendants also have not shown that California law is categorically unavailable on the pleadings. Their argument treats the assault as an isolated offshore event disconnected from California. [Defs.' MTD FAC at 10-12, Dkt. 43-1.] The FAC alleges otherwise. It alleges the charter was arranged, authorized, and executed through Sean Combs' California-based business structure, and that this transaction created the control giving rise to Plaintiff's claims. [FAC ¶¶ 10-14, 17-18, 35, 60, 69-71, 77, Dkt. 38]. Defendants' reliance on cases involving conduct wholly disconnected from California therefore does not warrant dismissal with prejudice. At minimum, choice of law cannot be resolved against Plaintiff on this undeveloped record.

**c. The FAC States Claims Against Sean Combs**

The claims against Sean Combs must be evaluated in context. The FAC alleges that Sean Combs was simultaneously: the father of the alleged assailant; the CEO of JCMUS, the entity that chartered the *Victorious*; and the principal charter guest who exercised control over the vessel, guests, crew, schedule, and charter environment. Trial testimony further supports that JCMUS was one of Sean Combs' entities and that he owned 100 percent of it during Ferguson's tenure. [FAC ¶¶ 3, 10-14, 18, 35, 60, Dkt. 38; Diggs Decl. ¶¶ 3-5, 9-12, Exs. A-B, D; James Decl. ¶ 7, Ex. E.] The FAC further alleges that Sean Combs transformed the *Victorious* into a

dangerous environment involving open drug and alcohol use, suspected laced drinks, suspected commercial sexual activity, disrespect toward crew, overnight demands on staff, fights, physical violence, and severely incapacitated women.[7] [FAC ¶¶ 21, 35-38, Dkt. 38.] After Christian Combs allegedly sexually assaulted Plaintiff, Sean Combs' own employees, including personal assistant Brendan Paul, chief of staff Kristina Khorram, and employee Frankie Santella, allegedly learned of the assault and informed Sean Combs. Plaintiff further alleges that rather than protecting her, initiating an investigation, or ensuring accountability, Combs paid Captain Milkov to dissuade him from protecting Plaintiff or taking action on her behalf. [FAC ¶¶ 33-34, 40, 63, 69-71, 77, Dkt. 38.]

**i. Premises Liability and Alternative Maritime Negligence Are Adequately Pleaded**

Defendants again argue that Sean Combs cannot be liable because he did not personally sign the charter agreement. [Defs.' MTD FAC at 14-16, Dkt. 43-1.] That argument elevates form over control. Premises liability turns on whether the defendant owned, leased, occupied, or controlled the premises. *Alcaraz v. Vece*, 14 Cal.4th 1149, 1156-57 (1997) ("A defendant need not own, possess and control property in order to be held liable; control alone is sufficient."); see also CACI No. 1000; *Rodriguez v. United States*, No. 2:14-cv-02518-ODW, 2017 WL 924458, at *2 (C.D. Cal. Mar. 6, 2017) (citing CACI No. 1000). The FAC alleges Sean Combs controlled the *Victorious* through JCMUS, his agent, and exercised actual control over the staff, guests, and premises during the charter. [FAC ¶¶ 10-14, 18, 35, 60, Dkt. 38.]

Defendants' "no special relationship" argument fails for the same reason. [Defs.' MTD FAC at 15, Dkt. 43-1.] The FAC alleges that Sean Combs was the controlling charter guest; that he obtained and exercised that control through JCMUS

[7] Trial testimony further supports that similar environments were not isolated to the *Victorious*. Witnesses described Sean Combs using staff, assistants, security, aliases, travel personnel, residences, hotel rooms, luxury properties, supplies, drugs, alcohol, and sexual activity in overlapping ways. [James Decl. ¶¶ __, Exs. __.]

over staff, guests, and the premises; and that he required Plaintiff, a working crew member, to serve him and his guests. [FAC ¶¶ 10-14, 18-21, 35-38, 60-66, Dkt. 38.]

The FAC also adequately pleads foreseeability. Defendants frame foreseeability too narrowly by asking only whether Sean Combs knew Christian Combs had previously committed a sexual assault. [Defs.' MTD FAC at 15-17, Dkt. 43-1.] But the FAC alleges a broader dangerous environment that Sean Combs controlled before the assault, including open drug and alcohol use, suspected laced drinks, suspected commercial sexual activity, disrespect toward crew, overnight demands on staff, fights, physical violence, and women becoming severely incapacitated after minimal alcohol. [FAC ¶¶ 21, 36-38, Dkt. 38.] That is sufficient at the pleading stage.

If the Court determines maritime law applies, the same allegations support maritime negligence in the alternative. Defendants' maritime-negligence argument assumes Sean Combs was neither a charterer nor a controller of the vessel. [Defs.' MTD FAC at 16-17, Dkt. 43-1.] The FAC alleges the opposite: he controlled the charter through JCMUS and exercised actual control over the charter environment. [FAC ¶¶ 10-14, 18, 35, 60, 66, Dkt. 38.] That factual dispute cannot be resolved against Plaintiff on a motion to dismiss.

**ii. Aiding and Abetting and Alternative Maritime Joint Tortfeasor Liability Are Adequately Pleaded**

Defendants argue the FAC does not allege actual knowledge because it does not allege Sean Combs knew Christian Combs planned to assault Plaintiff before it happened. [Defs.' MTD FAC at 17, Dkt. 43-1.] That is too narrow. The FAC alleges both pre-assault knowledge of dangerous conditions and post-assault knowledge followed by concealment. [FAC ¶¶ 21, 33-40, 69-71, Dkt. 38.]

Before the assault, Sean Combs allegedly controlled and maintained an environment where intoxication, suspected drugged alcohol, sexual activity, violence, and disregard for crew safety were already present. [FAC ¶¶ 21, 35-38, Dkt. 38.] After the assault, Sean Combs' employees allegedly informed him of what

happened. [FAC ¶¶ 34, 69, Dkt. 38.] He then allegedly used money and influence to suppress protection and accountability by paying Captain Milkov to dissuade him from protecting Plaintiff or taking action on her behalf, while Plaintiff remained aboard and had to continue serving Christian Combs. [FAC ¶¶ 33-34, 40, 63, 70-71, 77, Dkt. 38.]

Those allegations plausibly plead actual knowledge and substantial assistance at least as to the post-assault concealment and continuation of harm. This is not mere negligence or a vague suspicion of wrongdoing. Because the FAC plausibly alleges Sean Combs' own underlying fault, Defendants' derivative attack on alternative maritime joint-tortfeasor liability also fails at this stage.

**iii. IIED and Alternative Maritime IIED Are Adequately Pleaded**

The IIED claim against Sean Combs does not require Plaintiff to allege that he personally committed the assault. It rests on his alleged conduct after learning of it. The FAC alleges Sean Combs learned through his employees that his son sexually assaulted a young crew member working aboard his chartered yacht, then paid the captain to suppress protection or accountability, leaving Plaintiff to continue serving her attacker. [FAC ¶¶ 33-34, 40, 77-78, Dkt. 38.]

Defendants improperly isolate the alleged payment from the surrounding conduct. [Defs.' MTD FAC at 19-20, Dkt. 43-1.] The FAC alleges more than a payment in the abstract: after learning of the assault, Sean Combs allegedly paid the captain to dissuade him from protecting Plaintiff or acting on her behalf, leaving Plaintiff to continue serving Christian Combs without protection, investigation, or accountability. [FAC ¶¶ 33-34, 40, 77-78, Dkt. 38.] That is plausibly extreme and outrageous conduct directed at Plaintiff. At minimum, those allegations support reckless disregard of the probability that forcing a young crew member to continue serving her alleged attacker while suppressing protection or accountability would cause severe emotional distress.

The FAC also pleads causation and severe emotional distress. It alleges distress from the assault and the post-assault coverup, including isolation, retaliation, forced continued contact with Christian Combs, termination, severe mental-health deterioration, medication and intensive therapy, anxiety, panic attacks, an eating disorder, suicidal ideations, epileptic seizures, and inability to secure another permanent position in the yachting industry. [FAC ¶¶ 40-43, 77-78, Dkt. 38.] Those allegations satisfy Rule 12(b)(6). If the Court determines maritime law applies, the same facts support maritime IIED in the alternative.

**d. Jurisdictional Discovery or, Alternatively, Leave to Amend Should Be Granted if the Court Finds Any Deficiency**

If the Court concludes Plaintiff has not made a prima facie showing of personal jurisdiction, Plaintiff respectfully requests limited jurisdictional discovery before dismissal. Defendants' motion turns on factual disputes concerning JCMUS's agency role, Brooks' authority and location when executing the MYBA Charter Agreement, Sean Combs' direction and approval of the charter, the use of West Hollywood personnel or systems in the transaction, and Sean Combs' California residence and business operations. Those facts are largely within Defendants' control and should not be resolved against Plaintiff on a Rule 12(b)(2) motion without targeted discovery.

Alternatively, if the Court finds any pleading deficiency, Plaintiff respectfully requests leave to amend. Fed. R. Civ. P. 15(a)(2). The case remains at the pleading stage, and the Court previously granted leave because it could not conclude the jurisdictional defect could not be cured. [March 31 Order at 12, Dkt. 37.] Plaintiff has now added allegations tying Sean Combs' California-based business operations, JCMUS, California-based personnel, and the charter agreement to Plaintiff's claims. Any remaining deficiency could be cured by additional allegations concerning Sean Combs' California residence and operations, JCMUS's agency relationship, Brooks' role, California-based charter personnel, Sean Combs' control over the *Victorious*,

and his post-assault response. Dismissal with prejudice is unwarranted.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss the First Amended Complaint or, in the alternative, grant limited jurisdictional discovery or leave to amend.

Dated: August 14, 2026 **IVIE McNEILL WYATT PURCELL & DIGGS**

**By:** */s/ Laura N. James*
**RODNEY S. DIGGS, ESQ.**
**LAURA N. JAMES, ESQ.**
Attorney for Plaintiff,
**GRACE O'MARCAIGH**

**DECLARATION OF LAURA N. JAMES**

I, LAURA N. JAMES, declare as follows:

1. I am an attorney at law duly licensed to practice before all courts of the State of California. I am an associate at the law firm of Ivie McNeill Wyatt Purcell & Diggs, A Professional Law Corporation ("IMWPD"), located at 444 South Flower Street, Suite 3200, Los Angeles, California 90071. I am one of the attorneys of record for Plaintiff Grace O'Marcaigh in this action. I have personal knowledge of the matters stated in this declaration and, if called as a witness, could and would competently testify to them.

*2.* I submit this declaration in support of Plaintiff's Opposition to Defendants' Motion to Dismiss the First Amended Complaint. This declaration attaches true and correct copies of selected materials relevant to the issues raised in Defendants' Motion, including correspondence concerning the parties' stipulation to proceed in federal court and selected transcripts from the federal criminal trial of *United States of America v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love,"* Case No. 24 Cr. 542 (AS), United States District Court for the Southern District of New York.

3. Attached as **Exhibit A** is a true and correct copy of correspondence between Rodney S. Diggs and Tyrine S. Aman, counsel for Plaintiff, and Megan A. Maitia and Hayley E. Huntley, then-counsel for Defendants, concerning the parties' stipulation to proceed in federal court. The correspondence includes emails from approximately May 22, 2025 through June 20, 2025, including Defendants' counsel's June 16, 2025 confirmation that the parties had agreed Plaintiff would withdraw her remand motion and Defendants would not seek transfer outside the Central District of California, and Defendants' counsel's June 18, 2025 circulation of the draft stipulation memorializing that agreement.

4. Attached as **Exhibit B** is a true and correct copy of selected excerpts from the trial transcript of Brendan Paul, dated June 20, 2025, in *United States of*

*America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including Sean Combs' Los Angeles residence and operations, staff infrastructure, use of assistants, logistics, supplies, travel, and controlled private environments.

5. Attached as **Exhibit C** is a true and correct copy of selected excerpts from the trial transcript of George Kaplan, dated May 21, 2025 and May 22, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including staff advance work, hotel and residence setup, use of assistants, supplies, travel logistics, and company resources.

6. Attached as **Exhibit D** is a true and correct copy of selected excerpts from the trial transcript of David James, dated May 19, 2025 and May 20, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including Sean Combs' use of assistants for travel and yacht-related logistics and the overlap between business and personal travel.

7. Attached as **Exhibit E** is a true and correct copy of selected excerpts from the trial transcript of Derek Ferguson, dated June 3, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including Sean Combs' ownership and control of JCMUS during Ferguson's tenure, JCMUS's business checking account, authorized signers on that account, and JCMUS's role in Sean Combs' business operations.

8. Attached as **Exhibit F** is a true and correct copy of selected excerpts from the trial transcript of Mia, dated May 29, 2025, May 30, 2025, and June 2, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's

Opposition, including staff control, employment-related power dynamics, fear of retaliation, and controlled environments.

9. Attached as **Exhibit G** is a true and correct copy of selected excerpts from the trial transcript of Jane, dated June 5, 2025 through June 12, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including Sean Combs' Los Angeles presence, Mapleton residence, staff logistics, and use of assistants and security to obtain drugs, cash, and other items.

10. Attached as **Exhibit H** is a true and correct copy of selected excerpts from the trial transcript of Casandra Ventura, dated May 13, 2025 through May 15, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including Sean Combs-controlled private environments involving drugs, alcohol, and sexual activity; staff, assistant, and security involvement in booking rooms, using aliases, stocking and replenishing supplies, and providing drugs; and Sean Combs' direction of those environments.

11. Attached as **Exhibit I** is a true and correct copy of selected excerpts from the trial transcript of Jonathan Perez, dated June 13, 2025, in *United States of America v. Sean Combs,* Case No. 24 Cr. 542 (AS). The excerpts are submitted for the limited Rule 12(b)(2) issues addressed in Plaintiff's Opposition, including Sean Combs' Los Angeles residence, staff operations, and physical work locations.

12. Plaintiff does not submit the trial-transcript excerpts to prove liability by propensity. The excerpts are submitted for targeted Rule 12(b)(2) purposes, including jurisdiction, agency, control, California residence and operations, staff infrastructure, use of entities and employees, and the relationship between Sean Combs' California-connected business activity and Plaintiff's claims.

13. To the extent the attached excerpts are cited in Plaintiff's Opposition,

they are cited for the limited purposes stated above and not to expand the pleadings or to ask the Court to resolve disputed merits issues at the Rule 12(b)(6) stage.

14. The documents attached as exhibits are true and correct copies of the materials identified above, except that irrelevant pages may have been omitted for concision. Any highlighting was added solely for the Court's convenience.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of August, 2026, at Los Angeles, California.

***/s/ Laura N. James***
LAURA N. JAMES, Declarant

EXHIBIT

A

**Laura N. James**

---

**From:** Rodney S. Diggs
**Sent:** Tuesday, August 11, 2026 1:21 PM
**To:** Laura N. James
**Subject:** FW: Grace O'Marcaigh - meet and confer?

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Wednesday, June 11, 2025 12:24 PM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Tyrine, Rodney,

I called your office and left a voicemail for Tyrine (Rodney, I understand you're out of the office).

Tyrine, please give me a call at your convenience. We would like to revisit your earlier offer to resolve the remand motion by agreeing not to move to transfer venue; in other words, agreeing that the case will remain in federal court in the Central District of California.

I'm available on my office line today. Thank you!

Megan A. Maitia (she/her)
Summa LLP
1010 Sycamore Ave. Unit 117
South Pasadena, CA 91030
Office: (213) 260-9452
www.summaLLP.com

On Sun, May 25, 2025 at 12:04 PM Megan Maitia <megan@summallp.com> wrote:

> Hi Tyrine, forgive me for the holiday-weekend email. I aimed to reply Friday, but alas here I am.
>
> Unfortunately, we are not able to stipulate on the remand/venue issue - that is, if the case remains in federal court, our plan remains to file a motion to transfer venue. As we discussed, we will send a stipulation to move out our response deadline until after the remand motion is decided.
>
> **Question**: are you available to move the hearing by one week, from June 20 **to June 27**? I am traveling out of state on June 20, but am here and available June 27 (currently, June 27 is our scheduling conference, so I'm hopeful that date will work, too.) Let me know at your convenience, and thank you, and enjoy the holiday weekend, everyone!
>
> Best,
> Megan
>
> Megan A. Maitia (she/her)
> Summa LLP
> 1010 Sycamore Ave. Unit 117
> South Pasadena, CA 91030
> Office: (213) 260-9452
> www.summaLLP.com
>
> On Thu, May 22, 2025 at 5:42 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:
>
>> Hello Megan,
>>
>> Nice speaking with you all today. To follow-up on our conversation, we will be filing our motion for remand tomorrow. We are willing to further meet and confer about this following our filing.

We are willing to stipulate to continue the deadline for your responsive pleading until after the Court's ruling on the motion on the motion for remand. Please circulate a stipulation.

Thank you,

Tyrine

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 10:09 AM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

No apologies, please. How's Thursday at 2 pm? I'll send a calendar invite to hold the time, and we can adjust it, as needed.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Mon, May 19, 2025 at 9:55 AM Tyrine S. Aman <TAman@imwlaw.com> wrote:

> Good morning Megan,
>
> Thank you for your e-mail. My apologies for the delay, I have in depositions all last week and Rodney was doing trial prep. I am available between 2:30 p.m. and 4:00 p.m. this afternoon and anytime Thursday. Please let me know what works best for you.
>
> Thank you,
>
> Tyrine

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Tyrine S. Aman | Associate**
IVIE McNEILL WYATT PURCELL & DIGGS
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 9:35 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>; Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Hayley Huntley <hayley@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, Tyrine, hope you both had a nice weekend.

Following up on our meet and confer obligations. I called your office last week and left a message for Tyrine. Our (defendants') deadline to meet and confer on a responsive motion is this Friday. Let me know your availability.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 14, 2025 at 10:31 AM Megan Maitia <megan@summallp.com> wrote:

Rodney, Tyrine, hope you are both doing well.

We have several meet and confer deadlines coming up, including for your motion to remand, our responsive motion to the complaint, and the Rule 26 meeting in advance of the scheduling conference.

Should we have a call? If you are moving to remand, perhaps we can seek a stipulated schedule where your motion is briefed and heard first and then, only if your motion is denied, we move forward with our responsive motion and the Rule 26 report and Rule 16 conference.

I am open to suggestions on how to do this the most efficiently.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

**Laura N. James**

**From:** Rodney S. Diggs
**Sent:** Tuesday, August 11, 2026 1:21 PM
**To:** Laura N. James
**Subject:** FW: Grace O'Marcaigh - meet and confer?

IVIE McNEILL WYATT PURCELL & DIGGS

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Tyrine S. Aman <TAman@imwlaw.com>
**Sent:** Thursday, June 12, 2025 11:39 AM
**To:** Megan Maitia <megan@summallp.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** RE: Grace O'Marcaigh - meet and confer?

Hi Megan,

I briefly spoke to Rodney and he still needs some time to think about it given that he is engaged in an all-day mediation out of town today and was traveling all day yesterday as discussed. He is willing to set up a call on Monday to discuss further, which should still give you ample time to oppose the motion if necessary.

Rodney did state that should you all come to an agreement regarding keeping the case in federal court in the Central District of California, he would only be willing to represent this agreement to the Court by way of written Stipulation.

Thank you,
Tyrine

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, June 12, 2025 11:15 AM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Tyrine, Rodney,

Can you let us know your position on the proposed agreement to resolve the remand motion?

Megan A. Maitia (she/her)
Summa LLP
1010 Sycamore Ave. Unit 117
South Pasadena, CA 91030
Office: (213) 260-9452
www.summaLLP.com

On Wed, Jun 11, 2025 at 12:24 PM Megan Maitia <megan@summallp.com> wrote:

> Tyrine, Rodney,
>
> I called your office and left a voicemail for Tyrine (Rodney, I understand you're out of the office).
>
> Tyrine, please give me a call at your convenience. We would like to revisit your earlier offer to resolve the remand motion by agreeing not to move to transfer venue; in other words, agreeing that the case will remain in federal court in the Central District of California.
>
> I'm available on my office line today. Thank you!
>
> Megan A. Maitia (she/her)
> Summa LLP
> 1010 Sycamore Ave. Unit 117
> South Pasadena, CA 91030
> Office: (213) 260-9452
> www.summaLLP.com
>
> On Sun, May 25, 2025 at 12:04 PM Megan Maitia <megan@summallp.com> wrote:
>
>> Hi Tyrine, forgive me for the holiday-weekend email. I aimed to reply Friday, but alas here I am.
>>
>> Unfortunately, we are not able to stipulate on the remand/venue issue - that is, if the case remains in federal court, our plan remains to file a motion to transfer venue. As we discussed, we will send a stipulation to move out our response deadline until after the remand motion is decided.
>>
>> **Question**: are you available to move the hearing by one week, from June 20 **to June 27**? I am traveling out of state on June 20, but am here and available June 27 (currently, June 27 is our scheduling conference, so I'm hopeful that date will work, too.) Let me know at your convenience, and thank you, and enjoy the holiday weekend, everyone!
>>
>> Best,
>> Megan
>>
>> Megan A. Maitia (she/her)
>> Summa LLP
>> 1010 Sycamore Ave. Unit 117
>> South Pasadena, CA 91030

Office: (213) 260-9452
www.summaLLP.com

On Thu, May 22, 2025 at 5:42 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

Hello Megan,

Nice speaking with you all today. To follow-up on our conversation, we will be filing our motion for remand tomorrow. We are willing to further meet and confer about this following our filing.

We are willing to stipulate to continue the deadline for your responsive pleading until after the Court's ruling on the motion on the motion for remand. Please circulate a stipulation.

Thank you,

Tyrine

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 10:09 AM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

No apologies, please. How's Thursday at 2 pm? I'll send a calendar invite to hold the time, and we can adjust it, as needed.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Mon, May 19, 2025 at 9:55 AM Tyrine S. Aman <TAman@imwlaw.com> wrote:

> Good morning Megan,

Thank you for your e-mail. My apologies for the delay, I have in depositions all last week and Rodney was doing trial prep. I am available between 2:30 p.m. and 4:00 p.m. this afternoon and anytime Thursday. Please let me know what works best for you.

Thank you,

Tyrine

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 9:35 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>; Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Hayley Huntley <hayley@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, Tyrine, hope you both had a nice weekend.

Following up on our meet and confer obligations. I called your office last week and left a message for Tyrine. Our (defendants') deadline to meet and confer on a responsive motion is this Friday. Let me know your availability.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 14, 2025 at 10:31 AM Megan Maitia <megan@summallp.com> wrote:

> Rodney, Tyrine, hope you are both doing well.
>
> We have several meet and confer deadlines coming up, including for your motion to remand, our responsive motion to the complaint, and the Rule 26 meeting in advance of the scheduling conference.
>
> Should we have a call? If you are moving to remand, perhaps we can seek a stipulated schedule where your motion is briefed and heard first and then, only if your motion is denied, we move forward with our responsive motion and the Rule 26 report and Rule 16 conference.

I am open to suggestions on how to do this the most efficiently.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

**Laura N. James**

**From:** Rodney S. Diggs
**Sent:** Tuesday, August 11, 2026 1:22 PM
**To:** Laura N. James
**Subject:** FW: Grace O'Marcaigh - meet and confer?

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, June 16, 2025 1:23 PM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Tyrine, Rodney just called my cell, and we talked (a scheduling miracle!). Rodney said, and I'm confirming here, that the parties are in agreement to resolve the remand motion by remaining in federal

court in the Central District of California, and Defendants agree not to move to transfer venue outside of C.D. Cal. We will circulate a draft stipulation for your review.

Best,
Megan

Megan A. Maitia (she/her)
Summa LLP
1010 Sycamore Ave. Unit 117
South Pasadena, CA 91030
Office: (213) 260-9452
www.summaLLP.com

On Mon, Jun 16, 2025 at 1:11 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

Hi Megan,

My sincerest apologies – Rodney needs to reschedule for this afternoon because of a personal matter. I am available to speak, but we would both like to be on the call. Are you all available any time after 3:30 p.m.?

**Tyrine S. Aman** | **Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**

Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, May 29, 2025 11:35 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Absolutely, see attached. The new briefing schedule based on a July 11 hearing date is highlighted in yellow.

Let us know of any comments or whether we have your permission to add your e-signature and file.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Thu, May 29, 2025 at 11:16 AM Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

Can you please send none last time for review.

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, May 29, 2025 10:57 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Thank you, Rodney! Once I change the hearing date to July 11, May I sign for you and file? (I can also send again for review, if you prefer.)

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On May 29, 2025, at 10:39 AM, Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

I am not available on July 18th. I have oral arguments in the 9th Circuit Court of Appeals that day.

July 11th just depends if my trial on July 7th starts. Ms. Aman will be licensed in federal court by then but she starts a trial on June 16th in Sacramento that has to go because the 5-yr SOL runs on June 30th. I am not sure if she will be completed by trial then.

Let's choose July 11th for now. I doubt there will be oral arguments but at least I will be in town if I am in trial and my trial is at Stanley Mosk.

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**

This electronic mail transmission, including any attachments, may contain confidential information which legally privileged. The information is intended only for the use of the individual or entity named above and ma contain information that may be protected by the attorney-client privilege, work-product doctrine, or oth privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intende recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in relian on the information is strictly prohibited. If you have received this electronically mailed information in erro please notify the sender immediately and permanently delete all copies of the original e-mail and any attache documentation.

**SERVICE NOTICE**

Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electron format does not indicate agreement or consent to acceptance of service in such format unless otherwise agree upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, May 29, 2025 9:53 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, are you available Friday, July 11 or 18? We can also propose Thursday July 3 for the Court, although Judge Gee normally holds civil hearings on Fridays (just in case).

Let me know at your earliest convenience, and thank you!

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 28, 2025 at 10:05 AM Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

I will be back in the country on July 1st.

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which legally privileged. The information is intended only for the use of the individual or entity named above and m contain information that may be protected by the attorney-client privilege, work-product doctrine, or ot privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intend recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in relian on the information is strictly prohibited. If you have received this electronically mailed information in err please notify the sender immediately and permanently delete all copies of the original e-mail and any attach documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electro format does not indicate agreement or consent to acceptance of service in such format unless otherwise agre upon or required by law.

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Wednesday, May 28, 2025 9:55 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune

Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, thanks for the quick response. When are you returning? Are there any Fridays dates in July that work for you? I agree that we shouldn't push it out too far, but I'm just trying to brainstorm solutions.

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 28, 2025 at 9:51 AM Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

Hi Megan –

I will be out of the country on June 27th. Currently, Ms. Aman is not licensed in federal court. I know the Court's general rule on the papers but in the event there are oral arguments, I will have no one to appear. Not sure what other suggestions you have. I don't want to push the hearing date out too far. I am available to discuss.

Best,

Rodney

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**

444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information whic legally privileged. The information is intended only for the use of the individual or entity named above and contain information that may be protected by the attorney-client privilege, work-product doctrine, or o privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the inten recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in relia on the information is strictly prohibited. If you have received this electronically mailed information in er please notify the sender immediately and permanently delete all copies of the original e-mail and any attac documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the servic process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electro format does not indicate agreement or consent to acceptance of service in such format unless otherwise agr upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Tuesday, May 27, 2025 7:20 PM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Tyrine, Rodney, attached is the proposed stipulation to move the motion hearing date by one week, to move our response deadline to a date after the remand motion is ruled on, and to move the scheduling conference.

The proposed new dates / timing is highlighted in yellow, for your review. Let me know of any comments or edits, and give me a call if you'd like to discuss live. I'm hopeful to file the stipulation tomorrow (Wednesday), if possible.

Thank you!

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Sun, May 25, 2025 at 12:04 PM Megan Maitia <megan@summallp.com> wrote:

> Hi Tyrine, forgive me for the holiday-weekend email. I aimed to reply Friday, but alas here I am.
>
> Unfortunately, we are not able to stipulate on the remand/venue issue - that is, if the case remains in federal court, our plan remains to file a motion to transfer venue. As we discussed, we will send a stipulation to move out our response deadline until after the remand motion is decided.
>
> **Question**: are you available to move the hearing by one week, from June 20 **to June 27**? I am traveling out of state on June 20, but am here and available June 27 (currently, June 27 is our scheduling conference, so I'm hopeful that date will work, too.) Let me know at your convenience, and thank you, and enjoy the holiday weekend, everyone!
>
> Best,
>
> Megan
>
> Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Thu, May 22, 2025 at 5:42 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

Hello Megan,

Nice speaking with you all today. To follow-up on our conversation, we will be filing our motion for remand tomorrow. We are willing to further meet and confer about this following our filing.

We are willing to stipulate to continue the deadline for your responsive pleading until after the Court's ruling on the motion on the motion for remand. Please circulate a stipulation.

Thank you,

Tyrine

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information wh

legally privileged. The information is intended only for the use of the individual or entity named above and contain information that may be protected by the attorney-client privilege, work-product doctrine, or privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the int recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in re on the information is strictly prohibited. If you have received this electronically mailed information in please notify the sender immediately and permanently delete all copies of the original e-mail and any att documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of pr motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic f does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed up required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 10:09 AM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

No apologies, please. How's Thursday at 2 pm? I'll send a calendar invite to hold the time, and we can adjust it, as needed.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Mon, May 19, 2025 at 9:55 AM Tyrine S. Aman <TAman@imwlaw.com> wrote:

Good morning Megan,

Thank you for your e-mail. My apologies for the delay, I have in depositions all last week and Rodney was doing trial prep. I am available between 2:30 p.m. and 4:00 p.m. this afternoon and anytime Thursday. Please let me know what works best for you.

Thank you,

Tyrine

**Tyrine S. Aman** | **Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information w legally privileged. The information is intended only for the use of the individual or entity named above a contain information that may be protected by the attorney-client privilege, work-product doctrine, o privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the in recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in r on the information is strictly prohibited. If you have received this electronically mailed information in please notify the sender immediately and permanently delete all copies of the original e-mail and any a documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of p motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed u required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 9:35 AM

**To:** Rodney S. Diggs <RDiggs@imwlaw.com>; Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Hayley Huntley <hayley@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, Tyrine, hope you both had a nice weekend.

Following up on our meet and confer obligations. I called your office last week and left a message for Tyrine. Our (defendants') deadline to meet and confer on a responsive motion is this Friday. Let me know your availability.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 14, 2025 at 10:31 AM Megan Maitia <megan@summallp.com> wrote:

> Rodney, Tyrine, hope you are both doing well.
>
> We have several meet and confer deadlines coming up, including for your motion to remand, our responsive motion to the complaint, and the Rule 26 meeting in advance of the scheduling conference.

Should we have a call? If you are moving to remand, perhaps we can seek a stipulated schedule where your motion is briefed and heard first and then, only if your motion is denied, we move forward with our responsive motion and the Rule 26 report and Rule 16 conference.

I am open to suggestions on how to do this the most efficiently.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

**Laura N. James**

**From:** Rodney S. Diggs
**Sent:** Tuesday, August 11, 2026 1:24 PM
**To:** Laura N. James
**Subject:** FW: Grace O'Marcaigh - meet and confer?
**Attachments:** 1. 2025.06.18 Stipulation to Proceed in Federal Court tsa edits [SUMMA EDITS].docx; 2. 2025.06.18 Proposed Order to Proceed in Federal Court tsa edits [SUMMA EDITS].docx

**Rodney S. Diggs | Director**
IVIE McNEILL WYATT PURCELL & DIGGS
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Hayley Huntley <hayley@summallp.com>
**Sent:** Wednesday, June 18, 2025 3:55 PM
**To:** Tyrine S. Aman <TAman@imwlaw.com>; Rodney S. Diggs <RDiggs@imwlaw.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>
**Cc:** Megan Maitia <megan@summallp.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Tyrine & Team -- thank you for reviewing so quickly (and for catching my typo in the caption, yikes).

We have accepted your suggested changes except for three (really just two on the stip, and a corresponding one on the proposed order). As we understand it, our agreement is a one-to-one swap, whereby we each agree not to pursue a single strategic move *without* regard to whether we have the right to do so. In the plainest terms, you agree not to move to remand; we agree not to move to transfer venue (putting aside our mutual ability to do so, or the viability of those requests). We feel paragraph 7 is straightforward and reflective of our agreement.

Please feel free to call us to discuss -- we aren't trying to obstruct or complicate, just hoping to memorialize the agreement, no more no less. (Attaching re-redlined versions representing this proposal.) Otherwise, if you approve, we will sign and file.

Thank you so much,

Hayley Huntley
*with* Megan Maitia

On Wed, Jun 18, 2025 at 1:56 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

> Good morning Hayley,
>
> Thank your office for drafting this. Please see our edits/revisions in redline.
>
> Best,
>
> Tyrine
>
> IMW
> IVIE McNEILL WYATT PURCELL & DIGGS
>
> **Tyrine S. Aman** | **Associate**
> **IVIE McNEILL WYATT PURCELL & DIGGS**
> 444 South Flower Street, Suite 3200
> Los Angeles, CA 90071
> Phone: (213) 489-0028 | Fax: (213) 489-0552
> TAman@imwlaw.com | www.imwlaw.com
>
> ***"A Tradition of Excellence Since 1943"***
>
> **CONFIDENTIALITY NOTICE**
> This electronic mail transmission, including any attachments, may contain confidential information which is

legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Hayley Huntley <hayley@summallp.com>
**Sent:** Wednesday, June 18, 2025 11:06 AM
**To:** Tyrine S. Aman <TAman@imwlaw.com>; Rodney S. Diggs <RDiggs@imwlaw.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>
**Cc:** Megan Maitia <megan@summallp.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Good morning Tyrine & Rodney,

Attached, please find the stipulation to remain in federal court (CD Cal) and to adjust the briefing schedule. Please feel free to propose any revisions in "track changes" and/or otherwise confirm we may sign on your behalf. We plan to file today if possible.

Thank you so much,

Hayley Huntley

On Mon, Jun 16, 2025 at 4:12 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

Hi Megan,

I am glad you both were able to connect! I think our communications were getting caught in the crosshairs between the three of us.

I am up to speed and will look out for the stipulation from your office.

Many thanks and have a great week,

Tyrine

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Tyrine S. Aman** | **Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, June 16, 2025 1:23 PM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer

<LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Tyrine, Rodney just called my cell, and we talked (a scheduling miracle!). Rodney said, and I'm confirming here, that the parties are in agreement to resolve the remand motion by remaining in federal court in the Central District of California, and Defendants agree not to move to transfer venue outside of C.D. Cal. We will circulate a draft stipulation for your review.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Mon, Jun 16, 2025 at 1:11 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

> Hi Megan,
>
> My sincerest apologies – Rodney needs to reschedule for this afternoon because of a personal matter. I am available to speak, but we would both like to be on the call. Are you all available any time after 3:30 p.m.?

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, May 29, 2025 11:35 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Absolutely, see attached. The new briefing schedule based on a July 11 hearing date is highlighted in yellow.

Let us know of any comments or whether we have your permission to add your e-signature and file.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Thu, May 29, 2025 at 11:16 AM Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

Can you please send none last time for review.

IMW
IVIE McNEILL WYATT PURCELL & DIGGS

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above and may contain information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reliance on the information is strictly prohibited. If you have received this electronically mailed information in error, please notify the sender immediately and permanently delete all copies of the original e-mail and any attached documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic format does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, May 29, 2025 10:57 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Thank you, Rodney! Once I change the hearing date to July 11, May I sign for you and file? (I can also send again for review, if you prefer.)

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

> On May 29, 2025, at 10:39 AM, Rodney S. Diggs <RDiggs@imwlaw.com> wrote:
>
> I am not available on July 18th. I have oral arguments in the 9th Circuit Court of Appeals that day.

July 11th just depends if my trial on July 7th starts. Ms. Aman will be licensed in federal court by then but she starts a trial on June 16th in Sacramento that has to go because the 5-yr SOL runs on June 30th. I am not sure if she will be completed by trial then.

Let's choose July 11th for now. I doubt there will be oral arguments but at least I will be in town if I am in trial and my trial is at Stanley Mosk.

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information whic legally privileged. The information is intended only for the use of the individual or entity named above and contain information that may be protected by the attorney-client privilege, work-product doctrine, or o privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the inter recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in relia on the information is strictly prohibited. If you have received this electronically mailed information in er please notify the sender immediately and permanently delete all copies of the original e-mail and any attac documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the servic process, motions, pleadings, documents, or any other items by electronic format. Correspondence via electro format does not indicate agreement or consent to acceptance of service in such format unless otherwise agr upon or required by law.

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Thursday, May 29, 2025 9:53 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, are you available Friday, July 11 or 18? We can also propose Thursday July 3 for the Court, although Judge Gee normally holds civil hearings on Fridays (just in case).

Let me know at your earliest convenience, and thank you!

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 28, 2025 at 10:05 AM Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

I will be back in the country on July 1st.

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**

This electronic mail transmission, including any attachments, may contain confidential information whi legally privileged. The information is intended only for the use of the individual or entity named above and contain information that may be protected by the attorney-client privilege, work-product doctrine, or privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the inte recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in reli on the information is strictly prohibited. If you have received this electronically mailed information in e please notify the sender immediately and permanently delete all copies of the original e-mail and any atta documentation.

**SERVICE NOTICE**

Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the servi process, motions, pleadings, documents, or any other items by electronic format. Correspondence via elect format does not indicate agreement or consent to acceptance of service in such format unless otherwise ag upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Wednesday, May 28, 2025 9:55 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>
**Cc:** Tyrine S. Aman <TAman@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, thanks for the quick response. When are you returning? Are there any Fridays dates in July that work for you? I agree that we shouldn't push it out too far, but I'm just trying to brainstorm solutions.

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 28, 2025 at 9:51 AM Rodney S. Diggs <RDiggs@imwlaw.com> wrote:

Hi Megan –

I will be out of the country on June 27th. Currently, Ms. Aman is not licensed in federal court. I know the Court's general rule on the papers but in the event there are oral arguments, I will have no one to appear. Not sure what other suggestions you have. I don't want to push the hearing date out too far. I am available to discuss.

Best,

Rodney

**Rodney S. Diggs | Director**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
RDiggs@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information wh
legally privileged. The information is intended only for the use of the individual or entity named above an
contain information that may be protected by the attorney-client privilege, work-product doctrine, or
privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the int
recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in re
on the information is strictly prohibited. If you have received this electronically mailed information in
please notify the sender immediately and permanently delete all copies of the original e-mail and any att
documentation.

**SERVICE NOTICE**
Rodney S. Diggs and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the serv
process, motions, pleadings, documents, or any other items by electronic format. Correspondence via elec
format does not indicate agreement or consent to acceptance of service in such format unless otherwise a
upon or required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Tuesday, May 27, 2025 7:20 PM
**To:** Tyrine S. Aman <TAman@imwlaw.com>

**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>; Patricia Reynaga <patricia@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Tyrine, Rodney, attached is the proposed stipulation to move the motion hearing date by one week, to move our response deadline to a date after the remand motion is ruled on, and to move the scheduling conference.

The proposed new dates / timing is highlighted in yellow, for your review. Let me know of any comments or edits, and give me a call if you'd like to discuss live. I'm hopeful to file the stipulation tomorrow (Wednesday), if possible.

Thank you!

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Sun, May 25, 2025 at 12:04 PM Megan Maitia <megan@summallp.com> wrote:

> Hi Tyrine, forgive me for the holiday-weekend email. I aimed to reply Friday, but alas here I am.

Unfortunately, we are not able to stipulate on the remand/venue issue - that is, if the case remains in federal court, our plan remains to file a motion to transfer venue. As we discussed, we will send a stipulation to move out our response deadline until after the remand motion is decided.

**Question**: are you available to move the hearing by one week, from June 20 **to June 27**? I am traveling out of state on June 20, but am here and available June 27 (currently, June 27 is our scheduling conference, so I'm hopeful that date will work, too.) Let me know at your convenience, and thank you, and enjoy the holiday weekend, everyone!

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Thu, May 22, 2025 at 5:42 PM Tyrine S. Aman <TAman@imwlaw.com> wrote:

> Hello Megan,
>
> Nice speaking with you all today. To follow-up on our conversation, we will be filing our motion for remand tomorrow. We are willing to further meet and confer about this following our filing.

We are willing to stipulate to continue the deadline for your responsive pleading until after the Court's ruling on the motion on the motion for remand. Please circulate a stipulation.

Thank you,

Tyrine

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information v
legally privileged. The information is intended only for the use of the individual or entity named above a
contain information that may be protected by the attorney-client privilege, work-product doctrine, o
privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the i
recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in
on the information is strictly prohibited. If you have received this electronically mailed information i
please notify the sender immediately and permanently delete all copies of the original e-mail and any a
documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of y
motions, pleadings, documents, or any other items by electronic format. Correspondence via electronic
does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed
required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 10:09 AM
**To:** Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Rodney S. Diggs <RDiggs@imwlaw.com>; Hayley Huntley <hayley@summallp.com>; Le Chaune Metoyer <LMetoyer@imwlaw.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

No apologies, please. How's Thursday at 2 pm? I'll send a calendar invite to hold the time, and we can adjust it, as needed.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Mon, May 19, 2025 at 9:55 AM Tyrine S. Aman <TAman@imwlaw.com> wrote:

> Good morning Megan,
>
> Thank you for your e-mail. My apologies for the delay, I have in depositions all last week and Rodney was doing trial prep. I am available between 2:30 p.m. and 4:00 p.m. this afternoon and anytime Thursday. Please let me know what works best for you.
>
> Thank you,
>
> Tyrine

**Tyrine S. Aman | Associate**
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, CA 90071
Phone: (213) 489-0028 | Fax: (213) 489-0552
TAman@imwlaw.com | www.imwlaw.com

***"A Tradition of Excellence Since 1943"***

**CONFIDENTIALITY NOTICE**
This electronic mail transmission, including any attachments, may contain confidential information legally privileged. The information is intended only for the use of the individual or entity named above contain information that may be protected by the attorney-client privilege, work-product doctrine, privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the recipient, you are hereby NOTIFIED that any disclosure, copying, distribution or taking of any action in on the information is strictly prohibited. If you have received this electronically mailed information please notify the sender immediately and permanently delete all copies of the original e-mail and any documentation.

**SERVICE NOTICE**
Tyrine S. Aman and Ivie McNeill Wyatt Purcell & Diggs, APLC do not accept or consent to the service of motions, pleadings, documents, or any other items by electronic format. Correspondence via electroni does not indicate agreement or consent to acceptance of service in such format unless otherwise agreed required by law.

---

**From:** Megan Maitia <megan@summallp.com>
**Sent:** Monday, May 19, 2025 9:35 AM
**To:** Rodney S. Diggs <RDiggs@imwlaw.com>; Tyrine S. Aman <TAman@imwlaw.com>
**Cc:** Hayley Huntley <hayley@summallp.com>
**Subject:** Re: Grace O'Marcaigh - meet and confer?

Hi Rodney, Tyrine, hope you both had a nice weekend.

Following up on our meet and confer obligations. I called your office last week and left a message for Tyrine. Our (defendants') deadline to meet and confer on a responsive motion is this Friday. Let me know your availability.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

On Wed, May 14, 2025 at 10:31 AM Megan Maitia <megan@summallp.com> wrote:

Rodney, Tyrine, hope you are both doing well.

We have several meet and confer deadlines coming up, including for your motion to remand, our responsive motion to the complaint, and the Rule 26 meeting in advance of the scheduling conference.

Should we have a call? If you are moving to remand, perhaps we can seek a stipulated schedule where your motion is briefed and heard first and then, only if your motion is denied, we move forward with our responsive motion and the Rule 26 report and Rule 16 conference.

I am open to suggestions on how to do this the most efficiently.

Best,

Megan

Megan A. Maitia (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9452

www.summaLLP.com

--

Hayley Huntley (she/her)

Summa LLP

1010 Sycamore Ave. Unit 117

South Pasadena, CA 91030

Office: (213) 260-9454

www.summaLLP.com

--
Hayley Huntley (she/her)
Summa LLP
1010 Sycamore Ave. Unit 117
South Pasadena, CA 91030
Office: (213) 260-9454
www.summaLLP.com

EXHIBIT

B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
June 20, 2025
8:35 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
Interim United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

(Government's Exhibits 3D-107-B, 3D-108-A, 3D-112-A, 3d-114-A, 3D-123-A, 3D-123-B, 3D-129-B, 3D-130-A received in evidence)

(Government's Exhibits J-122 and J-122R received in evidence)

Anything further?

MS. SLAVIK: No, your Honor.

THE COURT: All right. The government may now call its next witness.

MS. SLAVIK: The government calls Brendan Paul.

BRENDAN PAUL,

called as a witness by the Government,

having been duly sworn, testified as follows:

DEPUTY CLERK: Please provide the Court your first and last name and spell your first and last name.

THE WITNESS: First name is Brendan. Last name is Paul. B-R-E-N-D-A-N; P-A-U-L.

THE COURT: Ms. Slavik, you may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q. Good morning, Mr. Paul.

A. Good morning.

MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit A-101.

Q. Mr. Paul, do you recognize the individual in this photo?

A. I do.
Q. Who is that?
A. Sean Combs.
Q. How do you know Mr. Combs?
A. That was my former boss.
Q. What was your position under Mr. Combs?
A. An assistant to him.
Q. How long did you work as Mr. Combs' assistant?
A. Around 18 months.
Q. And during what timeframe?
A. Late 2022 to March of 2024.
Q. What was the last date of your employment?
A. March 25, 2024.
Q. What happened on March 25, 2024?
A. I was arrested at the Opa-Locka Airport when we were on our way to a family vacation.
Q. Where is the Opa-Locka Airport?
A. Miami, Florida.
Q. Why were you arrested?
A. Possession of cocaine.
Q. Why were you in possession of cocaine?
A. It was in my go Goyard, which was my bag for personal assistant duties.
Q. Why was cocaine in your Goyard bag?
A. I was sweeping his room early that morning and put it in my

bag to put it elsewhere and forgot about it while I was packing.

Q. When you say "his" room, whose room are you referring to?

A. Mr. Combs.

Q. We'll circle back to this, Mr. Paul, but first I want to talk about how you came to work for Mr. Combs. Where are you from?

A. Cleveland, Ohio.

Q. Did you go to college?

A. I did.

Q. When did you graduate?

A. 2022.

Q. What did you do after you graduated?

A. I built a studio in my parents' basement with my dad pursuing music production.

Q. So it was a music studio that you built?

A. Correct.

Q. Approximately when did you learn about the position as Mr. Combs' personal assistant?

A. Middle of 2022, a couple months after graduation.

Q. How did you learn about this position?

A. I was called to help manage direct the Crew League Season 4, which was owned by Revolt through Elie Maroun.

MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-312.

Q. Same thing about never seeing your family?
A. Correct.
Q. Did you interview for the position, Mr. Paul?
A. I did.
Q. When was that?
A. I want to say late October, early November of 2022.
Q. Where did the interview take place?
A. At Mr. Combs' residence in Los Angeles.
Q. Do you remember the address of that residence?
A. 200 South Mapleton Drive.
Q. What happened once you arrived at the Mapleton address for the interview?
A. I arrived, entered the middle gate. A former assistant let me in. And I went to the left of the house where the security office was, walked in those doors, was greeted by a security officer and gave him my ID. They scanned it, and I signed an NDA, and then was walked to the home office inside of the house.
Q. Who was in the home office when you arrived?
A. Kristina Khorram and Frankie Santella.
Q. Who is Frankie Santella?
A. He was Puff's music manager.

MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit A-322.

Q. Do you recognize the individual in this photo, Mr. Paul?

A. I do.
Q. Who is that?
A. Frankie Santella.
Q. He is one of the individuals who was there in the home office that day?
A. Correct.
Q. And who is Kristina Khorram?
A. That is Puff's chief of staff.
Q. Did you know her by any other names?
A. KK.

MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-301.

Q. Do you recognize the individual in this photo, Mr. Paul?
A. I do.
Q. Who is this?
A. KK.

MS. SLAVIK: Thank you. You can take this down.

Q. So what happened when you arrived in the office where Mr. Santella and KK were?
A. I had about a 20-minute interview, and then they asked me how soon I could start.
Q. Did you accept the position?
A. I did.
Q. When did you start working as Mr. Combs' assistant?
A. I had to travel to Nebraska because my dad was recently

diagnosed with prostate cancer, to catch a football game where he went to college, and then I came back that Monday to LA.
Q. So A couple of days later after the interview?
A. Four days.
Q. During your first couple of weeks on the job, where did you work?
A. Out of his residence in Los Angeles.
Q. That's the 200 South Mapleton address?
A. Correct.
Q. Who gave you instructions during that time period?
A. It mainly came from assistants who were there before me.
Q. Did KK provide you instructions as well?
A. Not much.
Q. What were you instructed to do by the other assistants?
A. I helped organize suitcases, do Amazon returns, pick up things at pharmacies, packed a lot of joints in the garage, coordinated with chef on meals and timing, things like that.
Q. What do you mean by "pack a lot of joints"?
A. Just like cones, I stuffed marijuana into cones.
Q. What, if any, interactions with Mr. Combs did you have during this first couple of weeks on the job?
A. Almost zero.
Q. Were you given instructions on how to interact with Mr. Combs?
A. KK told me to kind of just stay clear while I got used to

the environment before I met him.
Q. Were you eventually introduced to Mr. Combs?
A. I was.
Q. At what point?
A. Two or three weeks into the job.
Q. Who introduced you to Mr. Combs?
A. Kristina did.
Q. Can you describe that interaction?
A. She came to the garage, told me to grab something to take notes with. They were having a listening party out back for his new album. I sat in on that. Took notes on what I thought. And then once it was over, she grabbed me and introduced me to Mr. Combs in the back yard.
Q. When you say "she," you mean KK?
A. I do.
Q. After this interaction, how frequently did you interact with Mr. Combs throughout your tenure?
A. Almost every day.
Q. Who was your direct supervisor?
A. KK.
Q. And what was KK's role?
A. Chief of staff.
Q. What was your understanding of KK's job responsibilities as Mr. Combs' chief of staff?
A. She basically ran the enterprise, maintained all of his

Q. What was your salary?
A. $75,000 to start.
Q. And did that change eventually?
A. January of 2024, I got a raise so -- to a hundred thousand.
Q. So you started being paid a hundred thousand dollars in January of 2024?
A. Correct.
Q. How often were you paid?
A. Biweekly.
Q. Were you paid by a corporate entity?
A. I was.
Q. Do you remember what corporate entity?
A. Combs Enterprises.

MS. SLAVIK: Ms. Foster, could you please publish for the parties, the witness, and the Court what's been marked for identification as Government Exhibit 3A-158.

Q. Mr. Paul, do you see your name on this spreadsheet?
A. I do.
Q. Looking at the line for salary, was this the approximate amount of your biweekly paycheck in January of 2024?
A. Yes.

MS. SLAVIK: Your Honor the government offers Government Exhibit 3A-158 into evidence?

MR. STEEL: No opposition.

THE COURT: 3A-158 will be admitted.

(Government's Exhibit 3A-158 received in evidence)

MS. SLAVIK: Could you please publish this for the jury, Ms. Foster? Could you highlight the row that says Brendan Paul, please.

Q. Mr. Paul, can you point out the amount of your biweekly paycheck in January 2024?

A. $4,166.67.

Q. And that's when you were earning approximately $100,000 per year?

A. Correct.

MS. SLAVIK: Thank you. You can take this down.

Q. When you worked as an assistant for Mr. Combs, where were you based?

A. Both Los Angeles and Miami Beach, Florida.

Q. Why did you work in both Los Angeles and Miami?

A. Because that's where his residence were.

Q. You mentioned the address of the Los Angeles residence. What was the address of the Miami residence?

A. 1 and 2Star Island Drive.

MS. SLAVIK: Ms. Foster, could you please publish for the witness, Court, and parties only Government Exhibits 1B-288 and 1B-289 side by side.

Q. Mr. Paul, what's depicted in these photos?

A. That's his adjacent bathroom in 2 Star Island, his Miami home. We would call that her bathroom.

Q. And what about when you were in Miami?
A. Airbnb's all over Miami.
Q. Was KK based in Miami as well?
A. She was.
Q. Where did KK live in Los Angeles?
A. She had an apartment up the street.
Q. How close was that to the Mapleton residence?
A. Maybe four minutes.
Q. Where did KK live in Miami?
A. In 2 Star Island.
Q. Did you ever travel for work, Mr. Paul?
A. I did.
Q. How frequently?
A. Pretty frequently.
Q. How often did you travel with Mr. Combs?
A. I think I was on his private jet three or four times.
Q. When you did travel with him, did you travel by private jet?
A. I did.
Q. Otherwise you traveled separate from Mr. Combs, is that right?
A. Yes, majority of the time.
Q. What was the purpose of traveling separately from Mr. Combs?
A. It was my duty to advance any travel that he had. By

advance, I mean basically I would go there early with his stylist, and we would set up his rooms.
Q. What was the purpose of advancing locations?
A. Just so when he walked in, everything was seamless and he had everything he needed.
Q. Did others travel with you when you advanced locations?
A. Yes.
Q. Who was that?
A. Stylists, sometimes photographers. Really just depended on what we were doing, where we were going.
Q. When you traveled separate from Mr. Combs, how would you travel?
A. Commercial.
Q. Who booked your travel when you traveled in connection with your employment?
A. His travel manager.
Q. Who was that?
A. Jessica Ruiz.
Q. What was her role?
A. Travel manager.
Q. What did she do?
A. Booked flights for the entire, I guess, organization.
Q. During your tenure as an assistant, did you ever accompany Mr. Combs to club appearances?
A. Couple times.

A. Yes.
Q. Why did you take this picture?
A. Because it was left on the desk, and me not knowing -- being new not knowing where it should go, I sent it to the assistants asking where I should put it.
Q. Do you remember what you ultimately did with ecstasy and 2C that was in your hand?
A. I assume I put it in one of his bags.
MS. SLAVIK: You can take this down, Ms. Foster.
Q. Mr. Paul, were you ever instructed to obtain drugs for Mr. Combs?
A. I was.
Q. Who instructed you to obtain drugs for Mr. Combs?
A. He did himself or other assistants.
Q. What types of drugs did you buy for Mr. Combs?
A. Marijuana, 2C, cocaine, ketamine, ecstasy.
Q. Let's start with marijuana. How often did you buy marijuana for Mr. Combs?
A. Whenever we were low, I would say like once every two months.
Q. And in what quantity did you buy marijuana?
A. We bought two different strains, eight ounces each.
Q. What do you mean by two different strains?
A. There were two types of marijuana strains that he liked.
Q. Which were those?

A. I believe to secure drugs.
Q. For who?
A. Mr. Combs.
Q. And focusing on the last couple of chats, do you see the message from Baby Girl LA Plug at 11:47 that says: "Is it for you or Puff?"
A. I do.
Q. What do you say in response?
A. "Puff."
Q. Can you read your next chat?
A. "But please don't disclose that. You can tell whoever it's for me."
Q. What did you mean by that?
A. It was just very important to keep his profile low as he was a celebrity, and people could screenshot this and could say, hey, I was asked to get drugs for Diddy.

MS. SLAVIK: Thank you, Ms. Foster. You can take this down.

Q. After you obtained drugs for Mr. Combs, what typically did you do with them?
A. Either gave them directly to him or put them in his Gucci pouch.
Q. What is the Gucci pouch?
A. It's just a place where we would keep drugs.
Q. Who told you to put the drugs in the Gucci pouch?

A. Something I learned from former assistants.
MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit 1B-236.
Q. Do you recognize this photo, Mr. Paul?
A. I do.
Q. What is this?
A. The Gucci pouch.
Q. Who did the Gucci pouch belong to?
A. Mr. Combs.
Q. Where did Mr. Combs keep the Gucci pouch?
A. Kept it in a backpack or he kept it in his room or on his person.
Q. Which staff members, if any, handled the Gucci pouch?
A. Assistants.
Q. Did the security ever handle the Gucci pouch?
A. Not that I'm aware of.
Q. Under what circumstances did the assistants handle the Gucci pouch?
A. Just whenever he'd ask for it.
MS. SLAVIK: You can take this down. Thank you.
Q. Did you ever pick up prescription drugs for Mr. Combs?
A. Yes.
Q. Where did you pick up the prescriptions?
A. Pharmacies.
Q. Under whose names were the prescriptions?

A. Sean Combs and Frank Black.
Q. Can you explain who Frank Black is?
A. It was his alias for discretion.
Q. What do you mean by that?
A. We would use an alias so pharmacists or hotels wouldn't know that it was Sean Combs.
Q. Mr. Paul, are you familiar with Cialis?
A. I am.
Q. What is that?
A. Just like another form of saga.
Q. Did Mr. Combs use Cialis?
A. He did.
Q. Where did he keep that?
A. I mean, we kept it in med bags, and we also kept it in his nightstand like pill case.
Q. Were you ever asked to pick up prescription drugs without a prescription for Mr. Combs?
A. Once.
Q. Who asked you to do that?
A. He did.
Q. And what type of drugs did he ask you to pick up?
A. Xanax.
Q. Where did you get the prescription drugs without the prescription?
A. I didn't.

A. He had 2C with him. He asked me to try it to see if it was good.
Q. Did he give you anything?
A. I did it, yes.
Q. What did the 2C look like?
A. It was pink.
Q. Had you ever tried 2C before?
A. I had not.
Q. I'm sorry?
A. I had not.
Q. Is this something wanted to do?
A. I wanted to prove my loyalty, yeah.
Q. How did you feel after you took the 2C?
A. A little euphoric, but I don't think I did enough to actually like feel the full effect.
Q. Were you able to continue working after that?
A. Yes.
Q. What did Mr. Combs say to you after you took the 2C?
A. He asked if it was good.
Q. And then what happened?
A. I said I think so.
Q. And what happened after that?
A. We continued on with our night.
Q. Shifting to a different topic, Mr. Paul, are you familiar with the term wild king nights?

A. I am.
Q. Can you tell the jury what wild king nights are?
A. Mr. Combs and a significant other were going to a hotel for the night.
Q. And what did you understand wild king nights to involve?
A. Partying, alcohol, sex, drugs.
MS. SLAVIK: Your Honor may I approach the witness?
THE COURT: You may.
Q. Mr. Paul, I've handed you what's in evidence as a sealed exhibit, Government Exhibit 2A-402. Without saying the name, do you recognize the individual depicted in this exhibit?
A. I do.
Q. I'm going to refer to her as Jane, and I'm going to ask you to do the same thing, okay?
A. Okay.
Q. Do you know Jane?
A. I do.
Q. How do you know her?
A. One of Mr. Combs' girlfriends while I was employed.
Q. Did Jane participate in wild king nights during your employment are with Mr. Combs?
A. She did.
Q. Did Mr. Combs have other girlfriends?
A. He did.
Q. Did girlfriends other than Jane participate in wild king

nights?
A. Not that I'm aware of.
Q. Mr. Paul, who called these nights, these hotel stays wild king nights?
A. Kristina.
Q. Did you call them that?
A. No.
Q. What did you call them?
A. Just he's going to the hotel.
Q. Did they always take place at hotels?
A. Not always.
Q. Where else did they take place?
A. His residence. Her residence.
Q. Was there a point in time when these wild king nights stopped being at hotels?
A. Sure.
Q. Approximately when was that?
A. After the Cassie lawsuit.
Q. What, if any, role did assistants have with respect to wild king nights?
A. Setting up and cleaning up.
Q. Did you personally set up hotel rooms for wild king nights?
A. On a few occasions.
Q. And did you personally clean hotel rooms after wild king nights?

A. On a few occasions.
Q. When in your tenure did you begin setting up and cleaning up hotel rooms for wild king nights?
A. Six to eight months in probably.
Q. What, if anything, did KK tell you about what role you should have in wild king nights?
A. She didn't really want me involved in them.
Q. Did she explain why?
A. No.
Q. Which assistants primarily were responsible for setting up and cleaning up wild king nights?
A. Frank, our butler, and Joey Chavez.
Q. Approximately how many times did you personally set up hotel rooms for wild king nights?
A. Three or four times.
Q. Who instructed you to do that?
A. Kristina.
Q. Approximately how many times did you clean up hotel rooms after wild king nights?
A. Also three or four times.
Q. And who instructed you to do that?
A. Kristina.
Q. Mr. Paul, I want to show you a couple of documents.
MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-112-R.

Q. Approximately how often did wild king nights take place?
A. I mean, not extremely often. Probably once a month.
Q. And you mentioned that wild king nights took place sometimes in hotels?
A. Correct.
Q. In what cities did those wild king nights take place?
A. Los Angeles and Miami.
Q. Do you recall do you remember what hotels?
A. L'Ermitage, the London, and then there was one in Miami, The Edition.
Q. Under whose name were these hotels generally booked?
A. Under assistants' names or under Frank Black.
Q. Did wild king nights ever take place at Mr. Combs' residences?
A. Yes.
Q. Which residence?
A. Both Miami and Los Angeles.
Q. Did wild king nights take place in any other residences?
A. Jane's home.

MS. SLAVIK: Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-127.

Q. Focusing now on the first page, Mr. Paul, what is this?
A. It's a text message between KK and I.
Q. What is the date of this communication?
A. February 19, 2024.

active." What did you understand that to mean?
A. Like is he partying, is he getting high.
Q. And when you respond "in between the two," what did you mean by that?
A. Like I think he's about to start partying, and I think he's about to get high.
Q. Did you set up for this wild king night?
A. Yeah.
Q. At Jane's residence?
A. Correct.
MS. SLAVIK: Thank you. You can take this down, Ms. Foster.
Q. So what exactly did setting up a hotel or residence for a wild king night entail?
A. You would go before he got there. You would call room service, have them bring up extra sheets, extra towels, water, fruit plates. And then myself would bring lights, Astroglide, baby oil, liquor, champagne, small toiletries, toothbrush, toothpaste, cologne, that sort of thing.
Q. How did assistants know what to bring during a wild king night?
A. We created a running list. We had a lot of lists.
Q. Where did you keep the lists?
A. In the shared notes like in the notes app and shared file that we named PD personal.

A. To avoid getting damages charges.
Q. Did you leave tips for hotel cleaning staff?
A. I did.
Q. In cash?
A. Yes.
Q. How did you get the cash for the tips?
A. I just always had some cash on me.
Q. Was it your personal cash?
A. Yes.
MS. SLAVIK: Ms. Foster, could you please pull up what's in evidence as Government Exhibit 3G157.
Q. Mr. Paul, what does this photo show?
A. A hotel room after he had left.
Q. And do you remember when you took this photo?
A. Sometime in late 2023, I would assume.
Q. And this was in connection with your cleanup of a hotel room after a wild king night?
A. Correct.
Q. Why did you take this photo?
A. To send it to the travel manager, to be, like, hey, there's probably going to be some damage charges just in case she wanted to dispute them with the hotel.
Q. Can you remind the jury who the travel manager was?
A. Jessica Ruiz.
MS. SLAVIK: Thank you. You can take that down.

assistants provided Mr. Combs with cash in connection with wild king nights?

A. Occasionally, yeah.

Q. And the one time that you did it, just remind the jury of how much you gave him.

A. $5,000.

Q. Did you provide Mr. Combs with cash in that amount in any other context?

A. Not that I'm aware of.

Q. Just wrapping up, Mr. Paul, you said that your last day working for Mr. Combs was on March 25, 2024?

A. Correct.

MS. SLAVIK: Ms. Foster, could you please publish for the witness, Court and parties what's been marked for identification as Government Exhibit 1C109.

Q. Mr. Paul, do you see this photo?

A. I do.

Q. What is it?

A. That's me, Kristina and Mr. Combs.

MS. SLAVIK: Your Honor, the government moves to admit Government Exhibit 1C109.

MR. STEEL: No objection.

THE COURT: All right. 1C109 will be admitted.

(Government Exhibit 1C109 received in evidence)

MS. SLAVIK: Ms. Foster, could you please publish this

to the jury.
Q. Mr. Paul, can you explain to the jury what they're looking at?
A. This is Mr. Combs, Kristina and I boarding a private jet to go on a vacation to the Bahamas.
Q. Whose private jet were you on?
A. It's not his. It was rented.
Q. Where was this photo taken?
A. At the Miami Opa-Locka Airport.
Q. When was this photo taken?
A. March 25, 2024.
Q. Where were you planning to travel before you were arrested?
A. The Bahamas.
Q. And you were getting to the Bahamas on this private plane?
A. Correct.
Q. This was work travel for you?
A. Yes.
Q. You said that you were arrested for cocaine possession on that day, is that right?
A. Yes.
Q. Just remind the jury why you had cocaine that day.
MR. STEEL: Objection.
THE COURT: That's sustained.
BY MS. SLAVIK:
Q. Why did you have cocaine that day, Mr. Paul?

THE COURT: That's sustained, right?

I think the grounds are asked and answered.

MR. STEEL: Yes.

THE COURT: Yes.

Sustained.

BY MS. SLAVIK:

Q. Was the cocaine yours, Mr. Paul?

A. No.

THE COURT: That's overruled.

BY MS. SLAVIK:

Q. It was not your cocaine?

A. Correct.

Q. Did you tell law enforcement that it wasn't your cocaine?

A. No.

Q. Why not?

A. Loyalty.

Q. Whose cocaine was it?

A. Mr. Combs's.

Q. Mr. Paul, you were arrested that day?

A. I was.

Q. What is the status of your criminal case?

A. My charges have been dropped, because I have a really good lawyer.

Q. What, if anything, did you do to have those charges dropped?

EXHIBIT

C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
May 21, 2025
8:45 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

case, correct?
A. That's correct.
MR. BACH: No further questions.
THE COURT: Ms. Steiner, anything further?
MS. STEINER: No, your Honor.
THE COURT: Thank you very much, Dr. Hughes.
THE WITNESS: Thank you, your Honor.
(Witness excused)
THE COURT: Government may call its next witness.
MS. COMEY: The government calls George Kaplan.
May I approach to remove the items?
THE COURT: You may.
MS. COMEY: Thank you, your Honor.
GEORGE KAPLAN,
called as a witness by the Government,
having been duly sworn, testified as follows:
MS. COMEY: May I inquire, your Honor?
THE COURT: You may.
MS. COMEY: Thank you.
DIRECT EXAMINATION
BY MS. COMEY:
Q. Good afternoon.
A. Hi.
Q. How old are you?
A. Thirty-four.

Q. How far did you go in school?
A. I got a bachelor's degree from the College of Charleston.
Q. What was your first job after college?
A. I worked at Nickelodeon for seven months.
Q. What did you do at Nickelodeon for seven months?
A. I was the executive assistant to the SVP of creative operations.
Q. What was your next job after that?
A. I was the executive assistant to the chief operating officer of Combs Enterprises.
Q. How did you end up moving from Nickelodeon to Combs Enterprises?
A. My boss moved from Nickelodeon to Combs Enterprises to become the chief operating officer, and I joined him.
Q. Who was your boss?
A. His name was Brian Offutt.
Q. When did you move with him to Combs Enterprises?
A. December 2013.
Q. When did you stop working for Combs Enterprises?
A. December 2015.
Q. What is Combs Enterprises?
A. Combs Enterprises is a holding company that controls the business interests of Sean Combs' companies.
Q. Could you explain to the jury what is a holding company, please.

A. It's a company that oversees a bunch of other companies. Often, in the case of Mr. Combs, someone who owns or operates numerous companies will have a company that is responsible and accountable for the success of the other companies known as a holding company.
Q. In the case of Combs Enterprises could you just give us a general sense of what types of businesses fell under the umbrella of that holding company?
A. Lifestyle businesses, liquor, television, music, clothing.
Q. Who ran all of those businesses?
A. Mr. Combs.
Q. What was your first job title at Combs Enterprises?
A. The executive assistant to the chief operating officer.
Q. What were your duties and responsibilities in that role?
A. They were very administrative, scheduling meetings, scheduling phone calls, scheduling executive leadership off-sites and travel, things of that nature.
Q. Where did you physically work when you had that job title?
A. At 1710 Broadway in Manhattan.
Q. For about how long did you have that job title?
A. About 10 months.
Q. And then what was your next job title at Combs Enterprises?
A. Executive assistant to the chairman.
Q. Who was the chairman?
A. Sean Combs.

Q. How did you get that job?
A. I was promoted.
Q. Do you know why?
A. I think that Mr. Combs noticed my work ethic and attention to detail and thought that I could be of value to him professionally.
Q. So about when did you get this promotion?
A. September 2014.
Q. Remind us when you left the company.
A. December 2015.
MS. COMEY: Can we please pull up what's in evidence as Government Exhibit 2A-101, Ms. Foster.
Q. Do you recognize the person in that photograph?
A. Yes.
Q. Who is that?
A. Sean Combs.
Q. The same Sean Combs we have been talking about?
A. Yes.
Q. Do you know him by any other names?
A. Mr. Combs, Puff Daddy, P Diddy, PD.
Q. During your time working at Combs Enterprises, what was Mr. Combs' role at Combs Enterprises?
A. He was the chairman.
MS. COMEY: We can take that down. Thank you, Ms. Foster.

Q. Who did you personally report to when you were Mr. Combs' assistant?
A. I reported to Kristina Khorram, who was the director of his office.
MS. COMEY: Ms. Foster, would you please pull up what's in evidence as Government Exhibit 2A-301.
Q. Do you recognize the person in that photograph?
A. Yes.
Q. Who is that?
A. Kristina Khorram.
Q. The same Kristina Khorram you were just talking about?
A. Yes.
Q. Do you know her by any other names?
A. KK.
Q. What was her role within Combs Enterprises?
A. She was the director of Mr. Combs' executive office.
Q. So what were her job responsibilities?
A. She essentially ran Mr. Combs' life.
MS. COMEY: We can take that down. Thank you.
Q. During your time working as Mr. Combs' assistant, who paid your salary?
A. Combs Enterprises.
Q. Where did you physically report when you worked as Mr. Combs' assistant?
A. To his home in Los Angeles.

Q. Where was that during your time working for him?
A. 200 Mapleton.
Q. Generally, what were your duties and responsibilities as Mr. Combs' assistant?
A. I carried his bags. I made sure that they had everything that they might need in them for wherever we were going, and also made sure that his homes were organized and had his belongings where he needed them.
Q. You mentioned carrying bags. What were in these bags that you carried?
A. Clothes, medicine, computers and iPads, sometimes food.
Q. Where did you bring these bags?
A. Wherever we were going.
Q. When you say we, who do you mean?
A. Mr. Combs.
Q. How, if at all, did your duties and responsibilities change as you continued to work for Mr. Combs?
A. I think that as he grew to trust me a bit more, he had me around a bit more. I don't know that day-to-day duties changed tremendously, but I think that his confidence in my ability to do the things that he wanted continued to improve.
Q. So how did that impact the work that Mr. Combs asked you to do?
A. It broadened the purview a little bit. I would say I started being around more at the studio and at night and ending

nights, as opposed to only starting mornings.
Q. What did those responsibilities broaden to include, for example?
A. Late nights at the studio, setting up hotel rooms, late nights at the house, making sure that everything was shut down after the day was over.
Q. On average about how many hours per week did you work as Mr. Combs' assistant?
A. Between 80 and a hundred, I would say.
Q. What were you paid for all of that work?
A. I got -- I was there for 15 months. For the first 12 I got paid $125,000, and I was also paid for the last three, but I don't know what the total was. It was the same amount over another three months.
Q. What time would you typically start work each morning?
A. 9:30.
Q. How would your day start typically as Mr. Combs' assistant?
A. Arrive at the house, make sure that the chef was ready to make breakfast, that the housekeeping staff was doing what they needed to do, make sure that the office room was organized, and then go into his bathroom and make sure that all of his toiletries and toothpastes and medications and, you name it, were available, facing forward, and ready for use.
Q. About how long did that process take?
A. About a half hour.

Q. What time did you generally finish work each day as Mr. Combs' assistant?
A. It varied significantly. I wouldn't say that any two days were really the same.
Q. What's the earliest that you can remember finishing a day?
A. Maybe 6 p.m., 5 or 6 p.m.
Q. What's the latest that you can remember finishing a day?
A. 6 or 7 a.m.
Q. Why did the time vary so much, in your experience?
A. Mr. Combs was recording a mix tape at the time, so he was spending a lot of time in the recording studio, which necessitated often late nights.
Q. How did your nights typically end when you were working as Mr. Combs' assistant?
A. I would unpack the bags from the car, I would make sure that the office was ready to go for the next day, I would make sure that Mr. Combs was taken care of, that his bedroom was set up, that his phone chargers were ready to go, and that he had what he needed. I would get him food if he was hungry. And then I would go home.
Q. During your time working for him, what other assistants, if any, did Mr. Combs have?
A. He had four other assistants while I was there that I recall. Their names were Ezequiel Leal, Alex Plaisance, Eric Purvis, and Dave Shirley.

MS. COMEY: Ms. Foster, would you please pull up just for the witness the Court and the parties what's been marked for identification as Government Exhibit 2A-310.

Q. Do you recognize the person in that exhibit?

A. Yes.

Q. Who is that?

A. Ezequiel Leal.

Q. Is that the same Ezequiel Leal that you were just talking about?

A. Yes.

MS. COMEY: Your Honor, the government offers this in evidence.

MR. AGNIFILO: No objection.

THE COURT: 2A-310 will be admitted.

(Government Exhibit 2A-310 received in evidence)

MS. COMEY: May we please publish?

THE COURT: You may.

Q. Just remind the jury what this person's role was.

A. An executive assistant to Mr. Combs.

MS. COMEY: We can take that down. Thank you, Ms. Foster.

Would you please, Ms. Foster, pull up just for the witness, the Court, and the parties what's been marked for identification as Government Exhibit 2A-308.

Q. Do you recognize the person in that photograph?

A. Yes.

Q. Who is that?

A. That's me.

MS. COMEY: Your Honor, the government offers this in evidence.

MR. AGNIFILO: No objection.

THE COURT: It will be admitted.

(Government Exhibit 2A-308 received in evidence)

MS. COMEY: May we please publish briefly.

We can take that down. Thank you, Ms. Foster.

Q. During your time working for Mr. Combs, what, if any, security personnel also worked for him?

A. There were a few members of his security. There were two different teams during my time there. When I started, it was D-Roc, Paul, and Rube. And when I left, there were licensed security guards whose names I don't remember.

Q. Let me break that down a bit. Starting with D-Roc, did you know him by any other names?

A. His first name was Damion.

Q. And Rube, did you know him by any other names?

A. Rubin.

Q. And Paul, did you know him by any other names?

A. Uncle Paulie.

Q. Then you said that at some point there was licensed security, is that right?

A. Correct.
Q. About when do you remember Mr. Combs hiring what you refer to as licensed security?
A. Some time in the second half of 2015.
Q. Based on your experience working with and observing these security personnel, how did the new security in 2015 compare to the prior security team?
A. They were -- I would say they were more professional, they were more polished. They seemed to have a lot of real-time training.
Q. When you say they in that sentence, who are you referring to?
A. The new security group.
Q. What other employees for Mr. Combs did you regularly interact with during your time as his assistant?
A. The other assistants, Kristina, management, his stylist team, the chefs, and the heads of his business units.
Q. Who within the management team in particular did you work with?
A. James Cruz and Elie Maroun.
MS. COMEY: Ms. Foster, would you please pull up what's been marked for identification as Government Exhibit 2A-312, just for the parties and the witness and the Court, please.
Q. Do you recognize the person in that photograph?

A. Yes.
Q. Who is that?
A. Elie Maroun.
MS. COMEY: Your Honor, the government offers this in evidence.
MR. AGNIFILO: No objection, Judge.
THE COURT: It will be admitted.
(Government Exhibit 2A-312 received in evidence)
MS. COMEY: May we please publish that, Ms. Foster, to the jury.
Q. Mr. Kaplan, can you please tell the jury what this individual's role was for Mr. Combs.
A. He was on his management team.
MS. COMEY: We can take that down. Thank you.
Q. What properties did Mr. Combs own during your time working as his assistant?
A. He had a home in Miami, he had an apartment in New York, he had a home in Los Angeles. And then I believe he had homes in New Jersey and the Hamptons as well, though I never went to either of them.
Q. During your time working as his assistant, who typically traveled with Mr. Combs?
A. Assistants, security, sometimes guests or friends or stylists or other people.
Q. During your time as Mr. Combs' assistant, how frequently

did you communicate with him each day?
A. Multiple times a day.
Q. And if you were apart, how would you communicate with him?
A. Phone, text, email.
Q. And generally what topics would you and Mr. Combs discuss when communicating multiple times per day?
A. Things that he needed.
Q. What kinds of things?
A. Generally, something that might be found in the bags, whether it was clothing or potentially food from somewhere or drugs or liquor or an iPad or a speaker or anything.
Q. During your time working for Mr. Combs, what, if any, threats do you remember him making to you?
A. He threatened my job on occasion.
Q. About how often do you remember Mr. Combs threatening your job?
A. Maybe monthly.
Q. What types of things do you remember Mr. Combs saying when he would threaten your job approximately monthly?
A. That he was only to be surrounded by the best and that those were around him at the time were not performing to that level.
Q. What was his tone when he said these things?
A. Sometimes angry, sometimes motivational.
Q. What do you remember about the first time Mr. Combs

threatened your job?
A. It was my first week on the job, and he asked me to go to Whole Foods to get a BPA-free gallon water bottle, and they didn't have it, and I didn't want to be late coming back, so I got two half-gallon water bottles to make up the whole gallon, and that was insufficient.
Q. How did Mr. Combs respond when you brought him two half-gallon water bottles instead of a one-gallon water bottle?
A. He told me that I did not bring him what he asked for.
Q. And what was his tone?
A. He was angry.
Q. How far away from your face was he when he said this to you angrily?
A. He was very close to my face.
Q. What, if any, trips do you remember taking with Mr. Combs when you worked as his assistant?
A. Went to New York, to Miami, to Atlanta, to Washington, D.C., to Orlando, to Cabo.
Q. How did you get to all of those places?
A. I either flew on Mr. Combs' jet with Mr. Combs or I flew in advance on a commercial flight.
Q. Let's break that down. When you say you flew on Mr. Combs' jet, what do you mean?
A. That I traveled with Mr. Combs on his jet for the trip.
Q. Is that a private jet that he owned?

A. Yes.
Q. When you said you would otherwise do advance, what does advance mean?
A. It means arriving in the city in question before Mr. Combs arrives in order to make sure that his hotel or domicile or whatever is set up properly and so he can just walk in and have it feel like home and not like no one has been there for a while.
Q. You mentioned earlier that at some point your job responsibilities expanded to include setting up hotel rooms for Mr. Combs, is that right?
A. Yes.
Q. How did you set up those hotel rooms?
A. There was a hotel bag that had seemingly what was needed for hotel stays. So the first time I went I was just told to take the bag and essentially unpack it, so that's what I did.
Q. Do you remember who told you to set up your first ever hotel room for Mr. Combs?
A. No.
Q. What was in the bag that you unpacked that first time?
A. Clothes, a speaker, candles, liquor, baby oil, Astroglide.
Q. After that first time, what supplies did you bring when you were directed to set up hotel rooms for Mr. Combs?
A. I just tried to re-create the bag.
Q. Who bought the supplies that you just described for these

hotel room setups that you did?
A. Often I did.
Q. How did you pay for those supplies?
A. With my corporate credit card.
Q. When you say your corporate credit card, what do you mean?
A. By credit card issued to me by Combs Enterprises.
Q. About how much notice did you usually get before you needed to set up a hotel room for Mr. Combs?
A. About a matter of hours, probably.
Q. Who usually instructed you to set up a hotel room for Mr. Combs?
A. Either Mr. Combs himself or Kristina.
Q. When you say Kristina, do you mean Kristina Khorram?
A. Yes.
Q. In what cities do you remember setting up hotel rooms for Mr. Combs using the supplies that you have listed for us?
A. LA, New York, and Miami.
Q. In what hotels in LA do you remember setting up hotel rooms using the supplies you have described for us?
A. The Intercontinental, Mr. C, and the Bel-Air Hotel and there is another one, the name of which I can't recall.
Q. And in what hotels do you remember setting up hotel rooms using these supplies in New York?
A. Trump.
Q. Where is that Trump hotel located?

A. Near Columbus Circle.
Q. In Manhattan?
A. Yes.
Q. In what hotel or hotels do you remember doing setups like this in Miami?
A. At the SLS.
Q. Under what name were these hotel rooms you set up for Mr. Combs usually booked?
A. Frank Black.
Q. Do you know where that name came from?
A. I think it was a reference to Biggie.
Q. How so?
A. I think that his nickname was Frank White.
Q. Who else, if anyone, do you remember going to those hotel rooms you set up for Mr. Combs?
A. Nobody.
Q. Other than Mr. Combs.
A. Correct.
Q. Do you remember knowing whether anyone other than Mr. Combs would go into those hotel rooms after you set them up?
A. Yes. My understanding was that he would have guests or a partner there.
Q. When you say a partner, do you mean a male or a female partner, or do you know?
A. Female partner.

Q. About how long would Mr. Combs stay in a hotel room after you set it up for him in this way?
A. Twelve hours to a couple of days maybe.
Q. What would you do when Mr. Combs left a hotel room after that time?
A. I would return to it to collect his belongings and make sure that it was in somewhat polished shape from the night before as far as any pillows or garbage or baby oil being around the room.
Q. What do you remember seeing when you went into these hotel rooms after Mr. Combs finished his stay in them?
A. Lots of empty bottles, empty Gatorade bottles, empty liquor bottles, and often baby oil.
Q. Where did you see baby oil?
A. On the table, on the floor, on the bed, around the room.
Q. And what, if any, powder do you remember seeing in any of these hotel rooms?
A. There was a single occasion where I came across some sort of brown crystallized powder that I didn't know what it was, and I got rid of it.
Q. Where was it?
A. It was on the counter of the bathroom sink.
Q. And what cleanup, if any, did you do in these hotel rooms after Mr. Combs left them?
A. I tidied them. I made it as close as I could to look like

it was the way that it was found when he came in.
Q. Why did you do that instead of having say the hotel staff do that?
A. I think that it was implied in the role, as you continue to work closely with Mr. Combs, that protecting him and protecting his public knowledge were really important, and that was certainly nothing that I was very keen on doing.
Q. How was cleaning up these hotel rooms connected to protecting Mr. Combs?

MR. AGNIFILO: I am going to object to this line, Judge.

THE COURT: That's overruled.

Q. You can answer.
A. Can you repeat the question, please.
Q. Sure. How was cleaning up these hotel rooms related to your job responsibility of protecting Mr. Combs?
A. I would see often at some point during that time that people -- hotels would sell videos and images to newspapers to try to embarrass celebrities or other public figures, and that was something that I always wanted to avoid.
Q. Did you ever personally see Mr. Combs' guests after they left these hotels?
A. No.
Q. During these hotel stays, what would you do?
A. I would go home.

EXHIBIT

D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
May 19, 2025
8:35 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q. Good afternoon, Mr. James.

A. Good afternoon.

Q. Could you please state and spell your name for the record.

A. My name is David James. That is D-a-v-i-d J-a-m-e-s.

Q. Mr. James, why are you testifying here today?

A. I've been subpoenaed twice.

Q. Does that -- do the subpoenas you received obligate you to testify here today?

A. They do, yes.

Q. What specifically does the subpoena obligate you to do?

A. To tell the truth.

Q. Mr. James --

MS. SLAVIK: Excuse me. Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-101.

Q. Mr. James, do you recognize the individual in this photo?

A. I do.

Q. How do you --

Who is it?

A. That's Mr. Combs.

Q. What's his first name?

A. Sean.

Q. How do you know Mr. Combs?

A. I was his personal assistant for two years.
Q. Approximately when did you work as Mr. Combs' personal assistant?
A. From May 2007 to May 2009.
MS. SLAVIK: Ms. Foster, can you take this down and publish for the parties only what's marked for identification as Government Exhibit 2A-307.
Q. Mr. James, do you recognize the individual in this photo?
A. Yes, I do.
Q. Who is this?
A. That is myself.
Q. And is this a fair and accurate depiction of yourself?
A. It is, yes.
MS. SLAVIK: The government moves to enter Government Exhibit 2A-307 into evidence.
THE COURT: All right. 2A-307 will be admitted.
(Government's Exhibit 2A-307 received in evidence)
MS. SLAVIK: Can you publish this for the jury, Ms. Foster.
Q. Mr. James, can you just tell the jury who this is pictured in the photo?
A. That is David James.
Q. In other words, yourself?
A. That's right.
MS. SLAVIK: Thanks, Ms. Foster. You can take that

Q. At what company?
A. Bad Boy Entertainment.
Q. Who was the chairman of Bad Boy?
A. Mr. Combs.
Q. Mr. James, what, if anything, did Vashta say about working for Mr. Combs during that first interview?
A. I remember sitting at her desk, and we were sitting at her desk and there was a picture of Mr. Combs on the wall.
Sorry.
Q. You can take your time, Mr. James. There's a box of Kleenex next to you if you need it.
A. She pointed at the wall and she said, This is Mr. Combs' kingdom. We're all here to serve in it.
Q. What happened after you met with the folks that you just mentioned?
A. At the conclusion of my interview process, there was a final interview, round of interviews, and I was given a packet of questions on a Thursday to be filled out. And I had a week to compile those questions and answers.
Q. Do you remember what the questions were?
A. I remember a few of them, yes.
Q. What were they?
A. Oh, one was, do a swat analysis on the men's beauty industry, because Sean -- Sean John, one of Mr. Combs' industry, wanted to get into the beauty industry. Do a swat

analysis.

Second was they gave me 40 different appointments just on a piece of paper and asked me to put together a calendar in chronological order of where things would fit. You had to really know, for example, Hot 97, what time that show was during the day. You had to really show good knowledge of his schedule.

Another question was that Mr. Combs likes to go to Saint-Tropez. He wants to rent out a yacht, provide different options for him to select a yacht that he can rent out for the weekend in Saint-Tropez.

Q. Did you complete this assignment?
A. I did, yeah.

So, excuse me. I received the questions on a Thursday and I remember just being so excited. I went home and worked throughout the weekend, and I turned them in on Monday.

Q. What happened after that?
A. Well, Dia was a little surprised how quickly I answered all the questions. And she said, you know, you have a week to compile the information. I told her I didn't need a whole week to compile the information.

Q. Who, if anyone, did you meet with next?
A. The way they did it, whoever turned in the answers first, that was who got to meet with Mr. Combs first.

So I met with Mr. Combs and Dia in the office.

Q. Can you exhibit that interaction between you, Dia, and Mr. Combs?
A. Yeah. It was a very professional interaction. Dia was leading the charge of the interview and Mr. Combs asked me two questions.
Q. What were those questions?
A. He asked me -- first of all, he likes to go out in Miami. And he said, How do you compile a spreadsheet with my preferences in Miami?

So I took that, for example, with where he likes to eat. And so I said, well, I compile a spreadsheet that talked about what your food preferences were, what table you liked to sit at, what's the name of the maître d' so we can organize information around your preferences so we would know that, basically, wherever you were.

Excuse me. The second question was how would you make good personal assistant? And I told him that I would make a good personal assistant for two reasons. Number one was I'm not so concerned about what accomplishments we did yesterday. Only thing I'm concerned about is what have we got to do today to make sure we get accomplishments tomorrow. And the second thing is I said, I can't stop, I won't stop. And he kind of nodded his head and said, Yeah, I like that.
Q. So were you ultimately hired as Mr. Combs' personal assistant?

A. I was, yes.
Q. When did you start working as his personal assistant?
A. Pretty immediately afterwards. I was hired in a temporary position. I wasn't a full employee at that time. It was, like, a 90-day probationary period.
Q. When was that approximately, a month, year?
A. May 2007.
Q. When you joined, did Mr. Combs have other personal assistants?
A. He did. He had one senior personal assistant named Tommy.
Q. That was Tommy?
A. That's correct.
Q. What about through your tenure, did Mr. Combs have other personal assistants?
A. Yeah. We went through a lot of personal assistants in those two years.
Q. Can you name a few?
A. Genevieve Robles was one, a gentleman named Hector, Mike Barber was another one.
Q. Did you interact with any of Mr. Combs' former assistants during your tenure?
A. I did.

MS. SLAVIK: Ms. Foster, could you please publish for the parties only what's marked for identification as Government Exhibit 2A-406.

the executive team, his security staff, let them know what time I would be back for tomorrow.
Q. So, generally speaking, what were your hours?
A. I would say 30 minutes before he woke up until he gave me that call time at night, and that could be anywhere from eight in the morning to four in the morning.
Q. And how many days per week were you on duty?
A. Depending upon the personal staff at the time, some days it would be six days a week, seven days a week. There were times I worked three weeks straight. When we had more executive staff, I worked sometimes five days a week.
Q. What was your salary, Mr. James?
A. I believe my starting salary was $70,000.
Q. Were you paid any overtime?
A. I was.
Q. How did you receive your salary?
A. Through a check from Bad Boy Entertainment.
Q. Bad Boy signed the checks?
A. That's correct.
Q. Focusing back on your responsibilities as Mr. Combs' personal assistant, were you responsible for advancing locations?
A. I was often responsible for advancing locations, yes.
Q. Can you explain to the jury what you mean by advancing locations?

A. Yeah.

So, to advance a location, you want to set up an environment so Mr. Combs feels comfortable. We would often have different riders depending upon the location. If it was, like, a green room at Oprah, for example, or if it was at a hotel, or if it was at a concert venue. We knew exactly what he wanted to have in the room. That was based off a rider I was provided

Q. Can you explain what a rider is?

A. A rider is a list of items that he would like to have in the hotel room.

Q. You mentioned that one of the locations that you were responsible for advancing was hotel rooms, is that right?

A. That's correct.

Q. Did hotel rooms have a specific rider for Mr. Combs?

A. They had a relatively unique rider, as opposed to a dressing room at Ellen DeGeneres, sure.

Q. Mr. James, when you worked as a personal assistant for Mr. Combs, where were you based?

A. Wherever he was. So, in New York City, I had an apartment or I rented out a room in a townhouse in the Upper West Side. When I was in Miami, I would stay inside of his house in Star Island. When we were in Los Angeles, I would also either stay in his home in Los Angeles or in a hotel room down the road.

Q. You just mentioned New York City, Miami, Los Angeles.

Did Mr. Combs have homes in all of those locations?
A. Yes, he did.
Q. Did you travel with Mr. Combs as well?
A. I did.
Q. How frequently?
A. Very frequently. We traveled quite a bit.
Q. You mentioned other staff members for Mr. Combs.
Do you remember that?
A. Yes.
Q. You mentioned security staff?
A. That's correct, yes.
Q. Who were the members of Mr. Combs' security staff when you were employed as a personal assistant?
A. His head of security was a gentleman named Uncle Paulie. We also had a gentleman named Roger Bonds. A gentleman named D-Roc. Big Tim. And Malik was his driver in New York City.
Q. Did all of these individuals work for Mr. Combs?
A. That was my understanding. Um, Uncle Paulie oversaw them. I understood they were being paid by Bad Boy.
Q. And you mentioned the hours that you worked, sometimes up to 20 hours a day, is that right?
A. That's correct.
Q. Was it your understanding that security staff worked those similar hours?
A. Absolutely. They would have to be there just as long.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
May 20, 2025
8:38 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

CEO, this chairman working as efficiently as possible, you yourself would have to work very, very hard as well, right?
A. Yeah. I'm not afraid to work hard.
Q. I have no doubt because you wanted to work there at a very, very busy time in Mr. Combs's lives and the lives of his businesses, correct?
A. That's correct.
Q. So you knew this was going to be very long hours, right?
A. I assumed, sure. I don't have an issue with the hours.
Q. So we're going to come back to some of this.
So I want to understand a little bit more, because you talked quite a bit about this yesterday and I have just a couple of followup things for you.
You traveled with Mr. Combs pretty regularly I think you said yesterday, right?
A. Absolutely.
Q. International travel, domestic travel?
A. That's correct.
Q. Do you remember where you went internationally, just a few places?
A. Ibiza, Saint Tropez, Morocco, London.
Q. Are these business trips or personal vacations?
A. That's a fine line to determine that, but I'd say these are more business-oriented trips.
Q. What made them business oriented?

A. Well, I guess in Saint Tropez he was there going on vacations, so I guess that isn't a business trip necessarily. I mean, everything -- but -- so, for example, you could call it a personal trip. We're in Saint Tropez on a yacht, and he flew in Estée Lauder on a helicopter to determine different fragrance notes for his fragrances. So Mr. Combs's lives blended daily through business and personal. It was kind of one consistent theme. Even if he's on vacation, he's always working.
Q. So tell me if this is right: The idea is he's in this beautiful place and he's bringing in his business contacts to this business place with him?
A. That's right.
Q. And that's part of how he did business, right?
A. Absolutely.
Q. And you and Mr. Combs and others went to many beautiful places?
A. Sure.
Q. I'm not trying to trick you.
A. Beautiful is I guess, you know --
Q. In the eye of the beholder, as they say?
A. That's right.
Q. And so domestically, where did you travel domestically? I imagine quite a bit.
A. So our major places we'd go to was Atlanta, Miami,

EXHIBIT

E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
June 3, 2025
8:45 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
Interim United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

4G171, 4G180, and 4G190, 4G191, 4G192 and 4G131 received in evidence)

MS. SLAVIK: With that, the government calls Derek Ferguson.

DEREK FERGUSON,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: Ms. Slavik, you may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q. Good morning, Mr. Ferguson.
A. Good morning.
Q. Mr. Ferguson, why are you testifying here today?
A. I received a subpoena.
Q. What does that subpoena obligate you to do here today?
A. Testify truthfully and honestly.

MS. SLAVIK: Ms. Gavin, could you publish what's in evidence as Government Exhibit 2A-101.

Q. Mr. Ferguson, do you recognize the individual in this photo?
A. Yes.
Q. Who is it?
A. Sean Combs.
Q. How do you know Mr. Combs?
A. I worked for Mr. Combs and his various companies from 1998

through 2017.
Q. How many different roles did you hold from 1998 until 2017?
A. Three roles: chief financial officer, chief growth officer and chief operating officer of one of the subsidiaries, Revolt Media and TV.
Q. Focusing on your CFO role, what company did you work for as CFO?
A. The company was Bad Boy Entertainment.
Q. And you said that your position was CFO?
A. CFO, yes.
Q. Can you explain to the jury what CFO stands for?
A. Chief financial officer.
Q. And at a high level, what does a CFO do?
A. Chief financial officer oversees all of the finances of a company, starting with financial budgeting for that company, understanding the inflows and the outflows of that company, arranges for any financing needs of the company, collects accounts receivable, pays accounts payable, is responsible for the accounting and recordkeeping.
In my role I also was responsible for managing some of the joint venture businesses, doing some of the deal making, whether it was joint ventures or partnerships or strategic relationships, divestitures.
Q. We'll get back to your role as CFO at Bad Boy, but first I just want to ask you a couple of questions about Bad Boy.

Can you explain what sort of company Bad Boy was?
A. Well, Bad Boy really was a collection of companies individually, either -- either individually held by Mr. Combs or joint ventures.
Q. Who owned Bad Boy?
A. Each company would have their own ownership. A number of the companies would be owned by Mr. Combs, and there were a few joint ventures.
Q. Did Bad Boy have offices?
A. Yes.
Q. Where were they?
A. During my tenure, New York City.
Q. Anywhere else during your tenure?
A. I think there may have been -- L.A. may have came about toward the end of my tenure.
Q. And can you just remind the jury when, what time period you were CFO for?
A. CFO 1998 through 2012.
Q. And during that time period, you said that there were offices in New York City?
A. Yes.
Q. Where exactly in New York City?
A. Three locations I remember: 1440 Broadway, 1540 Broadway and 1710 Broadway.
Q. Where did you work as CFO?

Q. You mentioned that Mr. Combs had assistants on staff as well, is that right?
A. Yes.
Q. Did you interact with those assistants?
A. Depending. Some of them, on occasion, yes.
Q. In what contexts?
A. Maybe a scheduling question or they may have a question for me.
Q. Were these assistants and security staff folks employed by Mr. Combs?
A. Yes.
Q. Were they paid by Mr. Combs's corporate entities?
A. Depends on who we're referring to, but many of them were.
Q. Are you aware of anyone who was not?
A. There would -- there could be, in this definition of assistant, people that worked just at the homes or were not related to business, which would not have been in the business entities.
Q. In other words, household staff?
A. I would say broadly, yes, household staff.
Q. OK. I want to talk a little bit more about Bad Boy, which you described as a collection of companies.
Do you remember that?
A. Yes.
Q. Was Mr. Combs the sole owner of any of these companies?

A. Yes.
Q. What does it mean to be the sole owner?
A. That means you own 100 percent of the company.
Q. Can you name a few of the companies that Mr. Combs solely owned?
A. Bad Boy Productions, Bad Boy Marketing, Bad Boy Films.
Q. What were those -- what was the purpose of those companies?
A. Pretty much follows the description.
So Bad Boy Productions would be a company that furnishes his services as a producer primarily.
Bad Boy Films was a television film company, which produced television and film projects.
Bad Boy Marketing was a marketing company that engaged with brands and provided marketing services to various brands.
Q. When you first started, what was Mr. Combs's level of involvement in these companies?
A. Well, he always drove the creative and product development and marketing for -- for all of the companies.
Q. Did that change over time?
A. That really didn't change.
Q. Did his day-to-day involvement change over time with respect to these companies?
A. It depends on which company you're referring to, but I would say, in general, as I mentioned, more management was hired, so there were more heads of companies that were engaged

to handle the day-to-day business.

Q. Was Mr. Combs involved in any business ventures that had partners?

A. Yes.

Q. Just briefly, what sort of partnerships was Mr. Combs involved in?

A. So, the record companies were partnerships in some cases. So the -- Bad Boy Records was a partnership between Bad Boy and Arista Records.

Warner Music was a joint venture between Warner and Bad Boy. And those, those would be two of the prominent joint ventures.

The clothing company, Sean John clothing, was -- also had a partner as well.

Q. How was the ownership structure different from the partnerships that you just described versus the solely owned companies that you talked about a second ago?

A. So, the ownership structure would be different in that there would be joint ownership in each case versus 100 percent ownership.

Q. In other words, Mr. Combs owned the venture with partners as opposed to just himself?

A. Yes.

Q. Now, you just described a couple of businesses and partnerships that Mr. Combs was involved in.

At a high level, what was your role with respect to these businesses and partnerships?

A. So, in some cases, maybe it actually started with, if it was a joint venture deal started with the deal itself and structuring that. But then it would, it would then, then go to the things I described previously, which would be budgeting, annual budgeting, tracking budget versus actual, try to make sure that we hit our numbers, hit our plan. It would be, you know, expense management; financing, if required; managing the financing of the company; and really just managing the results, the financial results of the company and also responsibility for accounting and recordkeeping.

Q. Were these businesses and partnerships profitable?

A. Majority of these businesses were profitable.

Q. And in terms of profits, are we talking millions, tens of millions? Give us a sense of the scale.

A. Depends on the company, but --

Q. Overall, how profitable were Mr. Combs's companies?

A. Overall, very profitable.

Q. How was Mr. Combs paid?

A. He was either paid -- couple ways. Paid via salaries in some cases and also distributions from his companies.

Q. Focusing on salaries, from what entities did Mr. Combs draw a salary?

A. I mean I remember them all, but you know, and this is

different during the course of my tenure. So at some point through -- excuse me. At some point through the record company, he drew a salary. Through the clothing line, Sean John clothing, he drew a salary at some point. I believe Revolt as well.

Q. And how was his salary determined by these companies?

A. Well, these companies I just mentioned are -- were all with partners, so they would have to be agreed upon with partners, probably, probably dictated by the operating agreement between the partners.

Q. And you mentioned that Mr. Combs was paid by distribution as well. What is a distribution?

A. Distribution -- so, when you have a solely owned company or a company that is what I would define as a pass-through entity, like an S corp. or an LLC, you -- your profits sit in that company until you decide to distribute them. So a distribution is taking profits that were earned and distributing them to the owners.

Q. And the owner in this case was Mr. Combs?

A. Yes.

Q. Who determined when Mr. Combs would receive a distribution?

A. In joint venture deals, that would be usually dictated by an operating agreement and -- or decided by the partners. And in his wholly owned companies, he could decide that on his own.

Q. And who determined the amount of the distribution?

A. The amount of the distribution would be based on the profits, so you generally would not distribute more than the profits of the company. So that would be -- the finance department would, would basically determine what numbers were, were the recommended numbers to distribute.

Q. I want to move to banking and finances.

Did the businesses and partnerships that we've just been talking about have bank accounts?

A. Yes.

Q. Did they all share one bank account?

A. No. They, they all had individual bank accounts.

Q. What was the purpose of each entity having its own bank account?

A. Pretty standard for each company to have their own account so you can track funds of that company, not have cross-liabilities between the companies. So a standard structure would be for each company, each entity to have their own bank account.

Q. Who oversaw these bank accounts?

A. The finance team would oversee the bank accounts.

Q. Who had access to the bank accounts?

A. Myself, Mr. Combs. Several members on the finance team would have certain levels of access as well.

Q. Who had signature authority?

A. Usually for the wholly owned companies, myself and

Mr. Combs.
Q. And can you just explain what signature authority means?
A. It meant that either of us would be able to sign checks on the account.
Q. Either of us being you or Mr. Combs?
A. Yes.
Q. Where did Bad Boy have banking relationships during your tenure?
A. It changed over time as well, but I would say three banks that come to mind are Citibank, HSBC, Signature Bank.

MS. SLAVIK: Focusing on Signature Bank, I want to walk through a couple of documents with you.

Ms. Gavin, could you please publish what's in evidence as Government Exhibit 4G-140.

Q. Mr. Ferguson, do you recognize this document?
A. Yes.
Q. What type of document is this?
A. This is a bank-opening document, bank application.
Q. And focusing on the top portion of this document, do you see the account title here?
A. Yes.
Q. What is it?
A. Janice Combs Music Inc.
Q. What is Janice Combs Music Inc.?
A. Was an entity, one of Mr. Combs's entities. This entity

pretty much furnished his name and likeness, was the primary use of this entity.
Q. And was this entity a partnership, or was it solely owned by Mr. Combs?
A. This, during my tenure, was 100 percent owned by Mr. Combs.
Q. What is the mailing address of this account?
A. 1710 Broadway.
Q. And is that one of the Bad Boy offices that you mentioned a moment ago?
A. Yes.
Q. Looking at section 1(a), what type of account is this?
A. This is a monogram business checking account.
Q. And focusing on section 4, towards the bottom of the page here, Mr. Ferguson, are these your initials in section 4?
A. Yes.
Q. Turning to page 2 in section 4(a), Mr. Ferguson, do you see this authorized signer section?
A. Yes.
Q. What is an authorized signer?
A. Those -- the signers, authorized signers are those who have signing authority on the bank account.
Q. In other words, those who have control over the bank account?
A. Signing authority, yes.
Q. Whose names do you see here?

A. Sean Combs. Derek Ferguson.
Q. And whose signatures do you see here?
A. Sean Combs and Derek Ferguson.
Q. What about the dates of those signatures?
A. 9/21/09.
MS. SLAVIK: Thank you.
Ms. Gavin, could you focus on section 5.
Q. Do you see the account number here, Mr. Ferguson?
A. Yes.
Q. Is that the number ending in 9635?
A. Yes.
MS. SLAVIK: Thank you.
You can take this down, Ms. Gavin.
Q. This Janice Combs Publishing account that we've just been speaking of, do you remember what this account was used for?
A. That was Janice Combs Music.
Q. So for business -- a business-related account for that company?
A. Sorry. You said Janice Combs Publishing. The account we just looked at was Janice Combs Music.
Q. I'm sorry.
A. Yes.
Q. For Janice Combs Music, what was that account that we just looked at, what was that account used for?
A. That account was used, primarily used as a, for providing

his name and likeness. So in deals where we provided his name and likeness, that entity would be used as the, as the source of that name and likeness.

Q. How was this bank account funded?

A. This bank account was self-funded in that the revenues exceeded the expenses so really didn't require funding.

Q. In other words, this was one of the profitable companies that you just mentioned a moment ago?

A. Yes.

MS. SLAVIK: Ms. Gavin, could you please publish what's in evidence as Government Exhibit 4G-131.

Q. And looking at section 1, Mr. Ferguson, do you see the account title of this document?

A. Yes.

Q. And again, this is another application for a bank account?

A. Yes.

Q. What is the account title for this account?

A. Combs Enterprises LLC.

Q. What is Combs Enterprises LLC?

A. It's an entity formed to do business -- yeah, just -- this is a business entity, yes.

Q. The mailing address for this account is also 1710 Broadway?

A. Yes.

Q. And looking at section 1(a) of this document, is this also a business checking account?

spending. So throughout my tenure, that changed a couple of times.

Q. So it varied from third party to internal management of Mr. Combs's finances, is that right?

A. Yes.

Q. When you were responsible for managing Mr. Combs's personal finances, just generally speaking, what did that entail?

A. It really entailed kind of similar, like, what was the plan for the year and managing kind of, like, an overall budget for the year and then managing budget versus actual throughout the year.

Q. Were you involved in managing Mr. Combs's properties?

A. I didn't manage the properties themselves, but -- but the inflows and outflows of the properties would be handled through the finance department.

Q. In other words, the financial management of these properties?

A. Yes.

Q. What properties did Mr. Combs own while you were CFO?

A. I'll do my best. Property, there was a property in the Hamptons; in New York City; Miami. I think -- Hamptons, yep. Those were ones during my tenure as CFO.

Q. And what was the ownership structure of the properties that Mr. Combs owned?

A. These properties were held in LLCs, corporations.

Q. What is the purpose of setting up the ownership structure in that way?
A. Well, for high-value properties, with celebrities, it's pretty common to use this type of structure for anonymity, for liability, for reduction and for some tax planning as well.
Q. So is this sort of ownership structure common, in your experience?
A. Yes.
Q. Were you involved in the financial management of Mr. Combs's properties?
A. Over, just understanding the ins and outs of the properties' spending, yes.
Q. What sort of -- what did that entail with respect to financially managing the properties?
A. Generally, it was -- there were kind of expected and known expenses that would be incurred throughout the year. So just, you know, making sure that those expenses were in line with what was expected. And if they got out of line, somebody on the team, you know, would identify that.
Q. Did you actually make payments for expenses?
A. Me personally, no, but the finance department would, yes.
Q. And what sort of payments did the finance department make with respect to Mr. Combs's properties?
A. Mortgage payments, where there was mortgages; you know, real estate taxes, maintenance, all of the standard expenses

EXHIBIT

F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
May 29, 2025
8:40 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

THE COURT: First, for the jury, you are about to hear from a witness testifying using a pseudonym. That is not using her real name. The government, the defense, the Court, and you, the jury, will know her real name, but the name will not be used in open court, solely to protect her privacy from disclosure to persons who are not parties to this case.

The fact that this witness is testifying using a pseudonym does mean that her testimony is deserving of greater or lesser weight than that of any other witness.

I will further remind everyone in this courtroom and in the overflow courtrooms that they are not to in any way, shape, or form document the witness in any notes or in any sketches or anything of that kind. The courtrooms will be monitored by court security. Any use of devices or any documenting of the witness' appearance or anything of that nature will result in severe consequences.

With that, Ms. Smyser.

MS. SMYSER: Thank you, your Honor.

MR. DONALDSON: Your Honor, may I grab that binder?

THE COURT: Yes, you may.

MIA,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Ms. Smyser, you may proceed when ready.

MS. SMYSER: Thank you, your Honor.

DIRECT EXAMINATION
BY MS. SMYSER:
Q. Good morning, Mia.
A. Good morning.
Q. Could you please state and spell the name under which you are testifying?
A. Mia, M-i-a.
Q. Mia, have you asked to testify under a pseudonym to protect your privacy?
A. Yes.
Q. I am going to show you what's been marked for identification as Government Exhibit 3T-113 just for the witness only.
THE COURT: Ms. Comey, is there an issue?
MS. COMEY: I just wanted to make sure that the screens in the overflow room are turned off for this exhibit, your Honor, only.
THE COURT: Can I ask the deputy, is there a way to confirm that?
THE DEPUTY CLERK: That is confirmed, your Honor, so long as the monitor is also disabled.
MS. COMEY: Thank you so much, your Honor.
THE COURT: Ms. Smyser.
MS. SMYSER: Thank you, your Honor.
Q. Do you see that Mia?

Q. What did you call him?
A. Puff.
Q. How do you know Mr. Combs?
A. I worked for him.
Q. When you worked for him, did Mr. Combs give you one title or more than one title?
A. More than one.
Q. How many?
A. Two.
Q. What were those two titles?
A. Personal assistant and then director of development and acquisitions for Revolt Films.
Q. We will discuss each of those roles in a moment, Mia.
But, first, at a high level, could you describe what the work environment was like when you were working for Mr. Combs.
A. It was chaotic, it was -- could be toxic, it could be exciting. The highs were really high and the lows were really, really low.
Q. What determined what the environment was like on a particular day?
A. Puff's mood.
Q. How often did Mr. Combs' mood shift?
A. All the time.
MS. SMYSER: You can take that down, Ms. Foster.

Q. Mia, was Mr. Combs ever violent toward you?
A. Yes.
Q. What are some of the violent things that Mr. Combs has done to you.
A. He has thrown things at me. He has thrown me against the wall. He has thrown me into a pool. He has thrown an ice bucket on my head. He has slammed my arm into a door. He has also sexually assaulted me.
Q. Did Mr. Combs sexually assault you on one occasion or more than one occasion?
A. More than one.
Q. We will talk about this violence in more detail later, Mia.
Before we get there, I want to talk a little about your work experience before getting a job with Mr. Combs.
What were your career goals when you left college?
A. I really loved storytelling and film and TV, especially comedy, and I really wanted to be a writer and a performer, but I didn't know how to do that because this was like a different era, before social media or iPhones or access.
So I thought I could just put a mattress on the top of my car and move to New York City and get a job somehow in the entertainment industry and work really, really, really hard, and maybe in like 10 years I would have had the education and experience to navigate that world to make whatever those dreams were come true.

Q. At some point did there come a time when you got a job in the entertainment industry?
A. Yes.
Q. Where was that for initially?
A. First was for Georgina Chapman, who was the owner and designer of Marchesa.
Q. Who were Georgina's Chapman's clients?
A. It was all like red-carpet celebrity dressing.
Q. Where did you work next?
A. I worked for the comedian Mike Myers.
Q. What did you do for Mike Myers.
A. I was his personal assistant.
Q. Who did you work for after Mike Myers?
A. Puff.
Q. Approximately when did you begin working for Mr. Combs?
A. 2009.
Q. In what year did you leave Mr. Combs' companies?
A. 2017.
Q. I want to talk some about when you first got the job with Mr. Combs. How old were you when you applied to work for him?
A. When I applied I was either 25 or just turned 26.
Q. Where were you living at the time?
A. In New York City.
Q. Where was Mr. Combs' business located then?
A. He was also in New York City.

Q. Could you please read this, Mia?
A. Every single day is different. PD can ask you to do 17,000 things at one time that range from cracking his knuckles, to writing his next movie, to doing his taxes. He can also just have you standing next to him for 22 hours and not ask you one thing.
MS. SMYSER: Okay. You can take down the exhibit, Ms. Foster.
Q. Mia, when you started working for -- as a personal assistant for Mr. Combs, did you have an apartment?
A. Yes.
Q. Where was that apartment?
A. It was in New York City.
Q. How often did you stay there when you worked for Mr. Combs?
A. Not very often. My roommates always made a joke that they lived with a ghost.
Q. Where were you staying if you weren't in your apartment?
A. Wherever Puff was.
Q. And what cities did Mr. Combs live when you were working for him?
A. Besides New York, he lived in Los Angeles and Miami.
Q. So focusing first on Los Angeles, where did you stay when you were in Los Angeles?
A. When I first started, I stayed in the staff house, and then I was moved into Puff's house at 9933 Beverly Grove.

Q. And focusing on Beverly Grove for a second, did Mr. Combs have that house before you started?
A. Yes.
Q. And approximately what years did Mr. Combs live in 9933 Beverly Grove when you were there?
A. I believe he moved in 2010.
Q. So 2009 and 2010?
A. Yes.
Q. And where did you live in LA after 9933 Beverly Grove?
A. Then into his second house, 9374 Beverly Crest Drive.
Q. What approximate years did Mr. Combs have that home?
A. I think it was 2010 until 2014 I think.
Q. Are you estimating?
A. Yes.
Q. At some point did you get your own apartment in Los Angeles?
A. Yes.
Q. Approximately when was that?
A. I believe it was 2013.
Q. And where did Mr. Combs move around 2014 when he moved out of the Beverly Crest house?
A. Then he moved to Mapleton.
Q. And what was the address there?
A. I believe it was 200 South Mapleton Drive.
Q. When Mr. Combs was in Miami, where would you stay?

rarely ever got to, like, run errands. I just felt like I was -- I just felt like I was bearing the brunt of everything and that I could never get like a -- I could never get like a free -- yeah, a free moment.
Q. So you felt like you had more responsibility?
A. Like a thousand times more.
Q. You mentioned that you sometimes got punished. What do you mean by that?
A. I guess there's a -- various ways of punishment. It was a lot of like getting cursed out and humiliated and berated, but also my intelligence insulted and my job threatened quite a bit.
Q. And who did those things?
A. Puff.
Q. We'll talk about them in more detail soon, but, first, I want to ask you about a few different people.
MS. SMYSER: Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-308.
Q. Do you recognize this person, Mia?
A. Yes.
Q. Who is it?
A. George Kaplan.
Q. And what was George Kaplan's role?
A. I believe he was the executive assistant to, at the beginning, I think to Brian Offutt, an executive. And then I

THE COURT: Are we ready to go, Ms. Smyser?

Let's bring Mia back.

(Jury present)

THE COURT: Ms. Smyser, you may proceed when ready.

MS. SMYSER: Thank you, your Honor.

BY MS. SMYSER:

Q. Mia, you testified earlier that Mr. Combs sexually assaulted you multiple times, is that right?

A. Yes.

Q. Did you ever want to engage in any sexual activity with Mr. Combs?

A. No.

Q. Over what period of time did the sexual assaults occur?

A. Over -- I am not sure of the years, but there was -- they were sporadic.

Q. Were they sporadic during your employment with Mr. Combs?

A. Yes.

Q. Where was Cassie when these sexual assaults occurred?

A. Not there.

Q. Did you tell her about them?

A. No.

Q. Where were you the first time you remember Mr. Combs sexually assaulting you?

A. At the Plaza Hotel in New York for his 40th birthday.

Q. For whose 40th birthday?

A. For Puff's 40th birthday.
Q. Why were you at the Plaza Hotel?
A. Because I was working.
Q. Were you Mr. Combs' personal assistant at the time?
A. Yes. I was very new.
Q. Approximately how long had you been working for Mr. Combs at this point in time?
A. Just a few months.
Q. How much of the hotel had Mr. Combs rented for his birthday party?
A. I believe it was the whole thing.
Q. Where was Mr. Combs physically located at the party?
A. He had like a penthouse suite, and then the downstairs of the hotel was where the main party was, so he was going back and forth between.
Q. Was there a time when Mr. Combs was in the penthouse?
A. Yes.
Q. Did there come a time when you went to the penthouse?
A. Yes.
Q. Why?
A. Because we had to stay within his eyesight and earshot.
Q. When both you and Mr. Combs were in the penthouse, who else was there?
A. A lot of people. Malcolm, whoever was working at the time, and then other party guests, celebrities.

Q. Was Cassie there?
A. No.
Q. What did Mr. Combs do when you were in the penthouse?
A. At some point he asked to speak to me in the kitchen.
Q. After he asked you to speak to you in the kitchen, what did he do?
A. I guess he had everybody else clear the room, leave.
Q. Did you end up going into the kitchen?
A. Yes.
Q. Who was in the kitchen with you and Mr. Combs?
A. Just us.
Q. What did Mr. Combs tell you in the kitchen?
A. He was saying that he noticed what a good job I was doing and that I didn't have to be nervous or scared to come to him, because at that time I was just going through Malcolm, the other assistant, to ask questions or -- I wasn't really like going direct to Puff. And he was saying that he had noticed I was doing a great job and that like -- sort of like we were going to be working closer together, so we should -- things like that.
Q. What, if anything, did Mr. Combs offer you when you were in the kitchen with him?
A. Then he poured us shots of vodka to cheers for his birthday.
Q. How many shots did he give you?

A. I think two.
Q. What did you do with the shots?
A. I took them.
Q. Had you been drinking earlier that night?
A. Not that I can recall, but, if so, like it wasn't affecting -- it wasn't like affecting me.
Q. How did these shots that you took with Mr. Combs make you feel?
A. I remember thinking like that, whoa, did I not eat or something because they affected me, like I felt like they hit me kind of hard.
Q. How did shots normally make you feel at this point in your life?
A. I was in my twenties in New York. Two shots would not have made me feel that way.
Q. What did Mr. Combs do after you took the shots?
A. He was still talking, like, and I just remember my back -- I was like standing against the wall, and I just remember he was talking and, all of a sudden, his face got closer. Like I remember my eyes couldn't like focus on his face because it was so close, and I didn't really know what was happening. And he put his arm next to my head up against the wall and like leaned in to like kiss me and put his other hand up the side of my dress.
Q. I just want to make sure I have this straight. Did

Mr. Combs kiss you at that point?
A. Yeah.
Q. Did you want Mr. Combs to kiss you?
A. No.
Q. Did Mr. Combs put his hand up your dress?
A. Yes.
Q. Did you want him to do that?
A. No.
Q. Were you able to tell Mr. Combs no in that moment?
A. No.
Q. Why not?
A. I was shocked and -- I was shocked, and I froze. I didn't even process what was happening.
Q. What is the next thing that you remember happening after Mr. Combs kissed you?
A. My next like memory is I just remember being on a chair like in the main room in the penthouse and like coming to the chair and the sun was coming up.
Q. When you came to, were you clothed?
A. Yes.
Q. Was anyone else around?
A. I don't really remember. In my memory, I don't see anyone.
Q. At this point in time, when Mr. Combs kissed you, what did you think about Mr. Combs' role?
A. He was my boss. He was a very powerful person. He was to

me like -- he is younger than my dad, but I looked at him like an older -- like adult. He was the boss or the king, very powerful person.
Q. Mia, earlier you said the next thing you remember is coming to on a chair in the penthouse. Do you remember how you got from the kitchen to the main penthouse?
A. No.
Q. What do you mean when you say like you came to?
A. That's just my next memory.
Q. What were your expectations about whether something like this would happen again?
A. I thought it would never happen again. I thought, oh, my gosh, he was so drunk, and I will never tell anybody. It was probably like a huge accident, and I was sort of like -- I knew the confidentiality, and I was just kind of like I didn't want that to -- I thought that he would have never remembered that and that it was a huge accident, and I was never going to -- I was going to act like nothing happened.
Q. Were there other times after this incident at the Plaza Hotel in which Mr. Combs made you feel uncomfortable sexually?
A. Yes.
Q. Approximately how long after his 40th birthday party was the next time you remember?
A. I don't know how long it was, but I remember still -- I remember how I felt as far as like I was still relatively new.

Q. How did this incident make you feel, Mia?
A. When he let me go, I felt like, OK, see, like he wasn't trying to do anything. That was just -- that is all in my head. That was just some silly joke that Uncle Paulie was saying. I felt crazy and felt safe again.
Q. Mia, you mentioned earlier that Mr. Combs sexually assaulted you on multiple occasions. Where were you the next time you remember Mr. Combs sexually assaulting you?
A. At his 9933 Beverly Grove Drive.
Q. That's a house in Los Angeles?
A. Yes.
Q. And he was in that house approximately 2009 to 2010, from what you remember?
A. Yes.
Q. Where were you in the Beverly Grove house?
A. The room I stayed in was upstairs in a room with bunk beds, so I was asleep on the bottom bunk bed.
Q. Did you lock the door to your room?
A. No.
Q. Remind the jury why not.
MR. STEEL: Objection.
THE COURT: It's overruled.
Q. Why didn't you lock the door to your room, Mia?
A. Because I wasn't allowed to. That was his house and you can't lock his doors.

Q. And who did not allow to you look your door?
A. Puff.
Q. Did there come a time a point in time when you woke up?
A. Yes.
Q. What caused you to wake up?
A. The weight of a person on top of me.
Q. Who was on top of you?
A. Puff.
Q. What do you remember happening when Mr. Combs was on top of you?
A. I remember -- I remember it was sort of like him telling you that, somehow, be quiet and using -- this just happened so fast. Using like one hand to get -- I guess his hands or whatever off.
Q. What did he do when he used that hand to get his hands undone?
A. He -- he put -- he put his -- he put himself inside of me.
Q. So you said he put himself inside of you, is that right?
A. Yes.
Q. Do you mean that he put his penis inside of you?
A. Um-hum, yes.
Q. How did you react when that happened?
A. I just froze. I didn't react.
Q. How did you feel?
A. Terrified and confused and ashamed and scared.

Q. Did you want to have sex with Mr. Combs?
A. No.
Q. How long was this assault?
A. It was very quick but felt like forever.
Q. How did it end?
A. I don't remember, but I know that he didn't -- that he didn't like leave the job unfinished, so --
Q. He wouldn't leave a job unfinished?
A. Yeah. Whenever he was done or satisfied or got what he want.
Q. Is that when it would end?
A. Yes.
Q. Mia, where were you the next time you remember Mr. Combs sexually assaulting you?
A. I was at the 9374 Beverly Crest house.
Q. What were you doing at the Beverly Crest house?
A. I was -- we were like getting him ready to go to like a meeting or run out of the house, so I was on his bedroom closet floor, like putting stuff in a bag.
Q. Who was in the bedroom closet with you?
A. I thought nobody or people were always in and out, like running around. But then Puff --
Q. Did there come a point in time when Mr. Combs came into the closet?
A. Yes.

Q. What did Mr. Combs do when he got into the closet?
A. I wasn't paying attention. It was going so fast. But the next thing, I looked up, and he was like standing right in front of me, in front of my face.
Q. And what happened when Mr. Combs was standing right in front of your face?
A. He had -- he had his -- he had his -- he had his penis out, and he like grabbed my head and -- and put it in -- and put it in there.
Q. So Mr. Combs took his penis out, is that right?
A. Yes.
Q. And did he grab your head and pull it toward him?
A. Yes.
Q. Did he put his penis in your mouth?
A. Yes.
Q. How did you react when that happened?
A. I was just -- just froze and -- I didn't do anything. I just let it happen.
Q. How did you feel when Mr. Combs put his penis in your mouth?
A. Like trash and scared and ashamed and defeated and like an idiot.
Q. Did you want to give Mr. Combs oral sex?
A. No.
Q. And how long did this last?

A. It was very fast, really fast.
Q. Mia, other than what we have described so far, were there any other times in which Mr. Combs sexually assaulted you?
A. Yes.
Q. Sitting here today, do you remember the details of those assaults?
A. No.
Q. What generally do you remember?
A. I just remember a feeling, like a specific horrible dark like feeling in my stomach that I would get surrounding like certain like places, but I don't remember.
Q. Can you describe an example of a memory you have with that kind of dark feeling?
A. I remember one time we were flying on a private jet and everyone was asleep, our team was asleep, and in the back between the main like area and the bathroom there was a separate place where there was a bed that he would get to sleep. And it was normal if you had to go to the bathroom you just walked through there and it was -- yeah, everyone was asleep. I went to the bathroom and I remember, when I opened the door, that he was standing right there and like basically was trying to push me back inside, which I don't remember what happened.
Q. Do you remember getting pushed back into the bathroom?
A. Yeah. I remember trying to like -- trying to squiggle out

A. She was not there.
Q. Did Mr. Combs have any other girlfriends?
A. Yes.
Q. Where were they in these instances?
A. Not there.
Q. Were you able to predict when the sexual assaults would happen?
A. Never. Never. There was no -- they were always random, sporadic. It would go so oddly spaced out where I would never think that it would happen again. And the way that our dynamic was, I was constantly -- there were no boundaries, so it wasn't like it wasn't weird for me to be in his room at all hours of the night or waking him up or talking to him while he's on the toilet, and it never happened in situations that would be like that or when -- like during a party. It never, no.
Q. After an assault, what was your expectation about whether Mr. Combs would ever engage in sexual contact with you again?
A. I always thought like that it was the last time and that the next time I would -- if there ever a next time I would somehow be more prepared. We would have to get right back into work, and there was so much going on, I never processed it. I never thought it would happen again.
Q. What would you do after the sexual assaults occurred?
A. Just keep it moving. Like keep right back to whatever I was doing right before, which was always an insane amount of

A. He didn't -- but he did threaten me sometimes with them.
Q. And how would he threaten you with them?
A. He threatened that he was going to tell everybody, and he was going to telecast as though I had something to do with it.
Q. As if you had something to do with it?
A. Yes.
Q. How did that make you feel when he threatened to tell everyone?
A. Like desperate and terrified and happened and the worst scariest situation. I would have done like anything to not have it happen, like it was my fault.
Q. Mia, when Mr. Combs was sexually assaulting you, did you tell anyone about it?
A. No.
Q. Why not?
A. I was going to die with this -- I didn't want anyone to know ever.
Q. What, if anything, were you worried would happen if you spoke up?
A. I would have been silenced. I would have been punished. I would have been exiled from my like second family. I would have had a horrible reputation. I would have lost everything.
Q. Who did you think would do those things to you?
A. Puff and anybody he involved.
Q. Why did you not tell HR or chiefs of staff about the sexual

assaults?
A. HR was only around when Puff wanted to call HR to punish you. HR was not there to protect you, but also who is going to believe me. And this was way before me too. This is way before social media or mental like help awareness or sexual assault, way before any of this. I didn't have like a -- I didn't have like a -- I just thought I would be punished. There is no way I ever told them. Plus, this confidentiality.
Q. Who instilled confidentiality in you?
A. Puff and the office.
Q. When you are working for Mr. Combs, Mia, were there ever time that you saw other employees speak up about Mr. Combs' abuse?
A. Yes.
Q. Who spoke up?
A. Kala Faulkner.
Q. Remind us who Kala is.
A. Kala was an assistant.
Q. Is this the same Kala Mr. Combs directed you to reach out to after he slammed Cassie's head into the bed frame?
A. Yes.
Q. Did Kala speak up before or after that incident?
A. After.
Q. How did you learn that Kala had spoken up about Mr. Combs?
A. I was told. There was like an urgent phone call among

EXHIBIT

G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
June 5, 2025
10:40 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
Interim United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

greater or lesser weight than that of any other witness.

With that, Ms. Comey, we'll bring the witness in.

MS. COMEY: Thank you.

And while she's coming in, could I please ask your deputy to confirm that the exhibit screens in the overflow have been turned off and that the public screen in this courtroom has also been turned off?

THE DEPUTY CLERK: Confirmed. I cannot see the monitor from here, but I'm sure it has happened as well.

MS. COMEY: Thank you very much.

JANE,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: Ms. Comey, you may proceed when ready.

MS. COMEY: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. COMEY:

Q. Would you please state and spell the first name under which you are currently testifying?

A. Jane, J-A-N-E.

Q. Good afternoon, Jane.

A. Good afternoon.

Q. Have you asked to testify here today under a pseudonym to protect your privacy?

A. Yes.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
June 6, 2025
8:40 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
Interim United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

THE COURT: Everyone may be seated.

Let's bring Jane back.

(Jury present)

THE COURT: Please be seated.

Ms. Comey, you may proceed when ready.

MS. COMEY: Thank you, your Honor.

Q. Jane, during any hotel nights you did with Sean, did Sean ever run out of drugs?

A. Yes.

Q. About how many times do you remember Sean running out of drugs during one of these hotel nights?

A. Various times.

Q. Each time he ran out, did you see the same thing happen or a different thing happen -- each time?

A. Different things --

Q. OK.

A. -- happened.

Q. Let's talk about the first time this happened.

The first time that Sean ran out of drugs during one of these hotel nights, do you remember about when that was?

A. Maybe early on in the relationship.

Q. What do you remember happening when Sean ran out of drugs?

A. He would call one of the assistants or butlers to grab more.

Q. So let's break that down.

Who did you see Sean call?
A. It varied between an assistant or security.
Q. And when you say it varied, do you mean across different hotel nights over the course of your relationship?
A. Yes.
Q. And let's start with the assistants.
What are the names of some of the assistants you remember Sean calling when he ran out of drugs during hotel nights?
A. I remember Brendan, Frank. There's so many of them. John. A few others.
Q. OK. Are the others not coming to mind right now?
A. Yes.
Q. But were there others?
A. Yes.
MS. COMEY: I'd like to show you what's been marked for identification as Government Exhibit 2A-313.
Ms. Gavin, would you please show that to the witness.
Q. Do you recognize that?
A. Yes.
Q. What is it?
A. It's a photo of Brendan.
Q. Which Brendan?
A. Sean's assistant.
MS. COMEY: Your Honor, the government offers this in evidence.

MS. GERAGOS: No objection.

THE COURT: All right. 2A-313 will be admitted.

(Government Exhibit 2A-313 received in evidence)

BY MS. COMEY:

Q. About how many times do you remember Sean calling Brendan when he ran out of drugs in these hotel rooms?

A. Various times.

Q. Multiple times?

A. Yes.

Q. And after each time Sean called Brendan, what did you see happen in the hotel room a short time later?

A. Brendan would have the drugs.

Q. Did Brendan come to the hotel room door?

A. Yes.

Q. And then what did you see Brendan had?

A. The drugs.

Q. And what drugs do you remember Brendan bringing to the hotel room?

A. I remember there would be, like, pill bottles, which are probably, like, ecstasy.

Q. I don't want you to guess.

So there would be pill bottles, and then after the pill bottles, what would you see in the hotel room?

A. Drugs.

Q. What kinds of drugs?

A. Ecstasy, coke, milk, which is like weed.

MS. COMEY: You can take that down. Thank you, Ms. Gavin.

Q. And then you mentioned security.

Who from security do you remember Sean calling when he ran out of drugs in these hotel rooms?

MS. GERAGOS: Objection. Time period, Judge.

THE COURT: Some more specificity on the time frame.

MS. COMEY: Certainly.

Q. Jane, you mentioned security.

When approximately do you remember Sean calling security when he ran out of drugs?

A. Maybe in the middle of our relationship, towards the end.

Q. Was that around 2023, approximately?

A. Yes.

Q. And who from security do you remember Sean calling around that time when he ran out of drugs in hotel rooms?

A. I remember hearing Faheem or J9.

Q. Do you know who Faheem is?

A. He's Sean's security.

MS. COMEY: Ms. Gavin, would you please pull up what's been marked for identification as Government Exhibit 2A-203.

Is this already in, Ms. Gavin?

This is already in evidence, so we can show that to the jury.

Q. Do you recognize the person in that photograph?
A. Yes.
Q. Who is that?
A. Faheem.
Q. Did you ever hear Sean call him any other names?
A. Maybe Fah.
Q. Fah, like F-A-H?
A. Yes.
Q. About how many times do you remember Sean calling Faheem in 2023 when he ran out of drugs in hotel rooms?
A. Maybe just a couple times or so.
Q. And after each time you saw Sean call Faheem, what happened a short time later in the hotel rooms?
MS. GERAGOS: Objection.
THE COURT: That's overruled.
A. Then drugs would appear.
Q. Well, who did you see come to the hotel?
A. Sometimes it was Faheem or J9 or assistants.
Q. And after one of those people came to the hotel room, what, if anything, would you see Sean had?
A. Drugs.
Q. What kind of drugs?
A. Ecstasy, molly, cocaine.
Q. Other than his own --
MS. COMEY: We can take that down, Ms. Gavin. Thank

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
June 9, 2025
8:40 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
Interim United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

(Witness present; jury present)

THE COURT: Please be seated.

Welcome back, members of the jury.

Before the break, there was an Instagram video played. Then there were a few questions asked after the video was played. You are to disregard those questions and the answers given to those questions.

With that, Ms. Comey, you may continue

MS. COMEY: Thank you, your Honor. I'm going to play the video one more time if it's all right. That's Government Exhibit 9 A-102.

(Videotape played)

Q. Again, when you saw that video on Instagram in May of 2023, what did you understand Sean was referring to throughout that video?

A. I understood take was referring to the hotel footage of him assaulting Cassie.

Q. And, Jane, what was the next time you saw Sean in person after you watched this video where he said he committed to be a better man?

A. I saw him in June.

Q. Do you remember the date?

A. June 18.

Q. 2024?

A. Yes.

Q. How do you remember that date specifically?
A. Because it was a very terrible day.
Q. I want to talk about that day now, okay?
A. Yes.
Q. Where did you see Sean on June 18, 2024?
A. I saw him at our residence in Los Angeles.
Q. Your home where he pays the rent?
A. Yes.
Q. What was the plan for you and Sean to do that night?
A. It was just for us to spend time together and see each other, and just have kind of like a date night but in the house.
Q. Where, if anywhere, had Sean told you he was coming to or coming from when he got to Los Angeles?
A. I believe he was on a family trip in Utah.
Q. Do you remember who, if anyone, came with Sean to your home to help set up for that night?
A. I believe it was Jonathan.
Q. Who's Jonathan?
A. One of Sean's assistants.
MS. COMEY: Ms. Becker, would you please pull up what's been marked for identification as Government Exhibit 2A-314 just for the witness and the parties.
Q. Jane, do you recognize the person in that photograph?
A. Yes.

Q. Who's that?
A. That's Jonathan.
Q. How do you know him?
A. I know him through Sean as Sean's assistant.
MS. COMEY: Your Honor, the government offers this Exhibit in objection.
MS. GERAGOS: No objection.
THE COURT: 2A-314 will be admitted (.
(Government's Exhibit 2A-314 received in evidence)
Q. What you do you remember Jonathan doing at your home on June 18, 2024?
A. I remember Jonathan came in and helped me stock up the fridge and put some candles around the house, and decorate the home with red lights and bringing in Sean's belongings and just kind of helping me make the environment cozy.
Q. From your perspective, was the plan to have an entertainer come over that night, or no?
A. No.
MS. COMEY: Can we take that down Ms. Becker, please.
Q. Jane, what did you wear for this night with Sean at your own home?
A. I wore a long brown dress.
MS. COMEY: Can we please pull up what's in evidence as Government Exhibit E-248.
Q. What's this, Jane?

EXHIBIT

H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
May 13, 2025
9:00 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

(Jury present)

THE COURT: Please be seated.

Is the government ready to call their next witness?

MS. JOHNSON: Yes, your Honor.

The government calls Casandra Ventura.

THE COURT: All right.

THE DEPUTY CLERK: Remain standing and please raise your right hand.

CASANDRA VENTURA,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Ms. Johnson.

MS. JOHNSON: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. JOHNSON:

Q. Good morning, Ms. Ventura.

A. Good morning.

Q. Just so you know, you can drink that water that's on the stand.

A. Oh, thank you.

Q. How old are you?

A. I am 38 years old.

Q. What is your occupation?

A. I'm a musician, an entertainer.

MS. JOHNSON: Ms. Gavin, could you please publish

Government Exhibit 2A-101 in evidence for all the parties in the courtroom.

Q. Ms. Ventura, who is depicted in Government Exhibit 2A-101?

A. Sean Combs.

Q. How do you know Sean Combs?

A. We were in a relationship for a little over 11 -- 10 years, 11 years.

Q. If I refer to Sean Combs as Sean today, will you know what I'm talking about?

A. Yes.

Q. You said you were in a relationship with Sean for a little over a decade.

During that period, were you together consistently or were there breaks during the relationship?

A. There were breaks.

Q. During that same time, were there times where you got along well with Sean?

A. Yes.

Q. Were there times where you did not?

A. Yes.

Q. Were there times when you had arguments with Sean?

A. Yes.

Q. Without getting into the subject matter of those arguments, can you describe what arguments with Sean were like?

A. If they were violent arguments, um, it would usually result

in some sort of physical abuse, um, and dragging, just different things of that nature.
Q. When you say physical abuse, can you tell me what types of things that Sean did that hurt you physically?
A. I mean, he would mash me in my head, knock me over, um, drag me, kick me, um, stomp me in the head, if I was down.
Q. How frequently was Sean physical with you during your relationship?
A. Too frequently.
Q. Were you ever injured as a result of these incidents?
A. Yes.
Q. What kind of injuries did you have as a result of Sean being physical with you?
A. Usually pretty similar. Um, I would get knots in my forehead, busted lips, swollen lips, black eyes, the whites of my eyes would be red, um, bruises all over my body, um, just depending.

MS. JOHNSON: OK. Ms. Gavin, could you please pull up and publish for the courtroom, Government Exhibit 10C-103 at 33 seconds.
Q. Ms. Ventura, directing your attention to the screen in front of you, do you recognize who's depicted in that still image?
A. Yes, that's me and Sean.
Q. Do you recognize the location recorded in this still image?

was, like, early on in LA. I just took it out. And then he made a suggestion that I do both, so the next week I went and did both. Yeah.

Q. When you say he made a suggestion that you do both, who is he?

A. Sean.

Q. And what does both refer to?

A. Both nipples.

Q. Did you want to pierce both nipples?

A. At the time, I think I did. I took it -- I took the initial one out because of the pain, um, but I thought it looked cool.

Q. And you mentioned a hood piercing?

A. Um-hmm.

Q. What's that?

A. Um, it's a piercing that, like, basically sits on your clitoris.

Q. And when did you get that piercing?

A. I got that shortly after the nipple piercings.

Q. Why did you get that piercing?

A. Sean's suggestion. He actually came with me. Yeah.

Q. Earlier you testified that the first freak-off was at Sean's house.

Do you remember that testimony?

A. Yes.

Q. Were there any other freak-offs at his house?
A. Yeah, there were others.
Q. Which of his homes did you have freak-offs in?
A. Um, I would say mostly all of them, except for Mapleton.
Q. Does that include his home in Miami?
A. Yes.
Q. Does that include his apartment in New York City?
A. Yep.
Q. And besides his home, what, if any, other homes did you have freak-offs at?
A. In my apartments, my homes.
Q. Which of your homes did you have freak-offs at?
A. I think all of them, except for the Studio City house.
Q. So does that include the West End address in New York?
A. Yes.
Q. Does that include 818 Doheny?
A. Yes.
Q. And does that include 875 Comstock?
A. Yep.
Q. And besides homes and apartments, at what other locations did freak-offs occur?
A. Hotels, mostly.
Q. And in what cities did you have freak-offs with Sean and a male escort?
A. New York, Miami, Los Angeles, Atlanta, um, Ibiza, Spain,

Turks and Caicos. Random places.
Q. What about Las Vegas?
A. Vegas, as well.
Q. So, going through, you mentioned New York City.
What are some of the hotels that you had freak-offs at in New York?
A. New York would be the London, Trump Hotel, Gramercy. Honestly, you name it, we probably did it there.
Q. What about the InterContinental Hotel?
A. 44th Street, yep.
Q. In LA, what are some of the hotels where you had freak-offs?
A. Um, L'Ermitage was frequent, Beverly Hills Hotel. The London there, as well. Um, Shutters on the Beach, you know, there's --
Where else? Other places.
Q. What about the InterContinental in LA?
A. Century City.
Thank you. Yeah.
Q. And in Miami, what are some of the hotels where you had freak-offs?
A. Um, Mandarin Oriental, Satei, Fountainbleu, the 1 Hotel. Yeah.
Q. What types of rooms were freak-offs usually held in?
A. They were usually held in, like, a room that had, like, a

living room that you could close the door or, like, an extra room with an additional bathroom so, like, a small suite, junior suite.
Q. Who, if you know, booked the hotel rooms?
A. It varied. Sometimes it was someone like Tony Fletcher on staff. Occasionally, I would book hotel rooms. Yeah.
Q. Who, if you know, paid for the hotel rooms?
A. I believe Sean paid for the hotel rooms.
Q. What are some of the names that were used on hotel reservations?
A. Um, Jackie Star was the name that I used. Um, Frank Black, Frank White. There was all types of names.
Q. Turning to Jackie Star, why did you use the name Jackie Star?
A. Um, that was a name that -- um, I don't know who came up with it, if it was him or me, um, that I used to actually book dancers. So I would use that name instead of my own name and then just started using it as a hotel room name.
Q. And you also mentioned Frank White and Frank Black?
A. Um-hmm.
Q. Whose aliases were Frank White or Frank Black?
A. They were Sean's.
Q. What, if any, supplies were needed for freak-offs?
A. Main supplies were baby oil, Astroglide, as lubricants, and condoms.

Q. Who typically brought the supplies to the freak-offs?
A. More often than not it was staff. The room was usually stocked by the time we got there. If not, if it were a last-minute situation and I set it up, I would get things or sometimes Sean would bring them.
Q. When you say staff, whose staff are you referring to?
A. Sean's staff.
Q. Which positions on Sean's staff would be tasked with stocking the hotel rooms?
A. Assistants, security.
Q. You mentioned baby oil.
What brand of baby oil was used?
A. Johnson's baby oil.
Q. How was the baby oil used during the freak-off?
A. It was -- it was just as important as everything else, as being there. We used it quite a bit.
Q. Where was it -- where was the baby oil placed?
A. We poured it all over our bodies. Had to be glistening. Yeah.
Q. Which participants in the freak-off, if any, used the baby oil?
A. Everyone.
Q. Would that include you?
A. Yes.
Q. Does that include the escort?

(In open court)

THE COURT: Ms. Johnson, you may proceed.

MS. JOHNSON: Thank you, your Honor.

Q. When we were just talking about Astroglide, how was the Astroglide used at freak-offs?

A. As a lubricant.

Q. With respect to these two supplies, baby oil or Astroglide, were there times when you ran out of them?

A. Yes.

Q. What would happen when you ran out?

A. When we would run out, would have to either call somebody, staff to bring it or ask the bell desk and give them a tip.

Q. When you say staff, whose staff are you talking about?

A. Sean's staff.

Q. Which members of Sean's staff would resupply the hotel rooms?

A. Assistants usually.

Q. Who would call those staff members?

A. Sean would advise me to or he would call himself.

Q. And you also mentioned calling the bell desk. Who would call the bell desk?

A. Again, either me or him.

Q. If you called, at whose direction would you be calling?

A. Sean's.

Q. Initially, what kind of lighting was used for freak-offs?

EXHIBIT

I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 24 Cr. 542 (AS)

SEAN COMBS,
a/k/a "Puff Daddy,"
a/k/a "P. Diddy,"
a/k/a "Diddy,"
a/k/a "PD,"
a/k/a "Love,"

Defendant. Trial
------------------------------x

New York, N.Y.
June 13, 2025
8:30 a.m.

Before:

HON. ARUN SUBRAMANIAN,

District Judge
-and a Jury-

APPEARANCES

JAY CLAYTON
Interim United States Attorney for the
Southern District of New York
BY: MADISON R. SMYSER
EMILY A. JOHNSON
MAURENE R. COMEY
MEREDITH FOSTER
MITZI STEINER
MARY C. SLAVIK
Assistant United States Attorneys

THE COURT: Are we ready to proceed, Ms. Smyser?

MS. SMYSER: Yes, your Honor.

THE COURT: Let's get our jury and then we will call the next witness.

(Jury present)

THE COURT: The government may call its next witness.

MS. SMYSER: The government calls Jonathan Perez.

JONATHAN PEREZ,

called as a witness by the Government,

having been duly sworn, testified as follows:

DEPUTY CLERK: Mr. Perez, can I ask you to give your first and last name to the Court and spell your first and last name.

THE WITNESS: Jonathan Perez, J-O-N-A-T-H-A-N; P-E-R-E-Z.

DIRECT EXAMINATION

BY MS. SMYSER:

Q. Good morning, Mr. Perez.

A. Good morning.

Q. How old are you?

A. 35.

Q. Where are you from?

A. Fort Lauderdale, Florida.

Q. How far did you go in school?

A. Bachelor's in communications.

Q. I want to direct your attention to the end of 2021. Were you working around that time?
A. Yes.
Q. Where were you working?
A. I started working for Combs Entertainment.
Q. Combs Entertainment or Combs Enterprises?
A. Combs Enterprises.
Q. Would you mind just pulling the mic closer to you?
When you were at Combs Enterprise, did the company ever change its name?
A. To Combs Global.
Q. What was your role at Combs Enterprises or Combs Global?
A. Personal assistant.
Q. Whose personal assistant were you?
A. Mr. Combs.
MS. SMYSER: Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-101.
Q. Mr. Perez, on the screen in front of you, do you recognize the person who's depicted here?
A. Yes.
Q. Who is that?
A. Mr. Combs.
Q. Do you know Mr. Combs by any other names?
A. Diddy, P.Diddy, Mr. C, Love.
Q. What did you call him?

A. Mr. Combs or Mr. C.

MS. SMYSER: You can take that down, Ms. Foster.

Q. Mr. Perez, when did you start working for Mr. Combs?

A. December 2021.

Q. Do you still work for him?

A. No.

Q. When did you stop?

A. September 2024.

Q. How did you first learn about the job opening as Mr. Combs' assistant?

A. KK reached out to me.

Q. Who is KK?

A. Kristina Khorram.

Q. What's Ms. Khorram's title?

A. Chief of staff.

Q. How did you know Ms. Khorram when she reached out?

A. I had interviewed with her a few years prior for the same role.

Q. And did you get or take a job at that time?

A. No.

Q. Okay. Mr. Perez, next I want to show you what's in evidence as Government Exhibit A-301. Do you recognize this person?

A. Yes.

Q. Who is that?

where he needed to be in terms of making sure he was at the meetings, making sure he had any materials to be prepped for his meetings, his buying, packing, organizing, working closely with the house managers to make sure the homes had everything they need.

Q. When you were working as a personal assistant, where were you physically working?

A. Between his homes and LA and Miami.

Q. Where did Mr. Combs live in LA?

A. 200 South Mapleton.

Q. What about in Miami?

A. 1- and 2 Star Island.

Q. Mr. Perez, what was your salary when you were a personal assistant?

A. I started making 85,000 a year and ended making a hundred.

Q. How often were you paid?

A. Biweekly.

Q. What entity paid you when you were a personal assistant?

A. Combs Enterprises and Combs Global.

Q. Who was your direct supervisor when you were a personal assistant?

A. KK.

Q. And you said she was chief of staff, right?

A. Correct.

Q. How often about, if at all, did you see Ms. Khorram

Q. What did you understand the term king night to mean?
A. I understood it to be Mr. Combs going to a hotel to have private time with a female.
Q. I want to show you a document, Mr. Perez. Could you just look in the binder that's to your left, the one closest to you. If you open it up, there's a picture in the front left. Do you see that?
A. Yes.
Q. That's marked as Government Exhibit A-402, which is an exhibit that's in evidence under seal.
Mr. Perez, I'm going to refer to the person in this photograph as Jane, and I ask you to do the same, okay?
A. Okay.
Q. Do you recognize Jane?
A. Yes.
Q. How do you recognize her?
A. As being one of Mr. Combs' guests.
Q. When you say "guest," what do you mean?
A. Like a female friend, companion. I'm not sure exactly how --
Q. Was Jane with Mr. Combs for any king nights when you were there?
A. Yes.
Q. How would you typically learn that Mr. Combs was going to have a king night?

A. Through KK or one of the assistants.

Q. How much notice would you generally get from Ms. Khorram or other assistants about a king night?

A. Anywhere from two hours to a full day.

Q. At a high level, what were personal assistants required to do for king nights?

A. There was a lot of packing materials, making sure that he was going to have everything he would need for 12 to 24 hours without having to bother anybody: So drinks, food. We would bring liquor, music, lights, and other personal items.

Q. We'll talk about some of those items in a bit. But where did these king nights typically take place?

A. In hotels.

Q. And who would book the hotel rooms?

A. Our travel manager.

Q. What was her name?

A. Jessica Ruiz.

Q. How did you know Jessica Ruiz was the one who helped book hotels?

A. From being in contact with her.

Q. Did you ever talk with her about hotel nights?

A. In what regard?

Q. About the rooms used for hotel nights?

A. About the rooms, yes.

Q. Was Jessica saved in your phone?

A. Yes.
Q. What was her contact in your phone?
A. I believe it was Jess Travel.
Q. Were there times when king nights were not in hotel rooms?
A. Yes.
Q. Where did they occur when they weren't in hotel rooms?
A. At a guest's home.
Q. Were there any at Jane's home?
A. Yes.
Q. Which assistants were primarily responsible for helping with king nights when you were there?
A. Typically whatever assistant was working in the evening.
Q. And were there assistants who typically helped in the evenings?
A. Joey or Frank.
Q. Were there ever times when you set up king rooms yourself?
A. Yes.
Q. Approximately how many times?
A. I can't give you an exact number, but somewhere around five.
Q. And why were you not involved with setting up king nights more often?
A. I typically worked during the day.
Q. When you set up hotel rooms, what kind of items did you bring to the hotel room?

A. Food, liquor, other beverages, a change of clothes, lights, music, and other personal items.
Q. What kinds of personal items would you bring?
A. Like condoms and lube.
Q. Did you ever include honey in your setup for king nights?
A. Yes.
Q. What was your understanding of what that was used for?
A. The honey like enhances a man's libido.
Q. I want to show you what's in evidence as Government Exhibit 1B-265?
A. Okay.
Q. Do you recognize what's in this photo?
A. Yes.
Q. What is it?
A. Honey.
Q. Is it the same honey that you would use for king nights?
A. Yes.
MS. SMYSER: You can take that down.
Q. Mr. Perez, you mentioned bringing lights to these hotel rooms. What kinds of lights did you bring?
A. Like small uplights.
Q. Were those lights set to a particular color?
A. They were usually set to red, but they could change colors.
Q. Where would you get the items that you needed to set up a king night at a hotel?

A. Typically from the house.
Q. And if they weren't in the house, where would you purchase them?
A. Stores, like regular stores like Target, Walgreens, CVS or on Amazon.
Q. Were there any other stores that you went to in order to purchase these kinds of items?
A. No.
Q. Did you ever go to sex stores?
A. Yes.
Q. Who told you to go to those sex stores?
A. Either Mr. Combs or a guest.
Q. And what, if anything, would you purchase there?
A. Like adult outfits and shoes.
Q. What kinds of shoes?
A. High heels.
Q. And how would you pay for the items that you purchased for king nights?
A. Either on my company card or cash.
Q. Where would you get the cash to purchase these items?
A. Typically from security.

MS. SMYSER: Ms. Foster, could you please pull up what has been marked for identification as Government Exhibit A-205.

Q. Do you recognize this, Mr. Perez?
A. Yes.